# 24-2092

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,

*Plaintiff-Appellant,*

—against—

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, In His Official Capacity as Secretary of Health and Human Services, CENTERS FOR MEDICARE AND MEDICAID SERVICES, CHIQUITA BROOKS-LASURE, In Her Official Capacity as Administrator of Centers for Medicare and Medicaid Services,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
NO. 23-CV-01103, HON. MICHAEL P. SHEA

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

ROBERT A. LONG, JR.
KEVIN F. KING
THOMAS R. BRUGATO
BRADLEY E. ERVIN
MICHAEL M. MAYA
MAKADE C. CLAYPOOL
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Plaintiff-Appellant Boehringer Ingelheim Pharmaceuticals, Inc. states that nongovernmental corporate entity Boehringer Ingelheim Pharmaceuticals, Inc. is a wholly owned subsidiary, directly or indirectly, of Boehringer Ingelheim USA Corporation and Boehringer Ingelheim Corporation, both privately owned corporations. No publicly held corporation owns 10% or more of the stock of Boehringer Ingelheim Pharmaceuticals, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ................................................................. 5

STATEMENT OF THE ISSUES.................................................................. 5

STATEMENT OF THE CASE................................................................... 6

I.     Statutory and Regulatory Background ............................................... 6

II.    Factual Background ............................................................... 13

III.   Procedural History .............................................................. 14

SUMMARY OF ARGUMENT ..................................................................... 16

STANDARD OF REVIEW ...................................................................... 20

ARGUMENT ................................................................................ 21

I.     The Medicare Drug Pricing Program Violates the Constitution and the
       APA. ............................................................................ 21

       A.     The Program Effects a *Per Se* Taking of Boehringer's Rights in
              its Jardiance® Products. ................................................. 21

       B.     The Program Deprives Boehringer of Procedural Protections
              Required by the Due Process Clause and the APA............................ 25

              1.     The Program Violates the Due Process Clause. ..................... 25

              2.     CMS Violated the APA's Notice-and-Comment
                     Requirement in Issuing the Manufacturer Agreement............... 31

       C.     The Program Violates the First Amendment by Compelling
              Boehringer to Endorse the Government's Characterization of
              the Program. ............................................................. 34

1.    The Program Unlawfully Compels Speech on a Matter of Public Concern. ......................................................... 35

2.    The District Court Erred in Holding that the Program Only Incidentally Affects Speech. ............................. 39

3.    The Program Violates the First Amendment by Compelling Boehringer to Engage in Expressive Conduct. .................................................................... 44

II.    The District Court Erroneously Rejected Boehringer's Constitutional Claims on the Theory that the Program Is Voluntary. .................................. 47

A.    Boehringer's Participation Is Coerced, Not Voluntary. ..................... 47

B.    Boehringer's Theoretical Ability to Withdraw from Medicare and Medicaid Is Legally Irrelevant. .................................................... 51

C.    CMS Implements the Program as a Regulator, Not a Mere Market Participant. .............................................................. 55

III.   The Program Would Violate the Unconstitutional Conditions Doctrine Even If Participation Were Voluntary. ......................................... 57

CONCLUSION .................................................................. 63

CERTIFICATE OF COMPLIANCE ................................................ 64

CERTIFICATE OF SERVICE .................................................... 65

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*74 Pinehurst LLC v. New York*,
   59 F.4th 557 (2d Cir. 2023) ................................................................53

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)................................................................17, 35

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013)................................... 38, 41, 46, 54, 58, 59, 61, 62

*Am. Health Care Ass'n v. Burwell*,
   217 F. Supp. 3d 921 (N.D. Miss. 2016)............................................50

*Am. Hosp. Ass'n v. Bowen*,
   834 F.2d 1037 (D.C. Cir. 1987)....................................................32

*Am. Trucking Ass'n v. City of Los Angeles*,
   569 U.S. 641 (2013)....................................................................56

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
   384 F. Supp. 3d 532 (E.D. Pa. 2019)................................................61

*Asiana Airlines v. FAA*,
   134 F.3d 393 (D.C. Cir. 1998).....................................................33

*Axson-Flynn v. Johnson*,
   356 F.3d 1277 (10th Cir. 2004) ......................................................54

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019)....................................................................34

*Bd. of Cnty. Comm'rs v. Umbehr*,
   518 U.S. 668 (1996)....................................................................58

*Bowles v. Willingham*,
   321 U.S. 503 (1944)..................................... 26, 28, 29, 30, 31, 54

*Burns v. Martuscello*,
   890 F.3d 77 (2d Cir. 2018) ..........................................................35, 38

iv

*C.N. v. Ridgewood Bd. of Educ.*,
430 F.3d 159 (3d Cir. 2005) ..................................................................54

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)..............................................................................48

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)...........................................................16, 21, 22, 24

*Circle Sch. v. Pappert*,
381 F.3d 172 (3d Cir. 2004) ..................................................................46

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affs.*,
464 F.3d 1306 (Fed. Cir. 2006) ............................................................29

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*,
508 U.S. 602 (1993)........................................................................25, 28

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
62 F.4th 748 (2d Cir. 2023) ..................................................................20

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)........................................................................59, 60

*Engquist v. Or. Dep't of Agric.*,
553 U.S. 591 (2008)..............................................................................56

*Expressions Hair Design v. Schneiderman*,
581 U.S. 37 (2017).........................................................................42, 43

*FCC v. Fla. Power Corp.*,
480 U.S. 245 (1987)..............................................................................24

*Furlong v. Shalala*,
156 F.3d 384 (2d Cir. 1998) ..................................................................54

*Garelick v. Sullivan*,
987 F.2d 913 (2d Cir. 1993) ....................................................19, 51, 54

*Holmes v. N.Y.C. Hous. Auth.*,
398 F.2d 262 (2d Cir. 1968) ..................................................................30

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
    560 U.S. 702 (2010) ................................................................24

*Horne v. Dep't of Agriculture*,
    569 U.S. 513 (2013) (*Horne I*) ............................................52

*Horne v. Dep't of Agriculture*,
    576 U.S. 350 (2015) (*Horne II*) ........................... 4, 21, 22, 23, 25, 37, 52, 53, 59

*Jackler v. Byrne*,
    658 F.3d 225 (2d. Cir. 2011) ................................................35

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps. Council 31*,
    585 U.S. 878 (2018) ...........................................................34, 35

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ................................................................38

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ...........................................................24, 52

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...........................................................25, 29

*McClendon v. Rosetti*,
    460 F.2d 111 (2d Cir. 1972) ................................................30

*Mem'l Hosp. v. Maricopa County*,
    415 U.S. 250 (1974) ................................................................60

*Morrison v. Amway Corp.*,
    517 F.3d 248 (5th Cir. 2008) ................................................34

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ............................................45

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
    116 F.4th 488 (5th Cir. 2024) ............... 7, 8, 9, 10, 25, 27, 29, 30, 37, 49, 50, 51

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................32

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ................................................48, 49, 50, 59, 60

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987) ................................................................24

*O'Connor v. Pierson*,
426 F.3d 187 (2d Cir. 2005) ...................................................58

*O'Hare Truck Serv., Inc. v. City of Northlake*,
518 U.S. 712 (1996) .................................................19, 57, 58

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n*,
301 U.S. 292 (1937) ................................................................30

*Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.*,
299 U.S. 183 (1936) ................................................................26

*Oscar Renda Contracting Inc. v. City of Lubbock*,
463 F.3d 378 (5th Cir. 2006) ..................................................57

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
475 U.S. 1 (1986) ............................................................36, 46

*Penn. Coal Co. v. Mahon*,
260 U.S. 393 (1922) ..................................................................4

*In re Permian Basin Area Rate Cases*,
390 U.S. 747 (1968) ................................................................31

*Perry v. Sindermann*,
408 U.S. 593 (1972) ................................................................58

*Peters v. Kiff*,
407 U.S. 493 (1972) ................................................................28

*R.S.W.W., Inc. v. City of Keego Harbor*,
397 F.3d 427 (6th Cir. 2005) ..................................................61

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ..........................................................27, 59

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ........................................................................42

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ...........................................................7

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011).......................................................................42

*Speiser v. Randall*,
357 U.S. 513 (1958).................................................................4, 58

*Heldman ex rel. T.H. v. Sobol*,
962 F.2d 148 (2d Cir. 1992) ..........................................................28

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002).......................................................................51

*Texas v. Johnson*,
491 U.S. 397 (1989).................................................................44, 45

*Thomas James Assocs., Inc. v. Jameson*,
102 F.3d 60 (2d Cir. 1996) ............................................................38

*Townley v. Hecker*,
748 F.2d 109 (2d Cir. 1984) ..........................................................29

*Tumey v. Ohio*,
273 U.S. 510 (1927).......................................................................28

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994).......................................................................35

*Union Pac. R.R. Co. v. Pub. Serv. Comm'n*,
248 U.S. 67 (1918).........................................................................47

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
438 F.3d 150 (2d Cir. 2006) ..........................................................56

*United States v. Afriyie*,
27 F.4th 161 (2d Cir. 2022) ...........................................................53

*United States v. Butler,*
  297 U.S. 1 (1936) ..........................................................4, 18, 48, 50, 51

*Vasquez v. Garland,*
  80 F.4th 422 (2d Cir. 2023) ................................................................50

*White v. Shalala,*
  7 F.3d 296 (2d Cir. 1993) ...................................................................32

*Wolff v. McDonnell,*
  418 U.S. 539 (1974) ...........................................................................30

*Yakus v. United States,*
  321 U.S. 414 (1944) ...........................................................26, 28, 29, 54

**Statutes**

5 U.S.C. § 559 ........................................................................................34

15 U.S.C. § 717d ....................................................................................40

18 U.S.C. § 1836 ....................................................................................27

26 U.S.C. § 5000D ...............................................9, 10, 11, 13, 22, 36, 49, 55

28 U.S.C.
  § 1291 .................................................................................................5
  § 1331 .................................................................................................5

38 U.S.C.
  § 502 .................................................................................................29
  § 8126 ...............................................................................................43

42 U.S.C.
  § 1320a-7c .........................................................................................33
  § 1320f .....................................................................8, 9, 11, 13, 31, 36
  § 1320f-1 ....................................................................8, 9, 12, 56
  § 1320f-2 ...........................8, 9, 10, 11, 12, 13, 22, 26, 27, 32, 36, 37, 44, 56
  § 1320f-3 ................8, 10, 23, 28, 29, 30, 31, 36, 37, 38, 44, 45
  § 1320f-4 .................................................................8, 11, 29, 30
  § 1320f-6 .........................................................10, 12, 23, 56
  § 1320f-7 ............................................................................28

42 U.S.C.
§ 1395j ...................................................................................6
§ 1395m ...............................................................................33
§ 1395w-4 ............................................................................33
§ 1395w-101 ..........................................................................6
§ 1395w-104 ...................................................................11, 22
§ 1395w-111 (2003) .........................................................7, 52
§ 1395w-111 ......................................................................8, 52
§ 1395w-114a .......................................................................55
§ 1395cc-7 ...........................................................................33
§ 1395-3a .............................................................................33
§ 1396 ....................................................................................7

49 U.S.C. § 10704 ...................................................................40

Conn. Gen. Stat. Ann. § 35-50 ..............................................27

Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 .............8, 12

## Constitutional Provisions

U.S. Const. amend. V ..............................................................21

## Other Authorities

88 Fed. Reg. 1390 (Jan. 10, 2023) ...........................................8

168 Cong. Rec. S4155-56 (Aug. 6, 2022) ...............................41

*Biden-Harris Administration Announces New, Lower Prices for First Drugs Selected for Medicare Price Negotiations to Lower Costs for Millions of Americans* (Aug. 15, 2024) .......................................14

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 29, 2024) .................................11

Morning Consult, National Tracking Poll #2109099 (Sept. 16-19, 2021) ......................................................................................40

Oral Arg., *AstraZeneca Pharms., LP v Becerra*, No. 24-1819 (3d Cir. Oct. 30, 2024) ......................................................41

State of the Union Address (Feb. 7, 2023) ..............................41

*Biden-Harris Administration Takes Major Step Forward in Lowering Health Care Costs; Announces Manufacturers Participating in Drug Price Negotiation Program* (Oct. 3, 2023) ...............................................41

## INTRODUCTION

This appeal concerns provisions of the Inflation Reduction Act of 2022 ("IRA") designed to reduce Medicare spending on prescription drugs. Congress had many options at its disposal to achieve that objective. It could have set prices directly by statute, making manufacturers take-it-or-leave-it offers for their drugs. It could have directed the Centers for Medicare and Medicaid Services ("CMS"), which administers Medicare, to take the same step through rulemaking. Or it could have authorized CMS to engage in arms-length negotiations with manufacturers, in which each party could walk away if it does not agree to the other's terms.

Congress did not adopt any of those well-established approaches. Instead, it enacted the misleadingly named Medicare Drug Price Negotiation Program ("Program"), which seeks to provide seniors with innovative, widely prescribed drugs at only a fraction of the drugs' market value. Under the Program, CMS selects a group of drugs each year and presents manufacturers of those drugs with an ultimatum: Provide the selected drug to Medicare participants at a highly discounted price, or else incur an even greater economic toll in the form of a 1900% excise tax or complete exclusion of the selected drug *and* all the manufacturer's other drugs from Medicare *and* Medicaid. The Program thus leverages the Government's sovereign powers—its authority to levy taxes and impose requirements for Medicare

1

and Medicaid—to coerce manufacturers into handing over selected drugs on terms dictated by CMS.

Compounding that harm, the Program insulates CMS's actions from political and legal accountability in unprecedented ways. It affords manufacturers fewer procedural protections than emergency wartime price regulations. And it disguises the Program's command-and-control structure by compelling manufacturers to describe the process in terms of negotiated agreements. Under threat of the penalties described above, manufacturers must attest, in writing, that they "negotiate[d]" the prices set through the Program and "agree" that the prices are not only "fair," but the "maximum fair prices" for their drugs. These normative statements are not necessary to set drug prices—agencies routinely regulate prices without requiring businesses to describe the process as a negotiation or say that the prices are fair— but they advance other governmental objectives by influencing private markets and forcing manufacturers to shoulder responsibility for the Program's effects. Indeed, by requiring manufacturers to express the view that the artificially low prices set through the Program are the *maximum fair* prices, the IRA forces manufacturers to indict their own conduct—to pronounce that the market rates they have charged in the past and continue to charge outside of Medicare are *unfair.*

That scheme is unconstitutional as applied to Plaintiff-Appellant Boehringer Ingelheim Pharmaceuticals, Inc. In 2023, CMS selected Boehringer's drug

Jardiance® for the Program, subjecting the company to tens of billions in annual excise taxes or across-the-board exclusion from Medicare and Medicaid (which together account for almost half the U.S. prescription drug market) if it did not "negotiate" and "agree to" a "maximum fair price" far below the prevailing rate.

The Program effects a *per se* taking by granting Medicare participants the right to take possession of Boehringer's Jardiance® products on terms the company would never voluntarily accept. It denies Boehringer due process by omitting basic safeguards, such as review by an impartial decisionmaker applying ascertainable standards, that the Supreme Court has held are essential checks against arbitrary governmental action. And it abridges the First Amendment by compelling Boehringer to speak and act in ways that endorse the Government's preferred messages about drug pricing—an issue front-and-center in the national debate. In addition, CMS violated the Administrative Procedure Act ("APA") by failing to take public comments on the Manufacturer Agreement, which implements the Program's negotiation and "maximum fair price" provisions.

The District Court upheld the Program primarily on the ground that participation is voluntary. But Congress carefully constructed the Program to ensure that manufacturers like Boehringer cannot opt out. Once CMS selects a drug for the Program, the manufacturer faces a Hobson's choice between giving away its drug for a fraction of its market value, withdrawing all its drugs from Medicare and

Medicaid, or paying a tax so ruinous that the Congressional Budget Office estimated it would raise no revenue because no manufacturer could afford to pay it. Because the Program employs "coercion by economic pressure," the "asserted power of choice is illusory" and participation is "not in fact voluntary." *United States v. Butler*, 297 U.S. 1, 70-71 (1936).

Even if the Program were voluntary, it would still violate the unconstitutional conditions doctrine. That doctrine prohibits the Government from producing indirectly "a result which [it] could not command directly," *Speiser v. Randall*, 357 U.S. 513, 526 (1958), by requiring a regulated party to give up its constitutional rights in exchange for a discretionary benefit. The Program violates that principle by tying Boehringer's ability to sell *any* of its drugs through Medicare or Medicaid to waiver of the company's First and Fifth Amendment rights regarding Jardiance®.

Finally, the Government defends the Program as a constitutional means of reducing spending on prescription drugs. But even when Congress has a strong "desire to improve the public condition," that is not a license to do so by a "shorter cut than the constitutional way." *Horne v. Dep't of Agriculture*, 576 U.S. 350, 362 (2015) (*Horne II*) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) (Holmes, J.)). Congress could lawfully have pursued its goal in other ways, but those approaches would have involved significant tradeoffs. For example, if Congress had authorized true arms-length negotiations between CMS and

4

manufacturers, the parties might not reach agreement on some widely prescribed medications—leaving millions of seniors without Medicare coverage for treatments they depend on.  The IRA prevents that outcome by leaving manufacturers with no choice but to acquiesce, while simultaneously compelling manufacturer speech to evade accountability for the Program's raw exercise of regulatory power.  Because those provisions take unconstitutional shortcuts, this Court should hold that the Program is unlawful as applied to Boehringer and reverse the District Court's order entering summary judgment for the Government.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331.  It entered final judgment on July 9, 2024, disposing of all of Boehringer's claims.  Special Appendix ("SPA") 48.  Boehringer timely filed a notice of appeal on July 26, 2024.  Joint Appendix ("JA") 412.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the Program violates the Fifth Amendment's Takings Clause by appropriating Boehringer's property rights in its Jardiance® products.

2.     Whether the Program violates the Fifth Amendment's Due Process Clause by depriving Boehringer of property without constitutionally adequate procedural safeguards.

3. Whether CMS acted unlawfully by issuing the Manufacturer Agreement without observing the notice-and-comment procedures required by the APA.

4. Whether the Program violates the First Amendment by compelling Boehringer to endorse the Government's messages regarding the Program.

5. Whether the Program violates the unconstitutional conditions doctrine by conditioning Boehringer's participation in Medicare and Medicaid on surrendering its First and Fifth Amendment rights with respect to Jardiance®.

## STATEMENT OF THE CASE

This case presents constitutional and statutory challenges to the Program and its implementation by CMS. Boehringer filed suit on August 18, 2023, and timely appeals from the July 9, 2024 final judgment of the U.S. District Court for the District of Connecticut (Shea, C.J.) granting summary judgment to Defendants. *See* SPA48 (final judgment); 2024 WL 3292657 (D. Conn. July 3, 2024) (opinion, reprinted at SPA1-47); JA412 (notice of appeal).

## I. Statutory and Regulatory Background

Medicare and Medicaid are among the largest programs administered by the federal government. Medicare provides health insurance coverage for seniors and consists of various parts, including Part B (which covers physician-administered drugs) and Part D (which covers self-administered prescription drugs). *See* 42

U.S.C. §§ 1395j *et seq.*, 1395w-101 *et seq.*  Separately, Medicaid provides health-insurance for low-income Americans.  *Id.* §§ 1396 *et seq.*  Together these programs comprise "almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).

Congress designed Medicare Part D to rely on market forces.  CMS, which administers Medicare and Medicaid, contracts with privately operated insurance plans to implement Part D.  In turn, insurers "negotiate [drug] prices with manufacturers" based on market factors to set "the prices paid for drugs covered by … Part D."  *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 494 (5th Cir. 2024) (*NICA*).  CMS then pays the insurers fixed amounts based on their anticipated drug spending.  In other words, CMS does not purchase drugs, but instead reimburses insurers that cover the patients who buy the drugs, and regulates interactions between patients, providers, and insurance plans.

One critical aspect of Medicare Part D has changed since its creation.  Before the IRA was enacted, CMS could neither "interfere" with negotiations between insurers and manufacturers nor "institute a price structure for the reimbursement of covered part D drugs."  42 U.S.C. § 1395w-111(i) (2003).

The IRA removed those prohibitions in 2022. *See* Pub. L. 117-169, §§ 11001-11004, 136 Stat. 1818, 1833-64. Under the IRA, CMS[1] is authorized to "institute a price structure" for the most widely prescribed drugs through the "Medicare Drug Price Negotiation Program." 42 U.S.C. § 1395w-111(i). The IRA thus shifted "the price-setting mechanism" for these drugs "from the free market to a government-run process." *NICA*, 116 F.4th at 494.

The Program comprises four stages: (1) CMS selects drugs for the Program; (2) manufacturers "enter into" "agreement[s]" with CMS to "negotiate" "maximum fair price[s]"; (3) the parties "agree to" a "maximum fair price" for each drug, which CMS publishes; and (4) manufacturers provide Medicare beneficiaries and their providers "access to" the selected drugs at "such price[s]." 42 U.S.C. §§ 1320f to 1320f-4.

**1. Selection.** The Program operates in annual cycles. In August 2023, CMS identified eligible drugs that accounted for the highest Medicare spending[2] and then selected the top ten drugs for the Program's first year. *Id.* § 1320f-1(a)(1), (d)(1)(A).

---

[1] The Secretary of Health and Human Services delegated authority to administer the Program to CMS. *See* 88 Fed. Reg. 1390 (Jan. 10, 2023). Accordingly, we refer to CMS when discussing implementation of the Program.

[2] This computation reflected Medicare *overall spending*, not the *price per prescription* for each drug. Thus, widely prescribed drugs such as Jardiance® were included in the initial group of selected drugs, despite having a lower price per prescription than many other drugs.

Each subsequent year, CMS will select additional drugs from Medicare Part D, and eventually from Part B, expanding the Program. *See id.* § 1320f-1(a)(2)-(4).

**2. Agreement.**   Once a drug is selected, a manufacturer has less than one month to "enter into" a "manufacturer agreemen[t]" with CMS. *Id.* §§ 1320f(d)(2)(B), 1320f-2(a).   Under that "agreement," the manufacturer must "agree" to "negotiate … a maximum fair price" for its selected drug, submit pricing data and any other "information that [CMS] requires," provide third parties "access to the maximum fair price … with respect to [the] selected drug," and "compl[y] with" other "requirements determined by [CMS] to be necessary." *Id.* § 1320f-2(a) ("Manufacturer Agreement").   CMS unilaterally drafted the Manufacturer Agreement and presented it to manufacturers on a take-it-or-leave-it basis.  JA126.

If a manufacturer declines to sign the Manufacturer Agreement, it is deemed "noncomplian[t]" and must pay an "escalating tax on all sales of the [selected] drug (not just Medicare sales) that starts at 185.7% of the drug's price and rises to 1,900%" after nine months. *NICA*, 116 F.4th at 495; 26 U.S.C. § 5000D; JA378 (explaining computation of tax).  "The Congressional Budget Office estimated that [this excise tax penalty] would raise no revenue because no manufacturer could afford to pay it." *NICA*, 116 F.4th at 495; JA323.

The only way to avoid the excise tax penalty and the Program's requirements is to "opt out of Medicare [and Medicaid] … entirely, meaning [CMS] will not

9

reimburse patients or providers for any of the drugs that the manufacturer sells (whether or not those drugs are part of the Drug Pricing Program)." *NICA*, 116 F.4th at 495; 26 U.S.C. § 5000D(c)(1).

**3. Negotiation.** Once a manufacturer signs the agreement, it must provide confidential drug pricing information to CMS and any other "information that [CMS] requires to carry out the negotiation." 42 U.S.C. §§ 1320f-2(a)(4), 1320f-3(b)(2)(A). CMS then makes an initial offer for the selected drug's "maximum fair price," the manufacturer must accept that offer or make a "counteroffer," and CMS must accept the counteroffer or "respond in writing" with a final offer. *Id.* § 1320f-3(b)(2). The price set through the Program must be at least 25-60% below a benchmark market-based price paid by wholesalers, and CMS must "achieve the lowest maximum fair price for each selected drug" below that ceiling. *Id.* § 1320f-3(b)-(c). "[T]here is no limit to how low [this price] can be." *NICA*, 116 F.4th at 495. The "negotiation" process ends when the manufacturer signs an addendum accepting the price set through the Program. JA295-307.

If a manufacturer attempts to "walk away" or "fail[s] to reach an agreement with [CMS]," "the consequences ... are severe." *NICA*, 116 F.4th at 495, 500. Failure to disclose information requested by CMS results in daily $1 million penalties. 42 U.S.C. § 1320f-6(c). Failure to continue the negotiation or agree to a "maximum fair price" also triggers the onerous excise tax penalty discussed above,

which can be suspended only if the manufacturer withdraws its entire drug portfolio from both Medicare and Medicaid. *See* 26 U.S.C. § 5000D.

After the "negotiation period" ends, CMS publicly discloses the "maximum fair price" for each drug. 42 U.S.C. §§ 1320f(d)(2)(B) & (6), 1320f-4(a). The "negotiation period" for the first ten selected drugs ended on August 1, 2024, and CMS published the "maximum fair price[s]" for those drugs, including Jardiance®, on August 29, 2024.[3]

**4. Access.** On January 1, 2026, the Program requires manufacturers to begin providing Medicare beneficiaries and their providers "access" to the selected drugs at or below the "maximum fair price." *Id.* § 1320f-2(a)(3). To facilitate that access, Part D insurance plans must include each selected drug on their list of covered medicines (the plan's "formulary"). *Id.* § 1395w-104(b)(3). Together, the access and formulary requirements ensure that every Medicare beneficiary can access a manufacturer's selected drug on the Program's terms. *See id.*

Again, manufacturers face massive penalties if they do not acquiesce. Manufacturers that violate terms of the Manufacturer Agreement face daily $1 million penalties. Manufacturers that sell selected drugs through Medicare for more

---

[3] *See* CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 29, 2024), https://perma.cc/P7QG-DZHF.

than the "maximum fair price" are liable for penalties equal to ten times the amount charged over that price. *See id.* § 1320f-6.

A selected drug remains in the Program until CMS determines that it no longer qualifies—for example, when a generic version of the drug enters the market. *See id.* §§ 1320f-1(c)(1), 1320f-2(b). The IRA directs CMS to "implement" the first three years of the Program "by program instruction or other forms of program guidance." IRA § 11001(c), 136 Stat. at 1854. CMS promulgated "Revised Guidance" in June 2023 after seeking comment on other aspects of the Program. JA97. CMS did not, however, "provide a comment period on the [Manufacturer] Agreement." JA126. Instead, CMS released a final version of the Agreement on July 3, 2023, after other manufacturers sued to enjoin the Program. The Agreement states that the manufacturer "agree[s]" to "negotiate to determine … a maximum fair price for the Selected Drug," and an addendum executed at the conclusion of the "negotiation period" represents that the manufacturer has "engaged in negotiation" and "agrees" to a "maximum fair price" for the selected drug. JA297-302. The Agreement also states that CMS "retains authority to amend this Agreement to reflect changes in law, regulation, or guidance," JA299—language that allows CMS to unilaterally alter the manufacturer's obligations (by adopting new guidance) and convert informal guidance into binding law.

## II.    Factual Background

Boehringer is a leader in research and development of innovative pharmaceuticals.  In 2022, more than 30 million patients worldwide were prescribed drugs developed by the Boehringer family of companies (including Plaintiff-Appellant and related entities).  JA87.  One of those medications, Jardiance®, has multiple approved uses, including lowering blood sugar in patients with type 2 diabetes and reducing the risk of cardiovascular death in adults with type 2 diabetes or heart disease.  JA87.  After Boehringer invested billions of dollars and years of research and development, FDA approved Jardiance® in 2014 and subsequently approved several additional indications in the years that followed, expanding the patient population that benefits from the product.  JA87.

In 2023, CMS selected Jardiance® for the Program.  Boehringer was required to sign the Manufacturer Agreement by October 1, 2023, and participate in the Program to avoid the noncompliance penalties described above.  *See* JA88; 42 U.S.C. §§ 1320f(d)(2), 1320f-2(a).  As Boehringer explained in an undisputed declaration, paying the excise-tax penalty was not an option because it would have started at more than $500 million per week and escalated to more than $5.5 billion per week after nine months.  *See* JA89; 26 U.S.C. § 5000D(d).  Withdrawing all of Boehringer's drugs from Medicare and Medicaid likewise was not an option because it would have deprived Boehringer of the revenues needed to continue researching

and developing new treatments. *See* JA89-90. Boehringer markets more than 20 drugs through Medicare and Medicaid, and more than half of Boehringer's net U.S. sales come from those programs. JA87-88. Withdrawal would also leave millions of patients without coverage for the drugs they depend on, undermining one of Boehringer's core values. JA90.

With no other option, Boehringer signed the Manufacturer Agreement under protest, furnished CMS with the confidential information it demanded, participated in the "negotiation" process, and "agreed" to the "maximum fair price" for Jardiance®. In August 2024, CMS announced that "negotiation" with Boehringer yielded a maximum fair price equal to 66% of the 2023 price.[4]

## III. Procedural History

Boehringer filed this lawsuit in August 2023, arguing that the Program violates its rights under the First and Fifth Amendments, the APA, and the unconstitutional conditions doctrine. JA74-83.[5]

The District Court granted the Government summary judgment on all of Boehringer's claims. The court held that the Program does not effect a taking of

---

[4] *Biden-Harris Administration Announces New, Lower Prices for First Drugs Selected for Medicare Price Negotiations to Lower Costs for Millions of Americans*, (Aug. 15, 2024), https://perma.cc/8VW8-EU3Y ("Price Announcement").

[5] Boehringer also asserted an Eighth Amendment claim but does not raise that issue on appeal.

Boehringer's property, deprive Boehringer of property without due process, or compel Boehringer's speech because participation in the Program is "voluntary." In the court's view, Boehringer could "opt out of Medicare and Medicaid" before "the deadline for signing the Manufacturer Agreement" and before "the maximum fair price goes into effect in 2026." SPA14-16, 31. The court reached this conclusion notwithstanding the Program's severe economic coercion because, in its view, only "legal compulsion" could cause a constitutional violation. SPA21-22. Although Boehringer cited Supreme Court precedent holding that economically coercive programs are not exempt from constitutional scrutiny, the District Court disregarded those decisions. SPA24-29.

With the exception of the due process claim, the District Court also rejected Boehringer's claims on their merits. The court held that the Program does not effect a taking because it "do[es] not permit the government to seize [Boehringer's] property (or to provide access to it by others) if [Boehringer] refuse[s] to turn it over." SPA27. Addressing Boehringer's compelled-speech claim, the court concluded that while the Program "require[s] … communicat[ion] in various ways," it regulates drug prices with only an "incidental" effect on speech. SPA31-32. The court disagreed that signing the Manufacturer Agreement involves protected speech because the Agreement "disclaim[s]" any expression by manufacturers. SPA33. With respect to the unconstitutional conditions doctrine, the court concluded that the

15

doctrine does not apply to Boehringer's Fifth Amendment claims and that Boehringer's First Amendment claim fails because the Program has only an incidental effect on speech. *See* SPA35-37. Finally, the court rejected Boehringer's APA claim, holding that Congress displaced the notice-and-comment requirement by directing CMS to implement the first three years of the Program through "guidance." SPA38-43.

## SUMMARY OF ARGUMENT

**I.A.** The Program effects a *per se* taking by granting Medicare participants access to Jardiance® products on terms Boehringer would never voluntarily accept. The Program thus appropriates Boehringer's right to exclude others from possessing its property, in violation of the principles articulated in *Horne II* and *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). The District Court misread *Horne II* as requiring a physical seizure of property for a *per se* taking to occur. Yet Supreme Court precedent emphasizes that appropriating property rights effects a taking regardless of how the appropriation "comes garbed." *Id.* at 149. The District Court also incorrectly cabined *Horne II* to situations where a plaintiff must acquiesce to a taking or exit the market altogether—a predicate unsupported by precedent or the facts of *Horne II*.

**B.** The Program violates Boehringer's due process rights because it lacks basic safeguards against the erroneous deprivation of Boehringer's property. The

Fifth Amendment guarantees a fair hearing conducted by an impartial decisionmaker, but the Program lacks those protections. CMS is the sole arbiter of the "maximum fair price" for selected drugs despite its financial interest in that price, creating an inherent conflict of interest. In addition, the IRA prohibits administrative and judicial review of CMS's action, making it impossible to correct agency errors. CMS compounded these shortcomings by issuing the Manufacturer Agreement, which creates binding legal obligations for manufacturers, without taking public comments. Contrary to the District Court's conclusion, the IRA's direction to implement the Program through "guidance" does not override the APA's notice-and-comment requirement.

**C.** The Program violates the First Amendment by compelling Boehringer to endorse the Government's preferred messages about the Program. The IRA requires Boehringer to engage in a faux negotiation process that masks CMS's regulatory price-setting role; to state in writing that it "negotiate[d]" and "agree[s]" to the price set through the Program; and to describe that price as the "maximum fair price" for Jardiance®. Boehringer disagrees with those statements, which distort the national debate about drug pricing and blur the lines of accountability for the Program's effects. The Program unlawfully "compels [Boehringer] to speak [the Government's] preferred messages" about a contested issue of public concern. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

17

The District Court erred in concluding that the Program has only an incidental effect on speech. The Program's compelled statements are not incidental effects of price regulation because the statements are not necessary to set maximum drug prices. Congress could achieve *the exact same effect on Medicare prices* without requiring manufacturers to describe the process as a negotiation or say that the prices set through the Program are fair. The gratuitous speech mandates are unprecedented as well: No other federal price-regulation scheme requires regulated parties to vouch for the fairness of the prices set by the Government or engage in performative negotiations backed by crippling penalties for noncompliance.

**II.A.** The Government's primary defense is that there is no constitutional violation because participation in the Program is voluntary. But that ignores the IRA's use of economic penalties to coerce manufacturers into submitting to the Program's terms. The Supreme Court has repeatedly held that a program is involuntary—and thus subject to constitutional scrutiny—where, as here, it employs "economic coercion" to secure compliance. *Butler*, 297 U.S. at 70-71. Boehringer can avoid the Program's requirements only by incurring debilitating excise tax liabilities or withdrawing all its drugs from Medicare and Medicaid—steps that would demolish the company's ability to continue developing innovative drugs and serving patients. Thus, the theoretical opt-out mechanisms cited by the District Court are illusory and do not negate Boehringer's claims.

18

**B.** Regardless, the ability to withdraw from Medicare and Medicaid is legally irrelevant. The plaintiffs in *Horne II* entered the raisin market voluntarily, had options to avoid the taking by paying penalties or selling their grapes for other uses, and yet still prevailed. It is thus no defense to say, as the District Court did, that Boehringer could avoid the Program's appropriation of its property rights by incurring even greater losses in the form of enterprise-crippling excise tax and other penalties.

The District Court held that legal compulsion is necessary to state a takings claim, based on an incorrect application of *Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993). *Garelick*'s rationale predates and was subsequently rejected by the Supreme Court's decision in *Horne II*. Even if *Garelick* were still good law, it addresses a version of Medicare that no longer exists, only applies to regulatory takings claims (which are not at issue here), and is otherwise distinguishable.

**C.** The Government asserts that CMS acts as a mere market participant, free from First and Fifth Amendment constraints. That ignores how the Program works. CMS exercises sovereign, regulatory powers in implementing the Program, including by imposing severe penalties for noncompliance. No mere market participant wields such powers. Moreover, precedent shows that government actions in the procurement context remain subject to constitutional scrutiny. *See, e.g.*, *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 721 (1996).

19

**III.** Even if the Program were voluntary, it would still violate the unconstitutional conditions doctrine. That doctrine prohibits CMS from using the threat of excluding *all of* Boehringer's drugs from Medicare and Medicaid to pressure Boehringer into surrendering its rights regarding Jardiance®. The District Court rejected Boehringer's First Amendment unconstitutional conditions argument on the ground that the Program has an incidental effect on speech, but that rationale fails for the reasons given in Part I.C. And while the District Court held that the unconstitutional conditions doctrine does not apply to Boehringer's Fifth Amendment claims, that conclusion fails to account for countervailing precedent and the staggering implications of its categorical exemption.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023).

# ARGUMENT

## I. The Medicare Drug Pricing Program Violates the Constitution and the APA.

### A. The Program Effects a *Per Se* Taking of Boehringer's Rights in its Jardiance® Products.

**1.** The Takings Clause requires the Government to provide "just compensation" whenever it "take[s]" private property for public use. U.S. Const. amend. V. The "essential question" when evaluating a *per se* takings claim is whether the Government has "appropriat[ed]" property rights "for itself or a third party." *Cedar Point*, 594 U.S. at 148-49. The Program does just that by giving Medicare participants a right to take possession of Boehringer's Jardiance® products on the Government's terms.[6]

*Horne II* establishes the principle that governs this case. There, a federal law required raisin growers to "physical[ly] surrender" a portion of their crops "to the Government, free of charge." 576 U.S. at 366, 364. When the Hornes declined to comply, "[t]he Government sent trucks … to pick up the raisins," the Hornes "refused entry," and the Government imposed fines for "disobeying." *Id.* at 356. The Government never physically seized the Hornes' raisins, but the challenged law was nevertheless "a clear physical taking" because of its effect on property rights:

---

[6] Boehringer has asserted only a *per se* takings claim. *See* JA75-77.

The growers no longer retained their right to "control [the] disposition" of their property. *Id.* at 361-62, 364.

The Supreme Court applied the same effects-based analysis in *Cedar Point*. A California statute had granted union organizers a "right [to] access ... the premises of an agricultural employer" for several days each year. 594 U.S. at 144. The statute was a *per se* taking because it "appropriate[d]" the employers' "right to exclude" by granting organizers a "right to invade the [employers'] property" on the state's terms. *Id.* at 149-50.

The Program effects a taking of Boehringer's property rights in its Jardiance® products—i.e., physical doses of the drug—under that effects-based analysis. Boehringer owns the right to exclude others from possessing its Jardiance® products, *see Cedar Point*, 594 U.S. at 149-52, and "to possess, use and dispose of" those products, *Horne II*, 576 U.S. at 361-62. The Program appropriates those rights by requiring Boehringer to grant Medicare beneficiaries and their providers "access to the maximum fair price" for Jardiance®, 42 U.S.C. § 1320f-2(a)(3), and also requiring every Part D insurance plan to include Jardiance® on its formulary, *id.* § 1395w-104(b)(3)(1). Together, those provisions give every Medicare enrollee a right to take possession of Jardiance® products on terms set by the Government.

The Program reinforces the taking by imposing massive penalties for failing to hand over Jardiance® on those terms. *See* 26 U.S.C. § 5000D (penalties for failing

22

to participate and agree to price set through the Program); 42 U.S.C. § 1320f-6(a) (penalties for failing to "provide access" to drug at the "maximum fair price"). The end result is a forced transfer: Boehringer must provide its property to Medicare participants on terms the company would never voluntarily accept.[7]

**2.** The District Court rejected Boehringer's takings claim primarily because it viewed Program participation as voluntary. SPA14-29. Because that rationale cuts across several claims, we address it separately in Part II below. This section addresses the District Court's other reasons for rejecting Boehringer's takings claim.

The District Court incorrectly limited *Horne II* to cases involving physical seizure of property. According to the court, the law at issue in *Horne II* effected a taking because "the government enforced i[t] … by physically appropriating the Hornes' raisins," whereas CMS does not physically seize Boehringer's drugs under the Program. SPA26.

That rationale fails several times over. To start, the Government did not seize any raisins in *Horne II*; it imposed penalties on growers for refusing to turn over their property. *See* 576 U.S. at 356. More generally, *per se* takings are not limited to physical seizures of property. In *Cedar Point*, California gave third parties a

---

[7] The Program also ensures that Boehringer will not be justly compensated by capping the "maximum fair price" well below market-based prices. *See* 42 U.S.C. § 1320f-3(c)(1).

"right to invade" land and consequently appropriated the employers' right to exclude, without seizing any property. *See* 594 U.S. at 149. Had actual seizure mattered, the Supreme Court would not have clarified that a *per se* taking can occur no matter how it "comes garbed." *Id.* Other cases confirm that appropriating property rights can cause a *per se* taking without physical seizure. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 828 (1987); *FCC v. Fla. Power Corp.*, 480 U.S. 245, 251-52 & n.6 (1987).

The District Court also distinguished *Horne II* by characterizing the Program as adversely affecting Boehringer only when it "chooses to sell" Jardiance®. SPA26. But that misunderstands the way the Program works. Unlike laws that "regulat[e]" the "voluntary decision … to [sell] property," SPA26 n.11, the IRA allows Medicare enrollees to demand access to, and take possession of, Jardiance® products—and it coerces Boehringer into acceding to those demands. While perhaps garbed differently, this compelled "transfer of property … to another private party" is the same type of "classic taking" present in *Horne II*. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010).

It was equally inaccurate for the District Court to write off *Horne II* on the theory that the growers "were barred from the entire market for raisins if they did not comply with the reserve requirement," whereas Boehringer can withdraw from

Medicare and Medicaid and continue to sell Jardiance® in the private market. SPA24. The theoretical possibility of withdrawing from Medicare and Medicaid is illusory, as discussed in Part II.A below. Regardless, the growers had options to sell their grapes to other buyers "as table grapes or for use in juice or wine," *see Horne II*, 576 U.S. at 365, just as Boehringer could sell Jardiance® products to non-Medicare patients. *Horne II* rejected this "[l]et them sell wine" defense as "wrong as a matter of law," *id.*, and the same is true of the District Court's rationale here.

### B. The Program Deprives Boehringer of Procedural Protections Required by the Due Process Clause and the APA.

#### 1. The Program Violates the Due Process Clause.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up), by a "neutral and detached" decisionmaker, *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617-18 (1993). The IRA violates that requirement by charging CMS—which has an economic stake in the outcome of the negotiation—with carrying out the Program, insulating CMS's actions from administrative and judicial review, and failing to provide ascertainable standards for CMS to follow when setting the "maximum fair price." These omissions "create a substantial risk of erroneous deprivation" of Boehringer's property interests. *NICA*, 116 F.4th at 503.

Apart from arguing that the Program does not deprive Boehringer of property, neither the District Court nor the Government below defended the Program's lack of procedural safeguards. To Boehringer's knowledge, no court has ever upheld a pricing scheme that deprives regulated parties of core procedural safeguards as the Program does here.

**i.** The Program has deprived (or will deprive) Boehringer of three constitutionally protected property interests.

*First*, as explained in Part I.A, Boehringer has a cognizable interest in physical doses of Jardiance®, including the rights to control the disposition of these drugs and exclude others from possessing them. The Program overrides those rights by granting third parties the right to access Jardiance® products over Boehringer's objection. *See* 42 U.S.C. § 1320f-2(a).

*Second*, Boehringer has a property interest in deciding "the price at which [it] will sell" its Jardiance® products. *Old Dearborn Distrib. Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 192 (1936). Courts have long analyzed price-control regimes through the lens of procedural due process, even where no one is compelled to engage in a sale. *See Bowles v. Willingham*, 321 U.S. 503, 517 (1944); *Yakus v. United States*, 321 U.S. 414, 438 (1944). Consistent with this approach, the Fifth Circuit has recognized that the Program implicates protected property interests by causing a "revenue decrease as a result of allegedly unconstitutional government

26

action." *NICA*, 116 F.4th at 503. By imposing an artificially reduced price for Jardiance®, the Program deprives Boehringer of this right.

*Third*, Boehringer has a property interest in its confidential data regarding Jardiance®. The IRA requires Boehringer to provide any "information that [CMS] requires to carry out the negotiation," 42 U.S.C. § 1320f-2(a)(4), and CMS has demanded this information, including how much Boehringer has spent researching and developing Jardiance®, the extent to which it has recouped those costs, and unit costs for production and distribution of the drug. *See* JA228, 283-93. Because these confidential data are valuable to Boehringer and would be valuable to its competitors, they are protected under trade-secrets laws[8] and the Fifth Amendment. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-03 (1984); *see also* JA90-91. By requiring Boehringer to disclose trade secrets that CMS can use to undermine Boehringer's interests in the negotiation process, the Program deprives Boehringer of this property as well.

**ii.** The Program's procedures are constitutionally inadequate. When Congress authorizes agencies to set prices, it has a constitutional obligation to ensure that the resulting prices are not arbitrary, confiscatory, or unduly discriminatory. The Program shirks that obligation by adopting a one-sided scheme that places no

---

[8] *See, e.g.*, Conn. Gen. Stat. Ann. §§ 35-50 *et seq.*; 18 U.S.C. § 1836.

meaningful external constraints on CMS. Indeed, the Program provides even fewer safeguards than emergency wartime price-control regimes that represent the low-water mark for due process protections. *See Bowles*, 321 U.S. 503; *Yakus*, 321 U.S. 414. Four features of the Program demonstrate that it violates Boehringer's due process rights.

*First*, CMS is not an impartial decisionmaker. It sets the "maximum fair price[s]" under the Program despite having a financial interest in reducing those prices. "Due process requires a[n] … impartial tribunal," no matter the "form of proceeding." *Peters v. Kiff*, 407 U.S. 493, 501 (1972); *see also Concrete Pipe*, 508 U.S. at 617; *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 154 (2d Cir. 1992). Adjudication conducted by a decisionmaker with a "pecuniary interest in the outcome" thus violates due process. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Here, the "negotiation" is irrevocably tainted because CMS determines the "maximum fair price" for selected drugs while also making payments to Part D insurance plans based on that "maximum fair price." The IRA compounds the problem by directing CMS to pursue "*the lowest* maximum fair price for each selected drug." 42 U.S.C. § 1320f-3(b)(1) (emphasis added).

*Second*, the IRA bars administrative and judicial review of CMS's "maximum fair price" determination, as well as other key CMS actions. *Id.* § 1320f-7(3). As a result, those actions are not subject to any review by an impartial decisionmaker.

28

Yet there must be "an opportunity … for judicial review which satisfies the demands of due process." *Yakus*, 321 U.S. at 444; *Bowles*, 321 U.S. at 521 ("provid[ing] for judicial review after the regulations or orders have been made effective" satisfies due process). The inability to seek review on "the back end" of the proceeding creates "a substantial risk" that Boehringer will be "erroneously depriv[ed]" of its property rights. *NICA*, 116 F.4th at 503.[9]

*Third*, the negotiation process denies Boehringer an opportunity to respond to the evidence on which CMS relies in setting the "maximum fair price." Due process requires the Government to provide regulated parties with access to the evidence against them and an "opportunity to meet it." *Mathews*, 424 U.S. at 348 (cleaned up); *see Townley v. Hecker*, 748 F.2d 109, 114 (2d Cir. 1984). But the IRA does not require CMS to disclose the evidence on which it relies; instead, CMS need only state a "concise justification" for its initial offer. 42 U.S.C. §§ 1320f-3(b)(2)(B), 1320f-4(a)(2)(B). That superficial approach falls short of the constitutional

---

[9] This lack of review further distinguishes the Program from other federal drug programs. *See, e.g.*, *Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affs.*, 464 F.3d 1306, 1316 (Fed. Cir. 2006) (recognizing "jurisdiction under [38 U.S.C. § 502] to review substantive and interpretative rules" implementing the TRICARE pharmacy benefits program).

minimum. *See Ohio Bell Tel. Co. v. Pub. Utils. Comm'n*, 301 U.S. 292, 300-02 (1937).[10]

*Fourth*, the IRA does not provide ascertainable standards to guide CMS in setting the "maximum fair price." Protection "against arbitrary action" is the "touchstone of due process." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Government action therefore must be limited by "ascertainable standards" to avoid vesting agencies with "absolute and uncontrolled discretion" and "invit[ing] … abuse." *Holmes v. N.Y.C. Hous. Auth.*, 398 F.2d 262, 265 (2d Cir. 1968). In other words, "the standards prescribed by the" IRA must be "adequate" to meaningfully evaluate CMS's decisionmaking. *Bowles*, 321 U.S. at 516. Government action unconstrained by such limiting principles offends not only due process, but also the constitutional separation of powers. *See Holmes*, 398 F.2d at 264-65; *accord McClendon v. Rosetti*, 460 F.2d 111, 115-16 (2d Cir. 1972).

Although the IRA lists "factors" that CMS "shall consider," 42 U.S.C. § 1320f-3(e), "there are no criteria for how to weigh these considerations," nor any means to ensure that CMS has, in fact, weighed them, *NICA*, 116 F.4th at 495. Moreover, the IRA defines "maximum fair price" as any price established following

---

[10] CMS must eventually provide an "explanation for the maximum fair price," but not until months after the "negotiation period" concludes. 42 U.S.C. §§ 1320f-3(b)(2)(E), 1320f-4(a)(2).

the faux negotiations—there is no requirement that the price be supported by evidence or provide constitutionally adequate (i.e., non-confiscatory) compensation. *See* 42 U.S.C. § 1320f(c)(3). Nothing in the statute curbs CMS's ability to choose a price "at whatever levels [it] pleases." *Bowles*, 321 U.S. at 514. Indeed, while the IRA prescribes a ceiling on the "maximum fair price," 42 U.S.C. § 1320f-3(c), it imposes no floor. The IRA thus fails not only to adequately cabin CMS's discretion, but also to prevent the agency from setting prices at levels so low as to transgress "constitutional limitations." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968).

The end result is that there is no mechanism to ensure that CMS implements the Program in a way that comports with the statutory requirements enacted by Congress. No court has ever upheld a price-regulation scheme that goes to such great lengths in dispensing with procedural safeguards for private rights, and this Court should not take that extraordinary step.

### 2. CMS Violated the APA's Notice-and-Comment Requirement in Issuing the Manufacturer Agreement.

CMS compounded these deficiencies by violating the APA. On July 3, 2023, CMS issued a one-size-fits-all Manufacturer Agreement, stating that the document was "the final text" and that the agency would not "provid[e] a comment period." JA126. The APA requires "legislative rule[s]" that "impos[e] legally binding obligations … on regulated parties—and that would be the basis for an enforcement

action for violations of those obligations or requirements"—to follow notice-and-comment procedures. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *see also White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). The Manufacturer Agreement is a legislative rule because it alters manufacturers' rights and imposes enforceable legal obligations on them, including a duty to "comply with requirements determined by CMS to be necessary for purposes of administering the" Program and to follow all future CMS guidance (effectively transforming that guidance into binding law). JA296-99.[11] CMS therefore violated the APA by issuing the Manufacturer Agreement without observing notice-and-comment procedures.

The District Court held that the IRA displaces notice-and-comment procedures because section 11001(c) directs CMS to "implement" the Program during its first three years "by program instruction or other forms of program guidance." SPA40-43. That is incorrect for two reasons.

*First*, the Agreement does not fall within the scope of section 11001(c). The IRA distinguishes between the Agreement and "program instruction[s] or other forms of program guidance." *See, e.g.*, 42 U.S.C. §§ 1320f-2 (imposing specific

---

[11] The contractual nature of the Manufacturer Agreement does not alter the analysis, as the District Court correctly acknowledged. *See Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1053-54 (D.C. Cir. 1987); SPA39.

requirements for manufacturer agreements), 1320f-6(c) (imposing civil monetary penalties for "[v]iolations of certain terms of [the] agreement," but not the guidance or program instructions). And as a matter of plain language, a legally binding agreement backed by penalties cannot be described as "guidance" or "program instruction." Moreover, the Agreement was issued separately from and goes beyond what CMS labeled as "guidance." *Compare* JA96, *with* JA295. The District Court disregarded these distinctions.

*Second*, even if the Agreement were "guidance" or "program instruction," section 11001(c) lacks the elements necessary to displace the notice-and-comment requirement. Congress may exempt agency action from that requirement only through "a specific directive to adopt procedures other than those of the APA." *Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998). Such displacement "must be express" to make "clear" that Congress made "a substantive change." *Id.* Unlike other Medicare statutes, the IRA does not contain express language disclaiming the APA's applicability.[12] Although the District Court thought the IRA's reference to "guidance" "contemplat[ed]" a different process, SPA40, mere "contemplat[ion]" is not enough to expressly displace the APA. *See Asiana Airlines*,

---

[12] *See, e.g.*, 42 U.S.C. § 1320a-7c(a)(6)(J) ("*Notwithstanding any other provision of law*, the Secretary may implement the partnership established by subparagraph (A) by program instruction or otherwise." (emphasis added)); *id.* §§ 1395cc-7(c), 1395m(u)(7)(G), 1395w-4(k)(2)(A), 1395-3a(c)(5)(C) (similar).

134 F.3d at 397; 5 U.S.C. § 559 (statute cannot "modify this subchapter … except to the extent that it does so expressly").  Nor does a reference to "guidance" clearly denote replacement procedures, especially where agency action labeled as "guidance" can still trigger the APA's notice-and-comment requirement.  *See Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019).

CMS's disregard of the notice-and-comment requirement is particularly problematic because the Manufacturer Agreement further undermines Boehringer's due process rights.  For example, the Agreement purports to allow CMS to unilaterally amend the document's terms, even after it is executed.  *See* JA299 (requiring signatories to comply with future CMS guidance).  Boehringer would have urged CMS to omit these provisions, which would render ordinary commercial contracts illusory, *see, e.g.*, *Morrison v. Amway Corp.*, 517 F.3d 248, 257-58 (5th Cir. 2008), had the agency taken public comment.

**C. The Program Violates the First Amendment by Compelling Boehringer to Endorse the Government's Characterization of the Program.**

The Program compels Boehringer not only to turn over its property for a fraction of its market value, but also to state in writing *that it negotiated and agrees with those terms*.  That violates Boehringer's "right to refrain from speaking," *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps. Council 31*, 585 U.S. 878, 892 (2018), by forcing the company to endorse the Government's preferred messages about the

Program.  Indeed, by requiring Boehringer to attest that the price set through the Program is the "maximum fair price" for Jardiance®, the IRA forces Boehringer to attest that the market prices it has charged in the past (and continues to charge in private markets) are unfair.

### 1. The Program Unlawfully Compels Speech on a Matter of Public Concern.

"[T]he First Amendment protects the right to decide what to say and what not to say." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (cleaned up).  That rule prohibits the Government from manipulating the marketplace of ideas by "compel[ing] a person to speak its own preferred messages." *Elenis*, 600 U.S. at 586.  Laws "that requir[e] the utterance of a particular message favored by the Government contraven[e]" the First Amendment because they "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to … manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).  The right not to speak applies with special force to laws that, like the IRA, "require [individuals] to make statements [they] believ[e] are false," *Jackler v. Byrne*, 658 F.3d 225, 241 (2d. Cir. 2011), and "compe[l]" regulated parties to carry the Government's message "on matters of substantial public concern," *Janus*, 585 U.S. at 884.

Given the importance of this right, speech mandates are subject to "the most exacting scrutiny." *Turner*, 512 U.S. at 642.  Particularly for issues of public concern

such as drug pricing, speech mandates are permissible only if they are a "narrowly tailored means of serving a compelling [governmental] interest." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 17, 19 (1986) (plurality opinion) (*PG&E*). Below, the Government did not contend that the Program satisfies that demanding test, forfeiting the argument on appeal. Boehringer's claim thus rises or falls on a single issue: Does the First Amendment apply at all?

The answer is "yes." The First Amendment applies because the IRA compels Boehringer to make expressive statements that advance the Government's preferred messages regarding the Program. The statements, in other words, enlist Boehringer in a public-relations campaign in support of the Program.

By statute, Boehringer was required to sign the Manufacturer Agreement by October 1, 2023, or pay crippling excise tax penalties. *See* 26 U.S.C. § 5000D; 42 U.S.C. § 1320f(d)(2).[13] The statute further required Boehringer to state that it "agree[d]" to the Program's terms and would participate in "negotiations" with CMS regarding a "maximum fair price." 42 U.S.C. §§ 1320f-2(a)(1), 1320f-3(b); JA78. Boehringer was then required to sign an addendum by August 1, 2024, to avoid the

---

[13] These penalties, along with the other adverse consequences of failing to sign the Manufacturer Agreement, establish that the statements are compelled speech for First Amendment purposes. *See infra* pp. 54-55.

same penalties—this time attesting that Boehringer "agreed" to a "maximum fair price" following a period of "negotiations" with CMS. JA302-04.

Boehringer signed both documents under protest, reserving the rights asserted in this litigation. Yet by affixing its signatures, Boehringer was forced to endorse the Government's preferred framing of the Program as involving a negotiation to establish a fair price for Jardiance® products.

Boehringer does not agree that the Program involves "negotiation[s]." *See, e.g.*, 42 U.S.C. § 1320f-2; JA90. In a genuine negotiation, each party can accept or reject the other side's terms—and can walk away if there is no agreement. *See NICA*, 116 F.4th at 500. That element is absent here. While the Program may superficially resemble a negotiation, the "severe" consequences for manufacturers that do not reach "agreement" effectively ensure that manufacturers cannot walk away. *Id.*

Boehringer also disagrees that the prices set through the Program are "fair," much less the "maximum fair price[s]." Under the Constitution and as a matter of common usage, the fair price for a product is its "market value." *Horne II*, 576 U.S. at 369 (citation omitted). But the IRA requires prices set through the Program to be at least 25-60% below the market-based rate paid by wholesalers, and CMS must go as far below that ceiling as possible. 42 U.S.C. § 1320f-3(b)(1), (c). Further, the statute artificially constrains the data that CMS and the manufacturer may consider during the negotiation, omitting from the list of relevant factors the market value of

the drug and the manufacturer's research and development costs for other drugs—including many of the 99.98% of candidates that never reach the market. *See id.* § 1320f-3(b)(2)(B), (b)(2)(C)(ii)(II), (e); JA55.

Nor did Boehringer "agree" to participate in the Program—it was coerced into doing so. As noted above, Boehringer signed the Manufacturer Agreement under protest, and only as a means of avoiding even larger penalties. *See* JA90. Boehringer is thus situated similarly to the plaintiff in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 210 (2013) (*USAID*), which had to "agree" to objectionable views in an "award document" to avoid losing federal grant funds.

Signing the Manufacturer Agreement and participating in the negotiations falsely conveys that Boehringer "manifest[s] [its] assent" to each of these messages. *Thomas James Assocs., Inc. v. Jameson*, 102 F.3d 60, 65 n.2 (2d Cir. 1996); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 194-95 (2010) (signing a petition expresses views and thus implicates First Amendment rights); *USAID*, 570 U.S. at 214-21 (assessing whether contract with federal agency complied with First Amendment). By compelling Boehringer's speech, the IRA "vitiat[es]" Boehringer's right to decide which messages it will and will not speak. *Burns*, 890 F.3d at 84.

### 2. The District Court Erred in Holding that the Program Only Incidentally Affects Speech.

The District Court described the Program as a "typical price regulation" that regulates conduct and has only an "incidenta[l] burden" on Boehringer's speech. SPA30-31 (citation omitted).[14]

**i.** That conclusion rests on a faulty understanding of the statements compelled by the Program. Those statements are not "just an incidental means to CMS' goal of regulating drug prices" and are not limited to "regulat[ing] the price [Boehringer] may charge." SPA31-32 & n.16. Other price-setting programs involve a straightforward exercise in which an agency considers relevant data and sets a price—e.g., through rulemaking. The Program works in a fundamentally different way by prescribing not only how much Boehringer may charge, but also *what Boehringer must say* about that price.

Illustrating that point, Congress could have achieved the same effect on drug prices without requiring Boehringer to make subjective statements about the prices or the underlying procedure. For example, Congress could have authorized CMS to set prices directly, without requiring manufacturers to call them the "maximum fair price" or forcing manufacturers to say that the prices were agreed to through

---

[14] The District Court also found no First Amendment violation because "participation in the Program is voluntary." SPA31. That rationale fails for the reasons discussed in Part II below.

negotiation. The Program's negotiation framework has the same fiscal effect as direct price regulation, but it is politically quite different because there is broad public support for negotiating Medicare drug prices but also widespread opposition to top-down government price-setting.[15] The Program's compelled statements serve no purpose other than to influence that debate.

The compelled statements also distinguish the Program from other federal price-regulation schemes. For example, the Federal Energy Regulatory Commission "determine[s] the just and reasonable rate" for natural gas, 15 U.S.C. § 717d(a), and the Surface Transportation Board "prescribe[s] the maximum rate" a rail carrier may charge to transport cargo, 49 U.S.C. § 10704(a)(1). Neither of those programs—or countless others that employ a similar framework—compel regulated parties to characterize the process as a negotiation or say that the resulting price is fair. The agency thus bears clear responsibility for the price caps and their effects. In contrast, the IRA blurs the lines of accountability by compelling manufacturers to take partial ownership for the Program's consequences. The Program is, in short, meaningfully different from the "typical price regulations" cited by the District Court. SPA31.

---

[15] *Compare* Morning Consult, National Tracking Poll #2109099, at 13 (Sept. 16-19, 2021), https://perma.cc/9XCL-JECJ (American public supports "allowing the federal government to directly negotiate with drug companies to get a lower price on medications"), *with id*. at 17 (less than half of Americans support "effectively allowing the federal government to set the prices of drugs").

The Government recently acknowledged as much in related litigation, stating that it could not identify any other federal price-regulation program that compels private parties to describe the prices as "fair."[16]

The Program stands apart from other pricing programs for another reason: It compels speech on drug pricing, a widely debated "issue of public concern." *USAID*, 570 U.S. at 218. The President and other senior officials have invoked the Program's negotiation theme in connection with that debate. For example, the President remarked in his 2024 State of the Union Address that the Program "giv[es] Medicare the power to negotiate drug prices" and puts an end to "exorbitant prices."[17] After manufacturers of all ten drugs selected for the Program's first year signed the Manufacturer Agreement, the White House proclaimed that Boehringer and the other companies had "com[e] to the negotiating table."[18] "[T]ypical price

---

[16] Oral Arg. 1:07:07-1:08:48, *AstraZeneca Pharms., LP v Becerra*, No. 24-1819 (3d Cir. Oct. 30, 2024), https://www2.ca3.uscourts.gov/oralargument/audio/24-1819-1820-1821_Astazeneca-BristolMyers-Janssenv.SecretaryUSDeptHHS.mp3.

[17] State of the Union Address (Feb. 7, 2023), https://perma.cc/9MXK-WRS7. Other officials have disagreed with those views. During debate on the IRA, one Senator argued against the Program's "system of bureaucratic drug price controls" because it involves "negotiation in name only" and makes manufacturers "an offer [they] can't refuse." 168 Cong. Rec. S4155-56 (Aug. 6, 2022) (remarks of Sen. Crapo).

[18] White House, *Biden-Harris Administration Takes Major Step Forward in Lowering Health Care Costs; Announces Manufacturers Participating in Drug Price Negotiation Program* (Oct. 3, 2023), https://perma.cc/96N9-7ZS3.

regulations," SPA31, do not contribute to national debates or feature prominently in the State of the Union Address.

The statements quoted above (and scores of others like them[19]) reveal, and indeed rely upon, the expressive nature of the Program's compelled speech. One can credibly assert that manufacturers have "come to the negotiating table" and that "Medicare will no longer have to pay … exorbitant prices" only because manufacturers have signed agreements to negotiate and agreed to new, below-market "maximum fair prices."

**ii.** The District Court also misapplied *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006), and *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017). *Rumsfeld* recognized that conduct regulations that have a "plainly incidental" effect on speech do not offend the First Amendment. 547 U.S. at 62. The Court thus held that a law requiring universities to provide military recruiters the same access as "other recruiters" and "sen[d] scheduling e-mails" for meetings with military recruiters was permissible, in large part because it "did not dictate the content of the speech at all." *Id.*; *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("ordinance against outdoor fires [that] might forbid burning a flag" would only incidentally affect speech). The IRA, in contrast, dictates the content of

---

[19] *See, e.g.*, Price Announcement, *supra* n.4 (characterizing manufacturers as having "agreed to negotiated prices").

Boehringer's speech and goes much further than requiring the company to provide Jardiance® at the price established through the Program.

The provisions challenged here are strikingly similar to those at issue in *Expressions Hair Design*. There, the law prohibited businesses that use a "single sticker price" from displaying a surcharge price for customers who pay using a credit card. 581 U.S. at 41, 47. Unlike a "typical price regulation," which "would simply regulate the amount that a store could collect," the New York law "regulate[d] how sellers may *communicate* their prices." *Id.* at 47 (emphasis added). The fact that the law concerned prices did not insulate it from First Amendment scrutiny because it "regulat[ed] the communication of prices rather than prices themselves." *Id.* at 48.

So too here. The compelled statements Boehringer challenges regulate how it communicates *about* the prices set through the Program—Boehringer must make normative statements that it negotiated with CMS and agreed to a maximum fair price for Jardiance®. None of those statements affects the "prices themselves." *Id.* If the IRA had required Boehringer to sign a document merely agreeing to comply with a price set by CMS—as Congress has done in other contexts, *see, e.g.*, 38 U.S.C. § 8126(a)(2) (pharmaceutical procurement contracts with Department of Veterans Affairs)—*Rumsfeld* might apply. But because Congress went further than that, *Expressions Hair Design* controls and the Government's "incidental effect" defense fails.

### 3. The Program Violates the First Amendment by Compelling Boehringer to Engage in Expressive Conduct.

In addition to compelling *speech*, the Program unconstitutionally compels the company to engage in expressive *conduct*.

CMS's selection of Jardiance® triggered an obligation for Boehringer to participate in the Program's negotiation process. 42 U.S.C. §§ 1320f-2(a), 1320f-3(b). That process involves elements designed to make the Program resemble a genuine negotiation, including an exchange of offers. *Id.* § 1320f-3(b)(2)(A)-(E). Together, these procedures required Boehringer to engage in expressive conduct that advances the Government's messages regarding the Program. *See Texas v. Johnson*, 491 U.S. 397, 404-05 (1989) (courts evaluate expressive conduct in "the context in which it occurred," including "the likelihood … that the message would be understood by those who viewed it").

The District Court rejected that claim, holding that Boehringer's Program participation is not sufficiently expressive for three reasons, all faulty.

*First*, the District Court asserted that Boehringer's conduct is not expressive because the Manufacturer Agreement incorporates terms defined in the IRA. SPA33. But that reinforces Boehringer's argument: The statutory language implemented through the Manufacturer Agreement requires Boehringer to convey that the Program involves genuine negotiation. The actions Boehringer had to take in conducting those negotiations, such as making a counteroffer, *see* 42 U.S.C.

§ 1320f-3(b)(2)(C), support that message.  Moreover, simply using defined statutory terms cannot shield compelled speech from constitutional scrutiny.  *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015).

*Second*, the District Court misapplied the *Johnson* test, under which conduct "fall[s] within the scope of the [First Amendment]" if it is "sufficiently imbued with elements of communication."  491 U.S. at 404.  Contrary to the District Court's conclusion, the Program *does* "forc[e]" Boehringer to "convey a particularized message" through its participation.  SPA33.  As described above, the actions Boehringer had to take as part of the "negotiation process," 42 U.S.C. § 1320f-3(b)(2), conveyed—indeed, were *designed* to convey—that Boehringer agrees with and bears partial responsibility for the price set through the Program.

Contrary to the District Court's assertion, that expression is far more than a mere "kernel."  SPA33.  The fact that the President and other officials continue to cite Boehringer's participation to support their messages about CMS's "power to negotiate drug prices" and bring manufacturers "to the negotiating table"[20] underscores the communicative effect of that participation.  This sustained, prominent attention to the implications of manufacturers' participation belies the

---

[20] *See supra* nn.17-18.

District Court's attempt to analogize the Program's compelled expressive conduct to "walking down the street." SPA33.

*Third*, the District Court held that the disclaimer in the Manufacturer Agreement negated any message Boehringer's participation might have expressed. SPA31, 32 n.16, 33. The Manufacturer Agreement contains a clause, drafted unilaterally by CMS, stating that "[u]se of the term 'maximum fair price' and other statutory terms throughout [the] Agreement reflects the parties' intention that such terms be given the meaning specified in the statute and does not reflect any party's views regarding the colloquial meeting of those terms." JA299. That language is no defense: It is blackletter law that disclaimers cannot negate a compelled-speech injury. *See PG&E*, 475 U.S. at 15 n.11. Were the rule otherwise, the Government could "infringe on anyone's First Amendment interest at will, so long as the mechanism of such infringement allows the speaker to issue a general disclaimer." *Circle Sch. v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004). That rule reinforces the broader principle that the Government cannot "require speakers to affirm in one breath that which they deny in the next." *PG&E*, 475 U.S. at 16; *see also USAID*, 570 U.S. at 220-21 (counter-speech allows regulated parties to "express [contrary] beliefs only at the price of evident hypocrisy").

## II. The District Court Erroneously Rejected Boehringer's Constitutional Claims on the Theory that the Program Is Voluntary.

The Government has argued that the Program is immunized from constitutional challenge because manufacturers like Boehringer can avoid participating in the Program by "opt[ing] out of Medicare and Medicaid," and CMS "has broad leeway to impose conditions" when acting as a market participant. The District Court accepted these arguments, holding that the Program cannot violate Boehringer's rights because it is voluntary. *See* SPA21-30. That conclusion is incorrect for three reasons: (1) participation in the Program is coerced, not voluntary; (2) the theoretical ability to withdraw Boehringer's entire drug portfolio from Medicare and Medicaid is legally irrelevant; and (3) CMS implements the IRA in its sovereign, regulatory capacity.

### A. Boehringer's Participation Is Coerced, Not Voluntary.

When the Government coerces participation in a federal program, that participation is not voluntary. The Supreme Court has long rejected government attempts to "impose an unconstitutional burde[n]" on private parties "by threat of [even greater] penalties" and then "declare the acceptance [of those burdens] voluntary." *Union Pac. R.R. Co. v. Pub. Serv. Comm'n*, 248 U.S. 67, 70 (1918). In *Butler*, the Government argued that "voluntary co-operation" made its cotton program "constitutionally sound" even if "compulsory," but the Supreme Court disagreed: By employing "coercion by economic pressure[, t]he asserted power of

47

choice [was] illusory," making the program "not in fact voluntary." 297 U.S. at 70-71; *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 289 (1936) (program threatened substantial penalties "to compel compliance," such that "yielding to compulsion" to avoid the penalties "lack[ed] the essential element of consent").

The Supreme Court applied this longstanding anti-coercion principle in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*). There, states had the "choice" to accept onerous new Medicaid requirements or lose federal funding comprising 10% of their budgets. *Id.* at 588. But that "economic dragooning" left states "with no real option but to acquiesce." *Id.* By threatening to revoke *all* of a noncompliant state's existing Medicaid funding, Congress failed to provide a "genuine choice" and impermissibly coerced compliance. *Id.* at 581-88.

The IRA is similarly coercive, making any "choice" to avoid the Program illusory. According to the Government, Boehringer could (1) refuse to sign the Manufacturer Agreement and pay an enormous excise tax penalty; (2) divest its interest in Jardiance®; or (3) withdraw all its products from all parts of Medicare and Medicaid. *See* SPA14.[21] However, the undisputed record shows that Boehringer has "no real option" but to participate in the Program. *NFIB*, 567 U.S. at 582.

_____

[21] During the proceedings below, the Government raised a fourth option: stop selling Jardiance® to Medicare beneficiaries, while continuing to market all of Boehringer's

If Boehringer had "opted" to pay the excise tax penalty, it would have paid hundreds of millions of dollars per week initially, and billions per week after a few months. *See* JA89. Given these enormous amounts, it is no surprise that the Congressional Budget Office estimated that the tax would generate "*no* revenue" because "no manufacturer could afford to pay it." *NICA*, 116 F.4th at 495.

Had Boehringer divested Jardiance® entirely, it would have lost all rights to this life-saving drug. The District Court made clear why this option is legally irrelevant: "The government cannot evade a Fifth Amendment challenge by requiring manufacturers to choose between losing any property rights they have through Government appropriation and losing them through divestment." SPA19.

Had Boehringer withdrawn all of its drugs from Medicare and Medicaid, the company would have lost more than half its U.S. net sales, and more than one million patients would have lost coverage for more than 20 Boehringer drugs. *See* JA87-88, 89-90. That harm far exceeds the threatened 10% budget cut that constituted "economic dragooning" in *NFIB*. 567 U.S. at 582. This purported option takes advantage of "basic economic rationality": For a diversified manufacturer like

---

other drugs through Medicare and Medicaid. *See* SPA14, 20. The District Court observed that this purported option "may only exist in theory." SPA20 n.10. In fact, it does not exist at all because it would render superfluous Congress's decision to suspend the excise tax only if a manufacturer withdraws its *entire* portfolio from Medicare and Medicaid. *See* 26 U.S.C. § 5000D(c).

Boehringer, acquiescing to CMS's demands for one drug will always be "preferable to losing the Medicare [and Medicaid] market for all of its drugs." *NICA*, 116 F.4th at 500.

In short, the IRA makes it "all but certain" that manufacturers will "adopt the price that [CMS] offers" by making the cost of not participating in the Program far more "severe" than the cost of participation. *Id.*

The District Court discounted *NFIB*'s significance because that case involved federalism concerns. *See NFIB*, 567 U.S. at 576-78. Yet *NFIB* applied a broader coercion principle that protects private parties, not just states—as illustrated by *Union Pacific*, *Carter*, and *Butler*.[22] *Butler*, for example, held that a program coerced private cotton growers when it sought to "indirectly accomplish" unlawful "ends by taxing and spending to purchase compliance." 297 U.S. at 64-65, 74-75. And at least one court has applied *NFIB*'s "basic point" in the private-party context, holding that CMS could not coerce nursing homes to forgo arbitration agreements by "threatening to withdraw Medicare and Medicaid funding entirely from any facility that continues to use arbitration." *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 929 (N.D. Miss. 2016).

---

[22] The District Court "question[ed] whether [these cases] remain good law." SPA29 n.14. But unless and until the Supreme Court overrules them—which has not happened—they are "binding" precedent that lower courts "lac[k] authority to disregard." *Vasquez v. Garland*, 80 F.4th 422, 436 (2d Cir. 2023).

**B. Boehringer's Theoretical Ability to Withdraw from Medicare and Medicaid Is Legally Irrelevant.**

The District Court dismissed the evidence of coercion, relying on *Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993), to conclude that Boehringer's option to withdraw from Medicare and Medicaid makes the Program voluntary. *See* SPA21. Not only is *Garelick* inapposite, but the Supreme Court has rejected its reasoning in the takings context, and it does not apply in the due process or free speech contexts.

**1.** *Garelick* involved anesthesiologists who voluntarily participated in Medicare but argued that statutory limits on the amounts they could bill to patients effected a regulatory taking. *See* 987 F.2d at 916. As a regulatory takings case, *Garelick* is not "controlling precedent" for Boehringer's *per se* takings claim. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002). *Garelick* also did not involve allegations that the plaintiffs were coerced into participating in Medicare, nor were there coercive mechanisms similar to those employed by the Program here (e.g., devastating noncompliance penalties). At most, the plaintiffs argued that not participating in Medicare would create "economic hardship," 987 F.2d at 917, but they did not argue that economic pressures were so high as to make their "power of choice" "illusory," *see Butler*, 297 U.S. at 70-71; *see also NICA*, 116 F.4th at 500. *Garelick* thus had no occasion to reach the issues presented here.

51

Nor did *Garelick* involve the type of structural change to Medicare effected by the IRA. For nearly 20 years, CMS could not "interfere" in drug pricing negotiations between manufacturers and Part D insurance plans. 42 U.S.C. § 1395w-111(i) (2003). The IRA changed that by authorizing CMS to "institute a price structure" for Part D drugs. *See id.* § 1395w-111(i). For the first time, CMS selects manufacturers for participation in the Program and subjects them to penalties for noncompliance—either through the excise tax or across-the-board exclusion from Medicare and Medicaid. *See supra* Part II.A. Thus, at a minimum the Court must analyze whether *this* version of Medicare is voluntary.

**2.** *Garelick*'s legal compulsion rationale also conflicts with subsequent Supreme Court precedent. In *Horne*, the Government argued, and both lower courts held, that there was no *per se* taking because participation in the raisin market was voluntary. *See Horne v. Dep't of Agriculture*, 569 U.S. 513, 522 (2013) (*Horne I*); *Horne II*, 576 U.S. at 357, 365. The Supreme Court rejected those arguments as "prov[ing] too much": Allowing the Government to circumvent Fifth Amendment protections anytime someone "voluntarily ch[ose] to participate in [a] market" would allow "property rights [to] be … easily manipulated." *Horne II*, 576 U.S. at 365 (cleaned up); *see also Loretto*, 458 U.S. at 439 n.17 (apartment building owner suffered taking from forced installation of cable equipment even though owner could "ceas[e] to rent the building to tenants"). *Horne II* thus displaces *Garelick*'s legal-

52

compulsion requirement. *See United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) (panel decisions are not binding when "an intervening Supreme Court decision casts doubt on [this Court's] controlling precedent" (cleaned up)).

The District Court brushed aside this conflict because *Horne II* and *Garelick* involved different statutes. *See* SPA24. That misunderstands the inquiry. This Court does not evaluate whether "the intervening decision … address[es] the precise issue already decided by [this Circuit]," but whether there is "a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision." *Afriyie*, 27 F.4th at 168 (cleaned up). Such an inconsistency exists here. Had legal compulsion mattered in *Horne II*, the Supreme Court would have rejected the growers' takings claims. Moreover, the factual distinction cited by the District Court—i.e., that noncompliant raisin growers would have been barred from the entire market, whereas Boehringer could still sell Jardiance® outside of Medicare—played *no* role in *Horne II*'s reasoning. Instead, *Horne II* considered, and rejected as irrelevant, the growers' ability to sell the same grapes to other buyers, just as Boehringer could sell Jardiance® to non-Medicare patients. *See* 576 U.S. at 365.[23]

---

[23] The District Court also erroneously suggested that *74 Pinehurst LLC v. New York*, 59 F.4th 557 (2d Cir. 2023), demonstrated *Garelick*'s continued vitality post-*Horne II*. *See* SPA24. Yet *74 Pinehurst* neither cited *Garelick*'s legal-compulsion requirement nor considered *Horne II*'s rejection thereof.

**3.** Nor does *Garelick* control Boehringer's other claims. *Garelick* did not extend its legal compulsion requirement to due process or compelled-speech claims—this Court applied that requirement only in the regulatory takings context. *See* 987 F.2d 913.

Additionally, the Government recently acknowledged in related litigation that voluntariness is not a defense to due process claims,[24] and this Court has analyzed due process claims without applying *Garelick*. *See, e.g.*, *Furlong v. Shalala*, 156 F.3d 384, 392-93 (2d Cir. 1998) (citing, but not relying on, *Garelick* when analyzing due process claim). Moreover, the Supreme Court consistently has considered due process challenges to price-control regimes even where property owners were not legally compelled to participate. *See, e.g.*, *Bowles*, 321 U.S. at 517 (adjudicating due process claim despite "no requirement that the apartments in question be used for purposes which bring them under the Act"); *Yakus*, 321 U.S. at 438 (similar). The same approach applies here notwithstanding *Garelick*.

In the compelled-speech context, the Government's action need not be "actually coercive." *USAID*, 470 U.S. at 214; *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) (law "need not take the form of a direct threat or a gun to the head" to compel speech). Instead, "indirect discouragement"

---

[24] *See AstraZeneca* Oral Arg., *supra* n.16, at 2:04:09-27.

such as taxes, fees, or exclusion from a program is sufficient. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (cleaned up). Because the Program employs severe "discincentive[s]" and "penalt[ies]" to coerce manufacturers into endorsing the Government's message, Boehringer has shown that the IRA compels its speech.[25]

### C.    CMS Implements the Program as a Regulator, Not a Mere Market Participant.

The District Court concluded that CMS "can use its power as a dominant buyer to demand lower prices from drug manufacturers" because it has "broad leeway to impose conditions on its own purchases of goods and services." SPA21, 25-26.    That reasoning misunderstands CMS's role and would have sweeping consequences the District Court failed to consider.

**1.**  CMS acts as a regulator under the IRA.  Congress could have created a program involving genuine arms-length price negotiations between CMS and

---

[25] Even if legal compulsion were necessary in the First Amendment context, it exists here because Boehringer could not have withdrawn from the Program before the deadlines to sign the Manufacturer Agreement and participate in the negotiation process.  *See* 26 U.S.C. § 5000D(c)(2); 42 U.S.C. § 1395w-114a(b)(4)(B)(ii) (delaying effective date of manufacturer withdrawal by 11 to 23 months).  CMS attempted to circumvent this waiting period by offering, in guidance, to shorten the withdrawal period to 30 days, *see* JA226-27, but that guidance conflicts with the statute.  The IRA suspends the excise tax only when a *manufacturer* terminates its Medicare and Medicaid agreements, *see* 26 U.S.C. § 5000D(c) (requiring "notice" to Secretary of manufacturer's "terminations of all applicable agreements"), and the IRA delays termination "by a *manufacturer*" by 11 to 23 months, *see* 42 U.S.C. § 1395w-114a(b)(4)(B)(ii) (emphasis added).

manufacturers, in which CMS could exclude a drug from Part D if the manufacturer's terms were not acceptable. But that is not the Program Congress enacted. The IRA augments CMS's market power by giving the agency a significant regulatory role in implementing the Program. Specifically, CMS has authority to select drugs for the Program, issue requirements manufacturers must follow, and impose penalties on any manufacturer that fails to comply or tries to walk away. *See* 42 U.S.C. §§ 1320f-1, 1320f-2(a)(5), 1320f-6; 26 U.S.C. § 5000D. CMS also claims authority to amend the Manufacturer Agreement without Boehringer's consent. JA295-307.

Because CMS exercises *sovereign* powers by "employ[ing] … coercive mechanism[s] available to no private party," *Am. Trucking Ass'n v. City of Los Angeles*, 569 U.S. 641, 651 (2013), it is a "market regulator," not a market participant, *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006). Accordingly, a market-participant theory cannot excuse the Program's constitutional violations. The District Court erred in concluding otherwise. *See* SPA25-26.

**2.** The District Court also misapplied the law. Courts sometimes distinguish between Government action taken pursuant to sovereign and proprietary capacities. *See* SPA25-26. But many of these cases concern a government's regulation of its own employees, *see, e.g.*, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008),

and none of them overrides the Supreme Court's coercion precedent described above. Moreover, the cases do not support the sweeping implications of the District Court's reasoning, under which *all* procurement activities would be exempt from compliance with the First and Fifth Amendments.

If the District Court's approach were correct, the Government could use procurement contracts to make unconstitutional demands or engage in unconstitutional conduct. For example, the Government could insert itself as the predominant purchaser of electric vehicles in the United States and then require all manufacturers, as a condition of selling cars to the Government, to donate a percentage of each sale to a specific political candidate's campaign. Or it could retaliate against a contractor's political speech by denying the contractor's bid. In reality, however, courts have deemed these situations unconstitutional despite arising in the procurement context. *See, e.g.*, *O'Hare*, 518 U.S. at 720 (First Amendment prohibits termination of private contractors for refusing to contribute to a political candidate); *Oscar Renda Contracting Inc. v. City of Lubbock*, 463 F.3d 378, 385 (5th Cir. 2006) (independent contractor "is protected by the First Amendment if its bid is rejected in retaliation of its exercise of protected speech").

## III. The Program Would Violate the Unconstitutional Conditions Doctrine Even If Participation Were Voluntary.

If the Court concludes that the Program is voluntary, that would not end the constitutional inquiry. The unconstitutional conditions doctrine is an "overarching

principle" of constitutional law that prevents the Government from ransoming valuable benefits to "coerc[e] people into giving … up" their constitutional rights. *Koontz*, 570 U.S. at 604; *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The doctrine protects a wide variety of constitutional rights, including First and Fifth Amendment rights. *See Koontz*, 570 U.S. at 604 (collecting cases). Its protections also apply when the Government contracts for goods or services. *See, e.g.*, *O'Hare*, 518 U.S. at 721; *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 678-79 (1996).

As the District Court acknowledged, voluntary participation in the Program "is not dispositive," SPA34, because the unconstitutional conditions doctrine applies even when a party "has no 'right' to a valuable governmental benefit," yet seeks the benefit voluntarily. *Perry*, 408 U.S. at 597; *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) (similar). Here, even if the Program could be viewed as voluntary, it unconstitutionally conditions Boehringer's ability to participate in Medicare and Medicaid on relinquishing its constitutional rights.

**1.** Regarding Boehringer's takings claim, precedent establishes that *directly* requiring an owner to transfer property to a third party effects a *per se* taking. *See supra* Part I.A. The unconstitutional conditions doctrine precludes the Government from achieving the same result "indirectly." *Speiser*, 357 U.S. at 526. That is the case here. The IRA conditions Boehringer's ability to market *any* products through Medicare and Medicaid on participating in the Program and relinquishing property

rights in its Jardiance® products. That indirect appropriation of property is an unconstitutional condition. *See Horne II*, 576 U.S. at 366. Indeed, *NFIB* shows that conditions which leverage "existing" revenue streams to secure the Government's demands are even more constitutionally suspect. *See* 567 U.S. at 585.

Applying the related nexus-and-proportionality test from *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994), yields the same conclusion. Under that test, the Court considers whether the Program's conditions are related and proportional to CMS's interest in establishing a "maximum fair price" for Jardiance®. Neither requirement is satisfied here. There is not a sufficient nexus because the Program seeks a confiscatory, below-market price for Jardiance® by leveraging unrelated funding for other drugs that treat distinct health problems and serve distinct patient populations. Similarly, there is not sufficient proportionality because the IRA relies on an all-for-one tradeoff in which all of Boehringer's drugs are excluded from Medicare and Medicaid unless the company acquiesces in the "maximum fair price" for a single drug (Jardiance®).

The District Court suggested that *Monsanto* renders the unconstitutional conditions doctrine inapplicable outside the land-use context. *See* SPA36. Not so. *Monsanto* did not expressly narrow this doctrine, and *Koontz* more recently reiterated that it continues to apply in contexts outside land-use permitting. *See* 570 U.S. at 604. At most, *Monsanto* stands for the proposition that a truly voluntary

exchange "can hardly be called a taking," 467 U.S. at 1007—a principle that has no applicability where the Government threatens significant, unrelated funding streams to secure waiver of constitutional rights, as the Program does here. *See NFIB*, 567 U.S. at 585, 587.

The District Court also held that the Program does not violate the unconstitutional conditions doctrine because the Program's requirements are "closely related to the government's goal of controlling spending in the Medicare program." SPA38. But that oversimplifies the inquiry. As noted above, courts also consider whether conditions are proportional to the Government's goals. *See, e.g.*, *Dolan*, 512 U.S. at 385, 391; *NFIB*, 567 U.S. at 580 (asking whether "financial inducement … pass[es] the point at which pressure turns into compulsion" (cleaned up)); *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 257-63 & n.15 (1974) (comparing "the extent to which the" condition affected plaintiffs' rights and the strength of the Government's interests). It might have been proportional for Congress to withdraw Medicare coverage *for a selected drug* if its manufacturer objects to the price set through the Program. But Congress went much further, threatening funding for Boehringer's entire portfolio of unrelated drugs in both Medicare and Medicaid. Neither the District Court nor the Government has explained how eliminating coverage for *other* drugs furthers the Government's goal of reducing spending on one drug.

**2.** The conclusion is the same in the due process context. The Government cannot deprive Boehringer of its property rights without due process, *see supra* Part I.B, so it cannot coerce Boehringer into giving up those rights indirectly.

The District Court did not assess this claim on the merits, instead asserting that the unconstitutional conditions doctrine rarely, if ever, protects due process rights, and that applying the doctrine would invite a flood of litigation. SPA36. Neither assertion is true. Courts have applied the unconstitutional conditions doctrine in the due process context.[26] That comes as no surprise—the Supreme Court has never cabined this "overarching principle" of constitutional law to only a subset of constitutional rights. *Koontz*, 570 U.S. at 604. Moreover, ruling for Boehringer on this argument would not affect "nearly every government purchase from a private sector firm," SPA37, because the overwhelming majority of purchases are governed by laws that, unlike the IRA, provide constitutionally adequate process.

**3.** The Program also unconstitutionally conditions Medicare and Medicaid participation on relinquishment of Boehringer's First Amendment rights. In *USAID*, the Supreme Court clarified that while Congress can "specify the *activities* [it] wants

---

[26] *See, e.g.*, *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532 (E.D. Pa. 2019).

to subsidize"—even activities that implicate speech—it cannot regulate the "grantee." 570 U.S. at 214-17. The Court then explained that requiring a "recipient to adopt a particular belief as a condition of funding … as their own" involves regulating the grantee, because such a mandate would allow the grantee to "express [contrary] beliefs only at the price of evident hypocrisy." *Id.* at 217-18, 220-21.

So too here. Instead of regulating only specific activities, such as providing third parties access to Jardiance® at a specific price, the Program compels Boehringer to adopt the Government's characterizations of the Program: that the price was determined through arms-length negotiation, was agreed upon by both parties, and is the maximum price Boehringer can fairly charge. *See supra* Part I.C. Because each of these penalty-backed requirements obligates Boehringer to essentially "pledge allegiance to the Government's" views about the Program, *USAID*, 570 U.S. at 220, and because those views affect Boehringer outside Medicare (i.e., in the private market), the Program imposes an unconstitutional condition on Medicaid and Medicare participation.

## CONCLUSION

For these reasons, this Court should reverse the District Court's judgment and hold that the Program violates Boehringer's rights under the First and Fifth Amendments and the APA.

Respectfully submitted,

*/s/ Kevin F. King*
Robert A. Long, Jr.
Kevin F. King
Thomas R. Brugato
Michael A. Maya
Bradley K. Ervin
MaKade C. Claypool
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Counsel for Plaintiff-Appellant*
*Boehringer Ingelheim*
*Pharmaceuticals, Inc.*

November 4, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32.1(a)(4)(A) because it contains 13,948 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14 point font.

*/s/ Kevin F. King*
Kevin F. King

*Counsel for Plaintiff-Appellant*
*Boehringer Ingelheim*
*Pharmaceuticals, Inc.*

November 4, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system on November 4, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I also certify that I caused six copies of the foregoing brief to be delivered to the Clerk of Court for the United States Court of Appeals for the Second Circuit via overnight courier.

*/s/ Kevin F. King*
Kevin F. King

*Counsel for Plaintiff-Appellant*
*Boehringer Ingelheim*
*Pharmaceuticals, Inc.*

SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Ruling on Motions for Summary Judgment, dated July 3, 2024 . . . . . . . . . SPA1

Judgment Appealed From, dated July 9, 2024 . . . . . . . . . . . . . . . . . . . . . . . SPA48

Relevant Statutory Provisions (excerpted) . . . . . . . . . . . . . . . . . . . . . . . . . SPA49

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., *Plaintiff*, v. UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, *et al.*, *Defendants*. | No. 3:23-cv-01103 (MPS) |

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

The plaintiff, Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"), challenges the Inflation Reduction Act's Drug Price Negotiation Program (the "Program"), alleging that the Program violates its rights under the Due Process Clause, the Takings Clause, the First Amendment, and the Excessive Fines Clause. BI also claims that the Center for Medicare and Medicaid Services issued a legislative rule implementing the Program without complying with the Administrative Procedure Act's and Medicare Act's notice and comment requirements. The parties filed cross-motions for summary judgment, and I heard oral argument on June 20, 2024. For the reasons explained herein, I grant the defendants' motion and deny BI's motion as to all claims.

### II.      FACTS AND PROCEDURAL HISTORY

#### A.  Medicare's Prescription Drug Coverage

Medicare is a federally funded health insurance program for individuals 65 or older and for some younger individuals with disabilities. It covers prescription drugs through two programs: Medicare Part B and Part D. Medicare Part B covers certain medically necessary

services or preventative services, including prescription drugs that are administered by medical providers. *See* 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2). Medicare Part D is an optional program that provides outpatient prescription drug coverage to individuals who enroll in plans administered by private insurance companies. *See Brew v. Burwell*, 263 F. Supp. 3d 431, 433 (W.D.N.Y. 2017) (describing Part D coverage); 42 U.S.C. § 1395w-102 *et seq.* The government covers a portion of the cost of covered drugs through Medicare Part D.

### B. The Drug Price Negotiation Program

In 2022, Congress passed the Inflation Reduction Act (the "IRA"). Pub. L. No. 117-169 §§ 11001-11003, 136 Stat. 1818 (codified in pertinent part at 42 U.S.C. §§ 1320f–1320f-7 and 26 U.S.C. § 5000D). The IRA authorizes the Secretary of Health and Human Services to establish a Drug Price Negotiation Program (the "Program"), which aims to limit the cost of certain drugs under Medicare Parts B and D. 42 U.S.C. § 1320f *et seq.* The Secretary has delegated this authority to the Centers for Medicare and Medicaid Services ("CMS").[1]

"The Program operates in cycles," which I will refer to as Negotiation Periods. *AstraZeneca Pharms. LP v. Becerra*, No. 23-CV-00931, 2024 WL 895036, at *2 (D. Del. Mar. 1, 2024). For each Negotiation Period, CMS must (1) publish a list of drugs selected for the Program, 42 U.S.C. §§ 1320f(a)(1), 1320f-1, (2) "enter into agreements with manufacturers of [the] selected drugs," *id.* §§ 1320f(a)(2), 1320f-2, and (3) "negotiate and, if applicable, renegotiate maximum fair prices for such selected drugs," *id.* §§ 1320f(a)(3), 1320f-3. I will refer to the negotiation period that began in 2023 as the "Initial Negotiation Period."

---

[1] Because the Secretary of Health and Human Service's authority under the IRA and other related statutes has been delegated to CMS, I will refer to CMS when describing the statutory requirements, although the statutes refer to the Secretary.

### (i)    <u>Drug Selection</u>

To be eligible for the Program, among other requirements, a drug must be (1) on the market for at least 7 years, *id.* § 1320f-1(e)(1)(ii), (2) "single source," i.e., there is no FDA-approved generic version of the drug on the market, *id.* § 1320f-1(e)(1)(A)(iii), and (3) "among the 50 qualifying . . . drugs with the highest total expenditures" for either Medicare Part B or Part D,[2] *id.* § 1320f-1(b). From the eligible drugs, CMS then ranks the drugs according to total Medicare expenditures. *Id.* § 1320f-1(b)(A). CMS must select a specified number of drugs with the highest total expenditures (the "Selected Drugs") for the Program—10 drugs for the Initial Negotiation Period, 15 drugs for each of the next two Negotiation Periods, and 20 drugs for every subsequent Negotiation Period. *Id.* § 1320f-1(a).

On September 1, 2023, CMS published a list of ten Selected Drugs for the Initial Negotiation Period. *See* 42 U.S.C. §§ 1320f(d)(1), 1320f-1(a)(1) (setting September 1 deadline to select drugs). Jardiance, one of BI's drugs, was one of the Selected Drugs. *See* ECF No. 28-4; U.S. Dep't of Health & Hum. Servs., *HHS Selects the First Drugs for Medicare Drug Price Negotiation* (August 29, 2023), https://www.hhs.gov/about/news/2023/08/29/hhs-selects-the-first-drugs-for-medicare-drug-price-negotiation.html.

### (ii)    <u>Manufacturer Agreement</u>

Once drugs are selected for the Program, the IRA sets a deadline for CMS to "enter into agreements" with manufacturers that will govern the drug negotiation process. 42 U.S.C. § 1320f-2(a). For the Initial Negotiation Period, that deadline was October 1, 2023. *Id.* § 1320f(d)(4), 1320f-2(a).

---

[2] For the Initial Negotiation Period, only the 50 drugs with the highest expenditures under Medicare Part D are negotiation eligible. *Id.* § 1320f-1(d)(1); ECF No. 28-5 at 105 (CMS guidance describing the process for identifying negotiation-eligible drugs).

**SPA4**

On July 3, 2023, CMS issued a Medicare Drug Price Negotiation Program Agreement (the "Manufacturer Agreement"). ECF No. 28-3 ¶ 4; ECF No. 28-6. CMS did not go through a formal notice and comment process before issuing the Manufacturer Agreement. *See* ECF No. 28-7. On March 15, 2023, however, CMS issued guidance describing the possible contents of the Manufacturer Agreement and "voluntarily solicit[ed] comments" on "[t]erms and conditions contained in the manufacturer agreement." CMS, *Medicare Drug Price Negotiation Program: Initial Memorandum* (Mar. 15, 2023).

The Manufacturer Agreement provides that "CMS and the Manufacturer shall negotiate to determine . . . a maximum fair price for the Selected Drug." ECF No. 28-6 at 3. The manufacturer agrees to make that price available to "maximum fair price eligible" individuals, health care providers, pharmacies, or other entities described in the IRA. *Id.*; *see also* 42 U.S.C. § 1320f(c)(2) (defining "maximum fair price eligible individual"). And the Manufacturer must provide certain information to CMS about the drug, including the average price the drug is sold for on the "non-federal market" (i.e., the wholesaler price in non-governmental sales), and any other information that CMS requires to carry out its duties during the negotiation process. ECF No. 28-6 at 4; *see also* 42 U.S.C. § 1320f-2(a)(4) (statutory provision stating that the Manufacturer Agreement must require the manufacturer to provide this information). Any information the manufacturer submits that CMS determines is "proprietary information" can be used only for the purposes of carrying out the Program. 42 U.S.C. § 1320f-2(c). The Agreement contains the following disclaimer:

> In signing this Agreement, the Manufacturer does not make any statement regarding or endorsement of CMS's views and makes no representation or promise beyond its intention to comply with its obligations under the terms of this Agreement with respect to the Selected Drug. Use of the term "maximum fair price" and other statutory terms throughout this Agreement reflects the parties'

4

intention that such terms be given the meaning specified in the statute and does not reflect any party's views regarding the colloquial meaning of those terms.

ECF No. 28-6 at 5.

If a manufacturer does not sign the Manufacturer Agreement by the statutory deadline, i.e., October 1, 2023, it "could be exposed to potential excise tax liability" starting the day after the deadline and continuing until the manufacturer signs the agreement. ECF No. 28-5 at 121 (CMS guidance); 26 U.S.C. § 5000D(b)(1). The excise tax provisions of the IRA are described in more detail below.

On October 3, 2023, CMS released a statement indicating that the manufacturers of all Selected Drugs, including BI, had "chosen to participate in the [Program]" and had signed the Manufacturer Agreement. CMS, *Medicare Drug Price Negotiation Program: Manufacturer Agreements for Selected Drugs for Initial Price Applicability Year 2026* (October 3, 2023).

 **(iii)**  **Negotiation Process**

For the Initial Negotiation Period, negotiations opened October 2, 2023, unless the manufacturer signed the Manufacturer Agreement on an earlier date.

Negotiations proceed in several steps. 42 U.S.C. § 1320f-3(b)(2). First, the manufacturer must provide CMS with data about the selected drug. *Id.* §§ 1320f-3(b)(2)(A), 1320f(d)(5)(A) (setting October 2, 2023 deadline for data to be submitted).

Second, CMS makes an initial offer as to the "maximum fair price" Medicare will pay for the drug. For the Initial Negotiation Period, the deadline for CMS to make its initial offer was February 1, 2024. *Id.* § 1320f(d)(5)(B), 1320f-3(b)(2)(B). To determine the maximum fair price, CMS must consider specified factors, such as (1) data about the costs of researching, developing, manufacturing, and distributing the drug, and (2) evidence about whether alternative treatments

are available and about the comparative effectiveness of those treatments. *Id.* § 1320f-3(e). The IRA also sets a ceiling on the maximum fair price. *Id.* § 1320f-3(c). For the Initial Negotiation Period, the price ceiling is the lower of (1) the price Medicare paid for the drug in the prior year, *id.* § 1320f-3(c)(1)(B), or (2) a percentage, ranging from 40 percent to 75 percent, of the average price that wholesalers other than the federal government paid for the drug (adjusted for inflation), *id.* § 1320f-3(c)(1)(C)(i), (c)(3). For most drugs, including Jardiance, there is no floor on the price CMS can offer. *Id.* § 1320f-3(d).

Next, within 30 days after receipt of CMS's initial offer, the manufacturer must either accept the initial offer or make a written counteroffer, which must be "justified based on the [factors specified in the statute]." *Id.* § 1320f-3(b)(2)(C)(i)-(ii). CMS is then required to "respond in writing" to the counteroffer. *Id.* § 1320f-3(b)(2)(D). CMS guidance says that CMS will "act on [the] manufacturer['s] counteroffer" by April 1, 2024. ECF No. 28-5 at 92. "CMS may accept or decline [the] counteroffer." *Id.* If CMS declines the counteroffer, CMS and the manufacturer can schedule "[u]p to three possible negotiation meetings" to "negotiate [the maximum fair price] for the selected drug." *Id.* at 93. By July 15, 2024, CMS must make its final maximum fair price offer to the manufacturer, which the manufacturer must respond to by July 31, 2024. *Id.*

For the Initial Negotiation Period, negotiations end on August 1, 2024. *Id.*; 42 U.S.C. § 1320f(b)(4)(B), (d)(2)(B). If the manufacturer agrees to the maximum fair price, that price is incorporated into the Manufacturer Agreement via an addendum the manufacturer signs. *See* ECF No. 28-6 at 8 (addendum providing that "the Manufacturer and CMS have engaged in negotiation of the price for the Selected Drug," and "the Manufacturer and CMS now agree to a price for the Selected Drug"). If a Manufacturer does not agree to the maximum fair price by

August 1, it may incur "potential excise tax liability." ECF No. 28-5 at 156-57; 26 U.S.C. § 5000D(b)(2).

By September 1, 2024, CMS must "publish the maximum fair price" it has selected for the drug. And CMS must publish an "explanation for the maximum fair price with respect to the [factors specified in the statute]" by March 1, 2025. 42 U.S.C. §§ 1320f-4(a)(1)-(2), 1320f(d)(6). The final selected price will take effect on January 1, 2026. *Id.* § 1320f(b)(1)-(2). The maximum fair price may be renegotiated in subsequent years.

The IRA provides that "[t]here shall be no administrative or judicial review" of (1) the determination of which drugs are negotiation eligible, (2) the selection of drugs for the Drug Price Negotiation Program, or (3) the final selected maximum fair price. *Id.* § 1320f-7(2)-(3).

### (iv)   Civil Monetary Penalties

The IRA imposes civil monetary penalties on manufacturers that violate certain statutory requirements after they sign the Manufacturer Agreement. *Id.* § 1320f-6. A manufacturer that does not "provide access to a price that is equal to or less than the maximum fair price for such drug" to eligible individuals and entities is "subject to a civil monetary penalty." *Id.* § 1320f-6(a). For every unit of the drug the manufacturer sells for more than the maximum fair price, the manufacturer must pay a civil monetary penalty equal to ten times the difference between the higher price and the maximum fair price. *Id.* In addition, any manufacturer that has signed the Manufacturer Agreement but fails to submit information CMS needs to administer the program or otherwise comply with Program requirements is subject to a civil monetary penalty of $1,000,000 for each day of the violation. *Id.* §§ 1320f-6(c), 1320f-2(a)(4)-(5).

(v)   **The Excise Tax**

Manufacturers that do not sign the Manufacturer Agreement or agree to the maximum fair price may be subject to an excise tax on sales of Selected Drugs for each day of the "noncompliance periods." 26 U.S.C. § 5000D(a)-(b). Noncompliance periods begin when the deadline to sign the Manufacturer Agreement or agree to the maximum fair price has passed—for the Initial Negotiation Period, on October 2, 2023 and August 2, 2024, respectively. *Id.* § 5000D(b)(1)-(2). These noncompliance periods generally end when the manufacturer reaches an agreement with CMS. *Id.* § 5000D(b).

The excise tax is imposed "on the sale by the manufacturer . . . of any designated drug," *id.* § 5000D(a), which the statute defines as "any negotiation-eligible drug . . . included on the list [of drugs selected under 42 U.S.C. § 1320f-1(a) for the Program] which is manufactured or produced in the United States or entered into the United States for consumption, use, or warehousing," *id.* § 5000D(e)(1). The parties disagree as to whether the tax applies to all domestic sales of the drug, ECF No. 28-1 at 17 (plaintiff's position), or only sales made "under the terms of Medicare," ECF No. 96 at 46 (defendants' position). For its part, the IRS posted a Notice indicating that it will promulgate regulations establishing that "the § 5000D tax would be imposed on taxpayer sales of designated drugs dispensed, furnished, or administered to individuals *under the terms of Medicare*." ECF No. 28-14 at 4 (emphasis added). The Notice states that taxpayers "may rely on" its contents. *Id.* at 6.

The parties also disagree as to the excise tax rates the statutory formula requires. *See* ECF No. 28-1 at 17 (plaintiff arguing that the tax rate "begin[s] at 186 percent and escalate[s] to 1,900

percent"); ECF No. 96 at 46 (defendant arguing that the tax rate begins at 65 percent and

escalates to 95 percent).[3]

### (vi)      <u>Alternatives to Excise Tax Liability</u>

A manufacturer that does not wish to participate in the Program can avoid the excise tax

by transferring ownership of the Selected Drug to another entity, ECF No. 28-5 at 132-33, or

withdrawing all its products from Medicare and Medicaid, 26 U.S.C. § 5000D(c).

If a manufacturer decides to transfer ownership of a drug to another entity, under CMS

guidance, it must notify CMS at least 30 days before the transfer becomes effective. ECF No. 28-

5 at 132. Once the transfer becomes effective, any excise tax liability could be imposed on the

new owner. *Id.*

Alternatively, the manufacturer can maintain ownership of the drug and instead notify

CMS of its withdrawal from Medicare and Medicaid. The excise tax is "suspend[ed]" if (1) the

manufacturer provides CMS with notice of termination of certain Medicare and Medicaid

agreements, 26 U.S.C. § 5000D(c)(1)(A)(i), (c)(2)(B), and (2) none of the manufacturer's drugs

are covered by the Medicare Coverage Gap Discount Program Agreement or the Medicare Part D

Manufacturer Discount Program Agreement, 26 U.S.C. § 5000D(c)(1)(A)(ii). In other words, the

---

[3] While the parties disagree as to whether the tax is correctly described as a 186 to 1900 percent tax or a 65 to 95 percent tax, they seem to agree as to the actual amount of the tax for any given transaction. As discussed, the amount of the tax is set by a statutory formula: the ratio of the tax to the "sum of the tax and the price for which [the drug is] sold" must equal an "applicable percentage," which ranges from 65 percent to 95 percent. 42 U.S.C. § 5000D(a), (d). For instance, if the applicable percentage is 95 percent and the "price for which [the drug is] sold" is $1000, the tax would be $19,000 under the formula. However, an IRS Notice indicates that, under forthcoming IRS regulations, the manufacturer can pass the cost of the tax to the consumer. ECF No. 28-14 at 4-5. In our example, then, the manufacturer could invoice the consumer for a total of $20,000—$1,000 for the price of the drug and $19,000 for the tax. The government would then take $19,000 in tax revenue. The parties apparently do not disagree as to these amounts, but they do disagree as to how to characterize the resultant tax rate. The plaintiff argues that this example represents a 1900 percent tax rate, because the $19,000 the government receives is 1900 percent of the $1000 pre-tax cost of the drug. ECF No. 28-1 at 17; *see also* ECF No. 28-15 at 32 (Congressional Research Service report on the IRA's tax provisions stating that "[t]he excise tax rate would range from 185.71% to 1,900% of the selected drug's price depending on the duration of noncompliance"). The defendants argue that this example represents a 95 percent tax rate, because the government takes 95 percent of the total post-tax amount the consumer pays. ECF No. 96 at 46 (noting that "the maximum ratio of the tax to the total amount the manufacturer charges for a drug is 95%").

manufacturer must withdraw all of its products from Medicare and Medicaid to avoid the excise tax.

After the IRA was enacted, some manufacturers raised the possibility that they would be subject to excise tax liability while they were waiting to terminate their relationship with Medicare and Medicaid. *See* ECF No. 28-5 at 34 (CMS's revised guidance addressing this concern); Complaint ¶¶ 6, 82, *Merck v. Becerra*, No. 23-cv-01615 (D.D.C June 6, 2023) (ECF No. 1); Complaint ¶¶ 96, 98-100, *Dayton Area Chamber of Com. v. Becerra*, No. 23-cv-00156 (S.D. Ohio June 9, 2023) (ECF No. 1). A manufacturer can terminate its agreements under the Medicare Coverage Gap Discount Program and Manufacturer Discount Program "for any reason." 42 U.S.C. §§ 1395w-114a(b)(4)(B)(ii), 1395w-114c(b)(4)(B)(ii). By statute, however, the termination will not become effective until between 11 and 23 months later. *Id.*

Through guidance, CMS has established a process for a manufacturer "that is unwilling to enter into [a Manufacturer Agreement] to expedite its termination from the Medicare Coverage Gap Discount Program and the Manufacturer Discount Program." ECF No. 28-5 at 4. CMS "may provide for termination" of Medicare Coverage Gap Discount Program agreements, and "shall provide for termination" of Manufacturer Discount Program agreements, after just 30 days "for a knowing and willful violation of the requirements of the agreement or other good cause shown." 42 U.S.C. §§ 1395w-114a(b)(4)(B)(i), 1395w-114c(b)(4)(B)(i). The CMS guidance permits the manufacturer to send CMS a notice that states its intent not to participate in the Program and requests termination of its agreements under Medicare and Medicaid. ECF No. 28-5 at 121-22. Upon receipt of that notice, "CMS will find good cause to terminate the [manufacturer's] agreement(s) under the Medicare Coverage Gap Discount Program and the Manufacturer Discount Program . . . pursuant to [42 U.S.C. §§ 1395w-114a(b)(4)(B)(i), 1395w-

114c(b)(4)(B)(i)]." *Id.* at 122; *see also id.* ("CMS has determined . . . that it will automatically grant such termination requests upon receipt and that it will expedite the effective date [of termination so that it occurs thirty days after the manufacturer gives notice].") Under this expedited process, the manufacture could withdraw from Medicare and Medicaid in as few as 30 days. *Id.*

BI claims that withdrawing from Medicare and Medicaid is "not a real option" for it. ECF No. 28-1 at 45. As of 2021, Medicare accounted for 21 percent of national health expenditures, and Medicaid accounted for an additional 17 percent. ECF No. 28-11 at 3 (CMS National Health Expenditure Fact Sheet). According to BI, it sells more than 20 drugs through Medicare and Medicaid, and its income from participating in those programs "accounts for more than half of the company's net sales in the United States in many years." ECF No. 28-2 ¶ 7.

### C. Procedural History

On August 18, 2023, BI filed a complaint alleging that the Program (1) violates its Fifth Amendment right to procedural due process, (2) constitutes a physical taking under the Fifth Amendment, (3) compels speech in violation of the First Amendment, (3) violates the Excessive Fines Clause of the Eighth Amendment, and (5) unconstitutionally conditions BI's participation in federal programs on relinquishment of constitutional rights.[4] ECF No. 1 ¶¶ 90-158. BI also alleges that CMS violated the Administrative Procedure Act ("APA") and Medicare Statute by issuing legislative rules without notice and comment. *Id.* ¶¶ 159-231. The parties filed a joint motion indicating that this matter "can properly be resolved through dispositive motions without the need for discovery" and requesting that the Court set a briefing schedule, ECF No. 16, and

---

[4] The complaint also briefly suggests that the Program constitutes an unconstitutional delegation of Congress's authority, ECF No. 1 ¶¶ 90-92, but the complaint does not allege this as a distinct claim and none of the parties raise this issue in their summary judgment briefing. As such, I do not address it.

the Court granted that motion, ECF No. 17. In accordance with the briefing schedule set by the

Court, ECF No. 17, the parties cross-moved for summary judgment, ECF Nos. 28, 48.[5]

This case is one of multiple constitutional and APA challenges to the Program filed in

federal district courts. *See Dayton Area Chamber of Com. v. Becerra*, No. 23-CV-00156, 2023

WL 6378423 (S.D. Ohio Sept. 29, 2023) (denying plaintiffs' motion for a preliminary injunction

because plaintiffs had not demonstrated a strong likelihood of success or irreparable harm);

*AstraZeneca Pharms. LP v. Becerra*, No. 23-CV-00931, 2024 WL 895036 (D. Del. Mar. 1, 2024)

(dismissing APA claims for lack of standing and granting summary judgment for government on

due process claim); *Bristol Myers Squibb Co. v. Becerra*, No. 23-CV-03335, 2024 WL 1855054

(D.N.J. Apr. 29, 2024) (granting summary judgment for government on Fifth Amendment

Takings Clause claim, First Amendment claim, and unconstitutional conditions claim); *Nat'l

Infusion Ctr. Ass'n v. Becerra*, No. 23-CV-00707, 2024 WL 561860, at *5 (W.D. Tex. Feb. 12,

2024) (granting motion to dismiss claims for lack of jurisdiction and improper venue); *Novo

Nordisk Inc. v. Becerra*, No. 3:23-CV-20814 (D.N.J.) (motion for summary judgment pending);

*Novartis Pharmaceuticals Corp.*, No. 3:23-CV-14221 (D.N.J) (motion for summary judgment

pending); *Merck & Co. v. Becerra*, No. 1:23-CV-01615 (D.D.C.) (motion for summary judgment

pending).

### III.   LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v.

Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In

reviewing the summary judgment record, a court must "construe the facts in the light most

---

[5] The Court also exempted the parties from Local Rule 56(a)'s requirement that they file statements of undisputed fact.

favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "Claims turning entirely on the constitutional validity or invalidity of a statute are particularly conducive to disposition by summary judgment as they involve purely legal questions." *Connecticut ex Rel. Blumenthal v. Crotty*, 346 F.3d 84, 93 (2d Cir. 2003).

## IV.    DISCUSSION

### A. Fifth Amendment Claims

BI argues that the Program violates the Fifth Amendment because (1) it deprives BI of its property interest in both "physical doses of Jardiance" and BI's confidential data without due process of law,[6] ECF No. 28-1 at 21-30, and (2) it effects a physical taking of BI's doses of Jardiance without just compensation, *id.* at 30-35.

Both the Due Process Clause and the Takings Clause require BI to establish that the government has "deprived [it] of a protected property interest." *Story v. Green*, 978 F.2d 60, 62 (2d. Cir. 1992). To raise a procedural due process claim, BI must "(1) identify a liberty or property interest, (2) show that the state has deprived [it] of that interest, and (3) show that the

---

[6] I note that BI does not argue that it has a property interest in charging Medicare a certain rate for its drugs. Nor could it: "procedural due process protections" attach when "state or federal law confers an entitlement to benefits." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005). BI points to no law that entitles it to any particular rate of Medicare reimbursement.

deprivation was [e]ffected without due process." *Wheatley v. New York State United Tchrs.*, 80 F.4th 386, 392 (2d Cir. 2023).

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "When the government effects a physical appropriation of private property for itself or another—whether by law, regulation, or another means—a per se physical taking has occurred." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 563 (2d Cir. 2023). The Takings Clause protects "personal property . . . against physical appropriation" by the government, just as it protects real property. *Horne v. Dep't of Agriculture*, 576 U.S. 350, 359 (2015). BI contends that the Program constitutes a physical taking of its property. But it disavows any claim of a regulatory taking, ECF No. 28-1 at 30 n.14, which "occurs when a regulation goes 'too far' in restricting a landowner's ability to use his own property." *74 Pinehurst LLC*, 59 F.4th at 564 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

The defendants argue that the Program does not deprive BI of its property under the Due Process Clause or Takings Clause, because participation in the Program is voluntary: BI can "withdraw[] from the Medicare and Medicaid programs," it can "divest its interest in the [Selected Drug] to a separate entity," or it can "stop selling [the Selected Drug] to Medicare beneficiaries, permanently or temporarily." ECF No. 48-1 at 37.

BI disputes whether it can evade the Program's requirements through the mechanisms the government proposes. And it argues that withdrawing from Medicare and Medicaid is not a realistic option, because of the large economic cost. I disagree and hold that because BI can opt out of Medicare and Medicaid, it has not been deprived of property for the purposes of its Due Process Clause and Takings Clause claims.

# SPA15

**(i)      Alternatives to Participating in the Program**

The parties disagree as to whether the IRA allows manufacturers to avoid participating in the Program. I begin, then, by assessing whether manufacturers seeking to escape the Program can opt out of Medicare and Medicaid, divest their interest in the Selected Drug, or decline to sell the Selected Drug to Medicare.

Withdrawing from Medicare and Medicaid

BI argues that there is no expeditious way for manufacturers to terminate their Medicare agreements. ECF No. 28-1 at 48. By statute, a manufacturer's notice of withdrawal from the Medicare Coverage Gap Discount Program Agreement or the Manufacturer Discount Program Agreement will not become effective until at least 11 months and up to 23 months after the notice is submitted. 42 U.S.C. §§ 1395w-114a(b)(4)(B)(ii), 1395w-114c(b)(4)(B)(ii). If a manufacturer learned its drug was selected for the Program on September 1, 2023, and sought to withdraw from those agreements immediately, its withdrawal would not be effective until January 1, 2025. *Id.* §§ 1395w-114a(b)(4)(B)(ii)(II), 1395w-114c(b)(4)(B)(ii)(II). In the meantime, if it refused to sign the Manufacturer Agreement on October 1, 2023 or did not agree to the maximum fair price on August 1, 2024, it could be subject to excise tax liability. *Id.* § 5000D(c)(1)(A)(ii) (providing that the excise tax is suspended only if "none of the drugs of the manufacturer of the designated drug are covered by a [Medicare Coverage Gap Discount Program Agreement or Manufacturer Discount Program Agreement.]").

Even when this delay is factored in, however, BI can still withdraw from Medicare without penalty before the maximum fair price takes effect. A manufacturer seeking to escape the Program can sign the Manufacturer Agreement and agree to a maximum fair price for its

Selected Drug by August 1, 2024, and then, before January 30, 2025, give notice of its withdrawal from the Medicare and Medicaid Programs. *See* ECF No. 121 (BI's counsel conceding that this is an option). Such a manufacturer would never have to sell the Selected Drug at the maximum fair price and would face no excise taxes or civil penalties.

In addition, CMS has created an accelerated path for manufacturers to terminate their Medicare agreements. CMS guidance states that, upon notice from the manufacturer that it does not wish to participate in the Program and that it requests termination, CMS will find "good cause" to terminate any Medicare Coverage Gap Discount Program Agreement or Manufacturer Discount Program Agreement. ECF No. 28-5 at 121-22; *see id.* at 122 (CMS "will automatically grant such termination requests upon receipt"). Existing statutes permit (and in some cases, require) CMS to "provide for termination of" Medicare agreements after 30 days for "knowing and willful violation of the requirements of the agreement or other good cause shown." 42 U.S.C. §§ 1395w-114a(b)(4)(B)(i), 1395w-114c(b)(4)(B)(i). CMS notified BI that Jardiance was a Selected Drug on September 1, 2023. This means that BI had an opportunity to withdraw from Medicare and Medicaid even before the October 2 deadline for committing to negotiations with and submitting data to CMS.[7]

BI argues that CMS's accelerated termination option is "foreclose[d]" by "the text and structure of the relevant statutory provisions." ECF No. 28-1 at 48. It accuses CMS of "ignor[ing]" the statutory language by "treating termination requests *by manufacturers* as termination requests *by the Government*." *Id.* And it claims that the IRA "limits 'good cause' to

---

[7] It is true that, if BI did not wish to submit data, the 30-day notice period would have meant that it had to act within a day of learning that Jardiance had been selected if it wanted to avoid the excise tax. But BI was on notice that Jardiance might be selected from the date of the enactment of the IRA, i.e., August 16, 2022. And the selection of Jardiance on September 1, 2023 could hardly have been a surprise given the statutory selection criteria, which focus on drugs that account for the highest total expenditures by Medicare. *See* 42 U.S.C. § 1320f-1(d)(1). Further, BI was alerted to the 30-day withdrawal option no later than June 30, 2023, when CMS published its revised guidance.

'knowing and willful violations of the requirements of the agreements' and related malfeasance."
ECF No. 92 at 19.

The statutory text does not support BI's interpretation. Nothing in the statute prohibits
CMS from commencing the 30-day good cause termination process upon receiving a notice from
the manufacturer; it simply precludes the manufacturer from opting for the 30-day termination
process unilaterally. 42 U.S.C. § 1395w-114a(b)(4)(B)(i) (providing for 30-day "good cause"
terminations by CMS under the subheading "Termination – By the Secretary"), (ii) (providing
for 11 to 23 month termination for any reason by the manufacturer under the subheading
"Termination – By a manufacturer"); *id.* § 1395w-114c(b)(4)(B)(i), (ii) (same). Further, the
statute states that CMS "may *provide for* termination of an agreement … for a knowing and
willful violation of the . . . agreement or other *good cause* shown.'" *Id.* § 1395w-114a(b)(4)(B)(i)
(termination by the Secretary of Medicare Coverage Gap Discount Program agreements;
emphases added); *id.* § 1395w-114c(b)(4)(B)(i) (same language for termination of Manufacturer
discount program agreements, except that CMS "*shall* provide for termination" of such
agreements in such circumstances (emphasis added)). Congress's use of the phrase "provide for"
suggests that it expected CMS to identify specific instances of "good cause" in the future as
experience under the statute developed. *See* Provides For, Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/provide%20for (defining "provides for" as "to
cause (something) to be available or to happen in the future"); Provide For, Oxford Learner's
Dictionaries, https://www.oxfordlearnersdictionaries.com/definition/english/provide-for
(defining "provide for" as "to make preparations to deal with something that might happen in the
future" and "to make it possible for something to be done," among other definitions). Such a

direction to an agency to adapt to future scenarios would be superfluous if Congress intended to restrict "good cause" to "other related malfeasance."

In addition, the term good cause is "a uniquely flexible and capacious concept, meaning simply a legally sufficient reason." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 429 n.2 (2023) (citation and internal quotation marks omitted).[8] A manufacturer's desire to withdraw from the Program before its teeth clamp down is good cause, particularly where "the absence of a speedy exit option would raise serious constitutional questions." ECF No. 96 at 17; *see Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 182 (2d Cir. 2006) ("Court[s] must construe statutes, where necessary and possible, to avoid serious constitutional issues."). So CMS's creation of the accelerated termination option was well within its statutory authority to "provide for termination of" Medicare agreements for good cause.

BI also argues that, even if it has the option to withdraw from Medicare and Medicaid after a 30-day delay, it is still required to "participate in the Program for a period of time." ECF No. 92 at 13. But mere participation in the Program, i.e., signing the Manufacturer Agreement and responding to CMS' offer of a "maximum fair price," does not constitute a deprivation of

---

[8] To the extent BI relies on the *ejusdem generis* canon to support its argument that "good cause" is restricted to "related malfeasance" because it follows "knowing and willful violation of . . . the agreement," *see* ECF No. 92 at 19-20 (citing *Owen of Georgia, Inc. v. Shelby County*, 547 F.2d 1084 (6th Cir. 1981)), its reliance is misplaced. *Ejusdem generis* holds that "words grouped in a *list* should be given given related meaning." *Shelby County*, 648 F.2d at 109 (emphasis added); *see also id.* ("[W]here general words follow specific words in an *enumeration* describing the legal subject, the general words are construed to embrace only objects similar to those objects enumerated by the preceding specific words." (emphasis added)); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) (explaining that "[t]he *ejusdem generis* canon applies" where "general words follow an enumeration of *two or more* things" (emphasis added and internal alterations omitted)). Here, by contrast, "other good cause" follows a single term, "knowing and willful violation" of the agreement. There is no cluster of related, specific terms to confine the meaning of "other good cause."

property under the Takings Clause or the Due Process Clause. Any deprivation of BI's alleged interest in Jardiance would occur, if at all, after the maximum fair price goes into effect in 2026.[9]

As to BI's claim that it has been deprived of its "property interest in its confidential data regarding Jardiance," ECF No. 28-1 at 23, BI was not required to turn over any data until October 2, 2023, *id.* §1320f-3(b)(2)(A), 1320f(d)(2)(A) (setting October 2, 2023 deadline for data to be submitted). As I have explained, it had an option to withdraw from Medicare and Medicaid before that point. *See* note 7, *supra*.

For all these reasons, I conclude that BI had the option to withdraw from Medicare and Medicaid before any taking or deprivation of its property interests.

<u>Divesting Interest in Jardiance</u>

The defendants also claim—and BI does not contest—that BI can avoid participating in the Program by divesting its interest in Jardiance. ECF No. 48-1 at 36. But the existence of this option is not relevant to the Fifth Amendment analysis. The government cannot evade a Fifth Amendment challenge by requiring manufacturers to choose between losing any property rights they have through government appropriation and losing them through divestment. Nor do the defendants cite any caselaw to support the notion that the option to divest property prior to deprivation can prevent a Fifth Amendment violation, and the Supreme Court has rejected this notion. *See Horne*, 576 U.S. at 363 (noting that, in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430, 436 (1983), the Court "held that the installation of a cable box on a

---

[9] BI's counsel stated during oral argument that, in his view, the physical taking of BI's property occurs at the moment BI is "required to give that access [to Jardiance], that's when [its] right to exclude . . . is appropriated for the benefit of third parties." ECF No. 121 at 15. That moment, he agreed, does not occur until the first date BI has to sell the product at the maximum fair price: January 1, 2026. *Id.* at 17 ("The Court: So [Medicare beneficiaries] don't have access to the price till January 1, 2026; is that true? Mr. King: Yes, that's correct, [they] don't have access to the price until January 1, 2026.").

small corner of Loretto's rooftop was a *per se* taking, even though she could of course still sell and economically benefit from the property").

<u>Stopping Sales of Jardiance to Medicare</u>

Finally, the defendants suggest that the IRA permits BI to avoid any statutory penalties if it "stop[s] selling [Jardiance] to Medicare beneficiaries, permanently or temporarily." ECF No. 48-1 at 36. They point out that while the statute and agency guidance require manufacturers to provide Medicare beneficiaries with access to a certain *price*, nothing requires manufacturers to provide access to the drug itself. ECF No. 96 at 30-31; *see* 42 U.S.C. § 1320f-2(a)(3) ("[CMS] shall enter into agreements with manufacturers . . . under which . . . access to the maximum fair *price* . . . shall be provided by the manufacturer" to Medicare beneficiaries and their medical providers (emphasis added)); ECF No. 28-6 at 2 (Manufacturer Agreement: "[T]he Manufacturer, if it reaches agreement with CMS, intends to provide access to the determined *price* to [maximum fair price]-eligible individuals . . . ." (emphasis added)); ECF No. 28-5 at 126-27 (CMS Guidance: "After entering into an Agreement with CMS . . . the manufacturer of a selected drug must provide access to the [maximum fair *price*]" to Medicare beneficiaries and their medical providers (emphasis added)). The defendants also claim the statutory penalties (the excise tax and civil monetary penalties) are imposed only on sales that BI makes to Medicare. ECF No. 48-1 at 23. Thus, the defendants argue, "if, after signing the agreement with CMS, BI were to refuse to sell Jardiance to Medicare beneficiaries, that would not be prohibited by the IRA—and would subject BI to no 'penalty.'" ECF No. 96 at 31.[10]

---

[10] During oral argument, however, defense counsel acknowledged that "it might be logistically difficult for companies to start parsing where the sale is going and try to restrict the Medicare beneficiaries from receiving a drug," because manufacturers use intermediaries to distribute drugs. ECF No. 121 at 50. So while this option may exist in theory, it is unclear whether any manufacturer can realistically make use of it.

BI responds that the defendants "do[] not say how a third party supposedly could access an abstract price without also receiving the underlying product." ECF No. 92 at 38. It argues the defendants' "cramped reading would defeat the Program's core purpose of providing access to drugs at lower prices." *Id.* It also maintains that the excise tax applies not only to sales to Medicare beneficiaries and their providers but also to all domestic sales of each Selected Drug. ECF No. 28-1 at 41.

But I need not decide whether manufacturers can evade the Program (or its penalties) by refusing to sell the Selected Drug to Medicare beneficiaries. Even if they cannot, as I explain in the next section, that does not deprive manufacturers of their property, because they have the option to withdraw from Medicare and Medicaid. So for the purposes of my analysis, I assume without deciding that withdrawing from Medicare and Medicaid is the only alternative to participating in the Program.

### (ii)      Voluntariness of the Program

BI argues that the option to withdraw from Medicare and Medicaid does not render the Program voluntary, because "forcing [it] to abandon [Medicare and Medicaid]," which occupy "nearly half the U.S. health care market" and account for over half BI's sales, is "'economic dragooning that leaves [it] with no choice but to acquiesce' to the Program." ECF No. 28-1 at 45 (citation omitted). The question, then, is whether the government can use its power as a dominant buyer to demand lower prices from drug manufacturers. The caselaw makes clear that it can.

The leading case is *Garelick v. Sullivan*, in which the Second Circuit considered a challenge by anesthesiologists to a law that limited the amount they could charge Medicare beneficiaries under Medicare Part B. 987 F.2d 913, 915 (2d Cir. 1993). The anesthesiologists

claimed that "the limiting charge regime g[ave] rise to a taking of property without just compensation." *Id.* The Second Circuit concluded that there "[could] be no taking," because the anesthesiologists had "voluntarily participate[d]" in Medicare. *Id.* at 916. The court noted that the law did not require the anesthesiologists to treat Medicare patients, and they "retain[ed] the right to provide medical services to non-Medicare patients free of price regulations." *Id.* at 916-17 ("Because they voluntarily [chose] to provide services in the price-regulated Part B Program, the plaintiff anesthesiologists do not have a viable takings claim."). And it rejected an argument that participation in Medicare was not voluntary because refusing to treat Medicare beneficiaries was "not an economically viable option" for the anesthesiologists. *Id.* at 917. The court observed that "economic hardship is not equivalent to legal compulsion for purposes of takings analysis." *Id*.

Other circuits have reached similar conclusions in evaluating other governmental limits on reimbursements to healthcare providers. *See, e.g.*, *Baker Cnty. Med. Servs., Inc. v. Atty. Gen.*, 763 F.3d 1274, 1276, 1279-80 (11th Cir. 2014) (noting that a "long line of cases instructs that no taking occurs where a person or entity voluntarily participates in a regulated Program or activity," rejecting Takings Clause challenge to federal statute requiring hospitals that opted into Medicare to treat federal detainees in emergency rooms at Medicare reimbursement rates, and finding participation in Medicare voluntary, even though "opting out of Medicare would amount to a grave financial setback"); *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 129 (1st Cir. 2009) (rejecting Takings Clause challenge to state law requiring hospitals that participate in MaineCare to provide care to low-income patients at capped reimbursement rates, and observing that "where a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking"); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of*

*Pub. Welfare*, 742 F.2d 442, 445 (8th Cir. 1984) (rejecting Takings Clause challenge to state statute conditioning participation in Medicaid on agreement by nursing home that it would not charge residents rates that were more than a specified amount: "it is . . . only through voluntary participation in the state's Medicaid program that a nursing home falls within the purview of [the state law]," and "[d]espite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary"); *see also Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 983 F.3d 498, 515 (D.C. Cir. 2020) ("[W]hen an owner of property voluntarily participates in a regulated market, additional regulations that may reduce the value of the property regulated do not result in a taking" (citation and internal quotation marks omitted)). BI cites no case to the contrary involving the government as a market participant, let alone a case involving a government health insurance program.

Courts in other circuits have also rejected Takings Clause challenges to the 340B Drug Price Program, which conditions drug manufacturers' participation in Medicaid and Medicare Part B on their agreement to sell drugs at a discounted price to the Veterans Health Administration and certain non-profit hospitals, among other entities. *Eli Lilly & Co. v. United States Dep't of Health & Hum. Servs.*, No. 1:21-CV-00081, 2021 WL 5039566, at *21 (S.D. Ind. Oct. 29, 2021) ("[Drug manufacturers] have voluntarily chosen to participate in the 340B program and are thus free to terminate their participation if and when they may choose to do so . . . . We concede that in withdrawing from the 340B program Lilly would no longer receive coverage or reimbursement for its products under Medicaid and Medicare Part B, which would result in a significant financial impact for Lilly, but 'economic hardship is not equivalent to legal compulsion for purposes of takings analysis.'" (quoting *Garelick*, 987 F.2d at 917)); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F. Supp. 3d 129, 210 (D.N.J. 2021)

23

("[F]inancial inducement generally does not rise to the level of a taking, 'as long as' a private party is 'aware of the conditions' and the conditions are 'rationally related to a legitimate Government interest.'" (quoting *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984)), *rev'd on other grounds*, 58 F.4th 696 (3d Cir. 2023).

BI nonetheless argues that the reasoning in *Garelick* and other similar cases "is inconsistent with the Supreme Court's later decision in [*Horne v. Dep't of Agriculture*, 576 U.S. 350 (2015)]." ECF No. 28-1 at 49. In *Horne*, the Supreme Court weighed a Takings Clause challenge to a Department of Agriculture market order requiring raisin growers to reserve a portion of their crop for the government's use. 576 U.S. 350. The government argued that "the reserve requirement [was] not a taking because raisin growers voluntarily choose to participate in the raisin market," and had the option to "sell their raisin-variety grapes as table grapes or for use in juice or wine." *Id.* at 365. The Court disagreed, holding that "a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *Id.* at 364-65.

The marketing order in *Horne* is readily distinguishable from the statutory provision at issue in *Garelick*—and the statute at issue in this case. First, the plaintiffs in *Garelick* and this case may continue to sell their medical services or products on the private market if they withdraw from Medicare. By contrast, the raisin growers in *Horne* were barred from the entire market for raisins if they did not comply with the reserve requirement. *Bristol Myers Squibb Co.*, 2024 WL 1855054, at *6 (discussing this distinction). Not surprisingly, then, even after *Horne*, the Second Circuit has continued to rely on the same general principle articulated in *Garelick*, i.e., that voluntary participation in a regulated market precludes a takings claim. *74 Pinehurst LLC v. New York*, 59 F.4th at 564 (citing *Horne*, but rejecting physical takings challenge brought

by associations of landlords against amendments to New York rent stabilization law: "[N]o plaintiff alleges that the [rent stabilization law] forces [landlords] to place their properties into the regulated housing market.").

Second, the statutes in *Garelick* and this case seek to regulate prices only in a portion of the drug market created and funded by the federal government: the purchasing of drugs on behalf of Medicare beneficiaries. In a variety of contexts, the Supreme Court and the Second Circuit have recognized that "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor.'" *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598 (2008) (collecting cases applying this distinction to government regulation of its employees in the First and Fourth Amendment contexts); *Selevan v. New York Thruway Auth.,* 584 F.3d 82, 93 (2d Cir. 2009) (discussing the market participant doctrine, which "differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant" in the Dormant Commerce Clause context (citations and internal quotation marks omitted)). Likewise, other circuit courts have found that "[t]aking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity." *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (finding that government breach of contract does not "give rise to compensation under the Fifth Amendment"); *see also Preston Hollow Cap., L.L.C. v. Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022) (same); *Masso-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 467-68 (1st Cir. 2017) (same). The government has broad leeway to impose conditions on its own purchases of goods and services. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940) ("Like private individuals and

25

businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.").

Third, in *Horne*, the government enforced its raisin regulation by physically appropriating the Hornes' raisins. *Horne v. Dep't of Agric.*, 576 U.S. 350, 356 (2015) ("The Government sent trucks to the Hornes' facility at eight o'clock one morning to pick up the raisins."). In *Garelick* and in this case, the statutes do not permit the government to seize the plaintiffs' property (or to provide access to it by others) if they refuse to turn it over. Moreover, unlike a price regulation, which is ordinarily applied at the point of sale, the reserve requirement meant the Hornes needed to give up their raisins before any sale occurred. *Horne*, 576 U.S. at 356. By contrast, the government in *Garelick* and in this case is regulating the price of drugs or services only at the moment the service provider or supplier chooses to sell, i.e., to engage in a voluntary transfer with a third party. *See* note 9, *supra*. As the Government notes, nothing in the IRA requires BI to sell or otherwise give up a single dose of Jardiance. ECF No. 48-1 at 3-5.[11]

For these reasons, the statute at issue in *Garelick*—and the statute at issue in this case—are "markedly different" from the reserve requirement in *Horne*. *Bristol Myers Squibb Co. v. Becerra*, 2024 WL 1855054, at *6. And I am "required to follow Second Circuit precedent 'unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a

---

[11] To be sure, this may appear to be a narrow distinction from *Horne*, because the reserve requirement apparently applied only to raisin growers that wanted to sell their crop in the market. But a physical taking is a narrow species of claim. It occurs only "[w]hen the government effects a physical appropriation of private property for itself or another," including when the government "grant[s] a third party the right to invade property closed to the public." *74 Pinehurst LLC*, 54 F.4th at 557, 563. When a property owner offers her property for sale, however, the property is no longer "closed to the public" and there is "no inva[sion]." There is, instead, a voluntary decision by the property owner to transfer her property, and any price regulation of the sale is just that—regulation. *See Horne*, 576 U.S. at 362 (noting that although "[a] physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower," the Constitution prohibits only the former—a "distinction [that] flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation").

subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" *Boone v. United States*, No. 02-CR-01185 (JMF), 2017 WL 398386, at *1 (S.D.N.Y. Jan. 30, 2017) (citation omitted); *Monsanto v. United States*, 348 F.3d 345, 351 (2d Cir. 2003) (despite "tension" between Supreme Court decision and governing Circuit precedent, "[w]e are bound by [circuit precedent] . . . unless and until [that precedent] is reconsidered by our court sitting in banc . . . or is rejected by a later Supreme Court decision"). Given the significant distinctions between *Horne* and *Garelick*, I cannot say that the Supreme Court's decision in *Horne* "so undermines [*Garelick*] that it will almost inevitably be overruled by the Second Circuit." *Boone*, 2017 WL 398386, at *1.

BI argues that *Garelick* is not binding as to all Fifth Amendment claims here for several reasons, including that  did not involve a procedural due process claim.[12] ECF No. 28-1 at 49. Yet while it may not be binding, *Garelick*'s reasoning remains persuasive in the due process context. Due Process Clause claims and Takings Clause claims both involve the question of whether BI has been deprived of a property interest. *Story v. Green*, 978 F.2d at 62. Although there are differences in how courts approach this issue in the two contexts, *Burns v. Pa. Dep't of Correction*, 544 F.3d 279, 285 n.3 (3d Cir. 2008) (discussing distinctions), I see no reason that voluntary participation in a government program should amount to a deprivation of property any more than it amounts to a taking of property. The few courts that have considered the application

---

[12] Beyond the due process issue, BI raises two other distinctions between *Garelick* and this case, namely that: (1) the plaintiffs in *Garelick* raised a regulatory takings claim, not a per se physical takings claim, ECF No. 92 at 31, and (2) the government in *Garelick* did not "select[] some, but all, providers for participation," *id.* at 30. Despite these differences, *Garelick* stands for a broader principle that participation in Medicare is voluntary and conditions placed on such participation therefore cannot constitute a taking. *Garelick*, 987 F.2d at 916 ("A property owner must be legally compelled to engage in price-regulated activity for regulations to give rise to a taking."). The Court did not base its decision on the narrower ground that the cap on the anesthesiologists' reimbursement did not satisfy the regulatory taking factors in the Supreme Court's regulatory takings jurisprudence. And many of the cases it relied on were not regulatory takings cases. *Id.* Finally, the fact that the IRA singles out certain manufacturers for the Program by focusing on the drugs that are the biggest drains on Medicare has no bearing on whether participation in Medicare is voluntary.

of *Garelick* to procedural due process claims have agreed: no deprivation of property occurs when the government places conditions on participation in a voluntary government program. *See, e.g., Kaiser Found. Health Plan, Inc. v. Burwell*, 147 F. Supp. 3d 897, 911 (N.D. Cal. 2015) (regulation of Medicare Advantage organization's (MAO's) expenditure of Medicare funds did not violate MAO's procedural due process rights, because "[p]articipation in the Medicare program is a voluntary undertaking" and MAO "ha[d] no property interest in Medicaid or Medicare payments"); *cf. Hinesburg Sand & Gravel Co. v. Chittenden Solid Waste Dist.*, 959 F. Supp. 652, 659 (D. Vt. 1997) (citing *Garelick* and finding no deprivation of property interests for the purposes of Due Process or Takings Clause claims where plaintiff decided to expend resources in response to government action, because plaintiff's "decision to expend its own funds to challenge [the government action] was entirely voluntary").[13]

Finally, BI cites *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 582 (2012) ("NFIB") for the premise that "actions taken under threat of severe economic coercion are not voluntary."[14] ECF No. 28-1 at 46-47. In *NFIB*, the Court held unconstitutional a

---

[13] To be sure, voluntary participation in a government program does not bar a due process claim where the plaintiff has a property interest in the government program *itself*. If an individual has a "legitimate claim of entitlement" to a government benefit under "statutory and administrative standards defining eligibility for them," the government cannot deprive the individual of that government benefit without due process. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). But BI does not claim it has a property interest in selling its products through Medicare or Medicaid or to any particular rate of reimbursement. Nor could it, because no statute or regulation entitles it to sell its products to the government at all, let alone to do so at a particular rate of reimbursement.

[14] BI also cites several *Lochner*-era Supreme Court cases to support its argument that participation in the Program is coerced. *See* ECF No. 28-1 at 46-47 (citing *Union Pacific Rail Road Co. v. Public Service Commission*, 248 U.S. 67, 69-70 (1918) (challenge to state law as "interference with interstate commerce and as bad under the Fourteenth Amendment"); *United States v. Butler*, 297 U.S. 1, 70 (1936) (challenge to Congress's authority to use its taxing and spending power to regulate matters it could not regulate under the Commerce Clause); *Carter v. Carter Coal Co.*, 298 U.S. 238, 289 (1936) (same)). None of those cases resembles this one. In *Union Pacific Rail Road Co.*, a railroad company could not obtain a certificate necessary to issue bonds secured by its entire 3500-mile line unless it paid a large fee to the state of Missouri, where it had less than a mile of trackage. 248 U.S. at 68-69. The Court found that Missouri's interference with interstate commerce was not diminished by the railroad's option not to apply for the certificate, because this would not "adequately . . . have avoided evils that made it practically impossible not to comply with the terms of the law." *Id.* at 70. In the other two cases, *Butler* and *Carter*, where the plaintiffs were subject to a tax if they refused to comply with a government regulation, *Butler*, 297 U.S. at 70-71; *Carter*, 298 U.S.

provision of the Affordable Care Act that withdrew all Medicaid funding from states that "opt[ed] out of the Affordable Care Act's [Medicaid] expansion." 567 U.S. at 581. The Court found that "[t]he threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582. But *NFIB* involved the anti-commandeering doctrine, which bars "federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *Id.* at 577. The Anti-Commandeering Doctrine rests on the notion that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* (internal quotation marks omitted). It is designed to preserve "our system of federalism" by preventing Congress from interfering with state governments by placing overly controlling conditions on federal dollars. *Id.* at 577-78 ("[W]hen pressure turns into compulsion, the legislation runs contrary to our system of federalism." (internal quotation marks and citations omitted)). No similar limit on Congress' spending powers applies here, where the government is dealing with private parties instead of state agencies. The federal government is free to use its economic power as a bulk purchaser of certain goods to negotiate better deals for those goods.

For all these reasons, I find that BI's participation in Medicare and Medicaid is voluntary, even if BI has a considerable economic incentive to participate. With all the resources at the federal government's disposal, private corporations will often have an incentive to participate in

---

at 289, they could not avoid the tax by declining to participate in a voluntary government program. I also note that it is questionable whether *Butler* and *Carter* remain good law—both cases relied on a narrow view of the federal government's powers that has since largely been rejected by the Supreme Court. *See Kansas v. United States*, 214 F.3d 1196, 1200 n.6 (10th Cir. 2000) ("The analysis in *Butler* has been discredited as flawed and unworkable, and has not been followed."); *see also NFIB*, 567 U.S. at 572-73 (noting that some early cases, including *Butler*, had "policed [Congress's taxing power] aggressively," but more recent cases "have declined to closely examine the regulatory motive or effect of revenue-raising measures").

federal programs. The Fifth Amendment does not prevent the federal government from placing conditions on participation in those programs.

### B. First Amendment Claim

BI next argues that the Program "violates BI's First Amendment rights by compelling BI to echo the Government's preferred narrative regarding the Program." ECF No. 28-1 at 35. BI objects to the requirement that it sign the Manufacturer Agreement, because that agreement uses terms like "negotiation" and "maximum fair price." *Id.* at 35-36. In BI's view, the text of the Manufacturer Agreement conveys messages with which it "strongly disagrees": that BI "has voluntarily agreed to participate in the Program," that the Program "involves an actual 'negotiation,'" and that the resulting price is the "maximum fair" one. *Id.* at 36-37.

The First Amendment prohibits the government from "telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006) [hereinafter "*FAIR*"]. But "[t]he government . . . does not necessarily run afoul of the First Amendment when it regulates conduct in a manner that incidentally burdens one's speech." *Moore v. Hadestown Broadway Ltd. Liab. Co.*, No. 23-CV-04837, 2024 WL 989843, at *17 (S.D.N.Y. Mar. 7, 2024); *see FAIR*, 547 U.S. at 62 (holding that compelling speech that "is plainly incidental to [a statute's] regulation of conduct" does not violate the First Amendment); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (observing that a typical price regulation's "effect on speech would be only incidental to its primary effect on conduct, and it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed'" (citation and internal quotation marks omitted)).

To begin with, as previously discussed, BI's participation in the Program is voluntary, and BI was free to withdraw from Medicare and Medicaid before the deadline for signing the Manufacturer Agreement. So the Agreement did not "compel" BI to do anything.

Beyond that, however, the Manufacturer Agreement regulates BI's conduct, and any effects it may have on speech are "plainly incidental." *FAIR*, 547 U.S. at 62. The language that BI objects to appears in provisions requiring that BI participate in the Program and provide access to the "maximum fair price," among other regulations of BI's conduct. ECF No. 28-6. Certainly, regulations are frequently "initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62. Indeed, the IRA requires BI to communicate in various ways, including, arguably, by signing the Manufacturer Agreement and by making a written counteroffer that must "be justified based on [the statutory factors]." 42 U.S.C. § 1320f-3(b)(2)(C). But as with "typical price regulations," the words CMS requires manufacturers to use are just an incidental means to CMS' goal of regulating drug prices. *Expressions Hair Design*, 581 U.S. at 47.

Though not required to do so by the Constitution, CMS took steps to minimize the communicative content of the Manufacturer Agreement. The Manufacturer Agreement makes clear that its "[u]se of the term 'maximum fair price' and other statutory terms throughout this Agreement reflects the parties' intention that such terms be given the meaning specified in the statute and does not reflect any party's views regarding the colloquial meaning of those terms." ECF No. 28-6 at 5; *see also id.* at 2 (noting that the price of drugs is "referred to as 'maximum fair price' in the act"). Another provision specifies that "[i]n signing this Agreement, the Manufacturer does not make any statement regarding or endorsement of CMS' views . . . ." *Id.*

31

BI nonetheless argues that the use of statutory terms in the Manufacturer Agreement constitutes compelled speech because an uninformed observer might read those terms out of context—and in conflict with the express terms of the contract—and draw inferences about BI's views.[15] This argument finds no support in precedent.[16] The First Amendment is not implicated when, in the course of regulating conduct, the government burdens speech in such a speculative and incidental manner. *See Arkansas Times LP v. Waldrip*, 37 F.4th 1386, 1390, 1394 (8th Cir. 2022) (holding that statutory requirement that state contracts include a certification that a company "is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel" does not violate the First Amendment because "[t]he 'speech' aspect— signing the certification—is incidental to the regulation of conduct"—boycotts of Israel).

BI also suggests that signing the Manufacturer Agreement might constitute expressive conduct. *See* ECF No. 28-1 at 39-40 (citing a number of expressive conduct cases). The First Amendment "affords protection to symbolic or expressive conduct as well as to actual speech."

---

[15] Adopting this argument could have broad implications for government contracting. Many statutes have names or use terms that some observer might read to suggest an ideological message (e.g., the Patient Protection and Affordable Care Act and Medicare Modernization and Prescription Drug Act, among many others). The logical extension of BI's reasoning is that government contracts that referenced these statutes must face First Amendment scrutiny as potential compelled speech or unconstitutional conditions on government funds. To avoid burdening speech, BI would require the government to substitute terms that some observer might find more neutral for an endless list of statutory words. ECF No. 92 at 43-44 ("The IRA could mandate that BI *do* everything set forth in the Agreement without compelling it to [use the statutory terms].").

[16] This is not to say that government contracts never infringe on First Amendment rights. During oral argument, BI pointed to *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013) [hereinafter *USAID*] as an example of a case standing "for the proposition that signing an agreement amounts to speech as opposed to conduct." ECF No. 121 at 68. In that case, a federal statute required recipients of HIV/AIDs relief funding to "agree in their award documents that they oppose prostitution." *Id.* at 205; *see also* Joint App'x at 303, *Agency for International Development v. Alliance for Open Society, Int'l, Inc.*, 591 U.S. 430 (2020) (contractual language: "[B]y accepting this award . . . a non-governmental organization . . . agrees that it is opposed to the practices of prostitution and sex trafficking because of the psychological and physical risks they pose . . . .") *USAID* suggests that requiring an entity to sign a government contract can have First Amendment implications. But it does not say that government contracts are compelled speech (or unconstitutional conditions on speech) merely because they contain words that, in some contexts, may be understood to convey a political message. The contractual provision in *USAID* went far beyond "incidental" regulation of speech: it was plainly designed to compel recipients to endorse a government-sanctioned message. By contrast, the provisions BI points to in the Manufacturer Agreement primarily serve to regulate the price BI may charge. The Manufacturer Agreement expressly states that BI is not endorsing any government-sanctioned message.

*Virginia v. Black*, 538 U.S. 343, 358 (2003). So where the government regulates or compels expressive conduct, the First Amendment is implicated.

However, the Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation and internal quotation marks omitted); *see also City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). "[T]o fall within the scope of the [First Amendment]," the conduct must be "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404. To determine whether it is, "courts consider whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Slattery v. Hochul*, 61 F.4th 278, 291 (2d Cir. 2023) (citation and internal quotation marks omitted). Given the text of the Manufacturer Agreement, including the disclaimers added by CMS, BI cannot show it has been forced to "convey a particularized message," or that the "likelihood was great" that anyone who read the Agreement would understand BI to be espousing the views with which it "strongly disagrees." ECF No. 28-1 at 36.

### C. Unconstitutional Conditions Claims

Next, BI argues that even if participation in the Program is voluntary, the Program places an unconstitutional condition on BI's "ability to participate in Medicare and Medicaid." ECF No. 28-1 at 50. BI claims that CMS requires it to sacrifice its rights under the First Amendment, Due

Process Clause, and Takings Clause in order to continue selling its products to Medicare and Medicaid. *Id.*

The unconstitutional conditions doctrine bars the government from "deny[ing] a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (citation and internal quotation marks omitted). The fact that BI's participation in the Program is voluntary is not dispositive: "[T]he government may not, as a general rule, grant even a gratuitous benefit on condition that the beneficiary relinquish a constitutional right." *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005).

The doctrine is most frequently applied in the First Amendment context, *see Koontz*, 570 U.S. at 604 (collecting cases), but the Supreme Court has also applied it in Takings Clause cases involving zoning regulations, *see id.*; *Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987). Because the application of the doctrine varies depending on the constitutional right at stake, I summarize the applicable rules for BI's First Amendment, Due Process, and Takings Clause claims separately.

**(i)      First Amendment**

"[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *USAID*, 570 U.S. at 214 (citations, alterations, and internal quotation marks omitted). In such cases, "the relevant distinction that has emerged" is "between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the Program itself." *Id.* at 214-215. But the unconstitutional conditions doctrine is only

implicated where the plaintiff is asked to sacrifice a constitutional right. So BI must first establish, at minimum, that it had a First Amendment right to refuse to sign the Manufacturer Agreement, i.e., that "the government could not have constitutionally ordered [BI] . . . to do what it attempted to pressure [BI] into doing," *Koontz*, 570 U.S. at 612. BI cannot make that showing. As I have explained, the Manufacturer Agreement primarily regulates BI's conduct, and any effects on speech are incidental. So the First Amendment does not bar CMS from ordering BI to do what the Manufacturer Agreement requires it to do. And CMS is free to condition BI's participation in Medicare and Medicaid on its signing the Agreement.

**(ii)       Takings Clause**

In the Takings Clause context, courts have applied the unconstitutional conditions doctrine to certain land-use decisions. In *Nollan* and *Dolan*, the Supreme Court considered whether local governments could condition building permits on a landowner's agreeing to sacrifice a portion of her property for public use. *Nollan*, 483 U.S. 825 (building permit conditioned on landowner's granting the public an easement in the form of a path to the beach); *Dolan*, 512 U.S. 374 (building permit conditioned on landowner's dedicating a portion of her property for improvement of storm drainage system and bicycle path). The Court has held that "[t]he government [may] condition approval of a permit on the dedication of property to the public" only if there "is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz*, 570 U.S. at 605-06. BI urges me to consider whether a nexus and rough proportionality exist here. ECF No. 28-1 at 51-52.

As the defendants point out, however, the Supreme Court has declined to "extend[] the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions

35

conditioning approval of development on the dedication of property to public use." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999). The test is tailored to the land-use permit context, and it does not work well in other areas.[17] Indeed, the Supreme Court has suggested that the unconstitutional conditions doctrine does not ordinarily bar the government from requiring corporations to sacrifice certain property rights to receive a voluntary government benefit. *See Monsanto Co.*, 467 U.S. at 1007 (dismissing unconstitutional conditions claim, and observing that "a voluntary submission of data by an applicant in exchange for the economic advantages of a [pesticide] registration can hardly be called a taking").

**(iii)     Due Process Clause**

Courts rarely apply the unconstitutional conditions doctrine to due process claims. Indeed, BI cites only one case in which a court done so. *See* ECF No. 28-1 at 51 (citing *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427 (6th Cir. 2005)). And the court in *R.S.W.W.* did not reach the merits of the due process claim, finding only that the district court had jurisdiction over that claim. *R.S.W.W.*, 397 F.3d at 433-34, 436.[18]

---

[17] The challenges of applying the test from *Nollan* and *Dolan* outside of the land use context are evident here. The test requires a "nexus" and "rough proportionality" between "the property that the government demands" and "the social costs of the [government benefit the property owner wants, i.e., the building permit]." *Koontz*, 570 U.S. at 605-06. The test is tailor-made for balancing an owner's right to use his or her land against the "negative externalities" such use entails. *Koontz*, 570 U.S. at 605. But it is a poor fit for a seller's participation in a government program: it is unclear whether there are any "social costs" to the benefit BI wants, i.e., the right to participate in Medicare and Medicaid (beyond the possibility that BI might overcharge the government). So the test provides little guidance when determining what conditions the government can place on Medicare and Medicaid participation.

[18] In any event, BI's analogy to *R.S.W.W.* falls apart upon inspection. *R.S.W.W.* involved a municipality's conditioning zoning approvals on a liquor license holder's agreement to close its premises during late night hours in which state law permitted it to remain open. The liquor license holder may have had a property right in remaining open as late as state law allowed; but BI has no property right in refraining from participating in the Program, which is the analogue BI identifies for the liquor license holder's right. ECF No. 28-1 at 41 ("By making Medicare and Medicaid participation contingent on Program participation, the Government would unconstitutionally require BI to give up its due process rights to obtain a government benefit."). For BI's analogy to work, refraining from participating in the Program must mean continuing to sell Jardiance to Medicare beneficiaries at whatever price BI sets—something BI has no entitlement to do—just as the liquor license holder sought to continue remaining open

Ultimately, BI advocates for a broad rule that the government cannot "require BI to give up its due process rights to obtain a government benefit." ECF No. 28-1 at 51. Applied to facts like those in this case, however, BI's rule would subject nearly every government purchase from a private sector firm to Fifth Amendment scrutiny. Any private firm that wants to sell to the government (or through a government funded program) must—if it wishes to continue receiving the benefit of participating in the government spending financing the purchase—surrender its product, sometimes at a price or under terms it does not like. To subject every such transaction to scrutiny about the adequacy of procedures afforded the seller would inundate the courts and reverse longstanding principles allowing the government the same leeway as private firms when it participates in the market in its proprietary capacity. *See Perkins*, 310 U.S. at 127-28 ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with which it will deal, and to fix the terms and conditions upon which it will make needed purchases . . . . Judicial restraint of those who administer the Government's purchasing would constitute a break with settled judicial practice and a departure into fields hitherto wisely and happily apportioned . . . to the administration of another branch of Government."); *United States v. Bostwick*, 94 U.S. 53, 66 (1876) ("The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen . . . ."); *cf. S&D Maintenance Co., Inc. v. Golding*, 844 F.2d 962, 967 (2d Cir. 1988) (noting that courts of appeals have been "reluctant to surround the entire body of public contract rights with due process protections").

*          *          *

---

during late-night hours. If BI instead is equating refraining from participating in the Program with continuing to sell Jardiance at all, then its claim fails because the Government has imposed no condition on that activity; BI is free to continue selling Jardiance at its preferred price to private buyers, regardless of whether it participates in the Program.

Regardless of the constitutional right at issue, the core feature of the unconstitutional conditions doctrine is a concern that the government will tie its own goals to unrelated benefits that flow from its regulatory and spending programs—and that feature is missing here. If any applicable principle emerges from the unconstitutional conditions caselaw, it is that courts are skeptical of conditions on government benefits that bear little relationship to the goals of the government program. *See, e.g.*, *Nollan*, 483 U.S. at 836, 838 (noting weak ties between the condition the government imposed and the supposed harms of issuing a building permit, i.e., that it would limit "the public's view of the beach"); *see also USAID*, 570 U.S. at 214-15 (describing test for permissible government conditions on federal spending in First Amendment context: "[T]he relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the Program itself"). But here, the condition the government has imposed—that BI sell the drug for the maximum fair price—is closely related to the government's goal of controlling spending in the Medicare program. And the benefit BI seeks is the ability to continue participating in that spending program by selling its products to Medicare beneficiaries. So the condition and the benefit are closely intertwined.

Accordingly, to the extent the unconstitutional condition doctrine applies at all to claims such as these, the IRA does not impose an unconstitutional condition.

### D.  APA and Medicare Act Claims

Next, BI argues that CMS violated the APA and Medicare Act when it "issued the form Manufacturer Agreement summarily, without providing an opportunity for comment on its terms." ECF No. 28-1 at 53. I conclude that CMS need not follow the APA and Medicare Act's

notice and comment rulemaking procedures, because the IRA exempts the Manufacturing Agreement from those requirements through 2028.

As a general rule, "contract provisions that are legislative are subject to [the APA's] notice and comment requirements." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C. Cir. 1987).[19] The Medicare Act likewise "places notice and comment requirements on the Secretary's substantive rulemaking similar to those created by the APA." *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001) (citing 42 U.S.C. § 1395hh(b)); *see also Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176, 183 n.3 (D.D.C. 2018).

Still, Congress can supersede the APA's and Medicare Act's notice and comment requirements by statute. 5 U.S.C. § 559 (the APA's rulemaking requirements may be superseded, but only if the subsequent statute "does so expressly"); 42 U.S.C. § 1395hh(b)(2)(A) ("[The Medicare Act's notice and comment requirement] shall not apply where . . . a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment."). Exemptions from notice and comment requirements "are not lightly to be presumed in view of the statement in [the APA] that modifications must be express." *Asiana Airlines v. Fed. Aviation Admin*., 134 F.3d 393, 397 (D.C. Cir. 1998) (quoting *Marcello v. Bonds*, 349 U.S. 302, 310 (1955)); *see also* 42 U.S.C. § 1395hh(b)(2)(A) (Medicare Act provision requiring that exemption from notice and comment be "specific"). Courts consider an exemption to be express where Congress "has established procedures so clearly different from those

---

[19] While the APA exempts "matter[s] relating to . . . contracts" from notice and comment rulemaking, 5 U.S.C. § 553(a)(2), the Department of Health and Human Services (by its predecessor) has waived that exemption. 36 Fed. Reg. 2532 (Feb. 5, 1971); *see also Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1084 (D.C. Cir. 1978) ("Cognizant of the prudence . . . of allowing public input in the wide variety of rulemaking covered by Section 553(a)(2), the Secretary [of Health, Education, and Welfare] in 1971 elected to waive the exemption and to submit to the normal requirements of the Administrative Procedure Act, and regulations promulgated since that time are subject to mandatory rulemaking procedures.").

required by the APA that it must have intended to displace the norm." *Asiana Airlines*, 134 F.3d at 397.

The IRA states that CMS "shall implement [the Program] . . . for 2026, 2027, and 2028 by program instruction or other forms of program guidance." IRA § 11001(c), 136 Stat. at 1854. This language is a departure from other implementation provisions in the IRA that call for the promulgation of regulations, suggesting that Congress's omission of any reference to "regulations" or "rules" here was a deliberate choice. *See id.* § 10101(a)(1), 136 Stat. at 1821 (in section making change to alternative minimum tax, stating that "[t]he Secretary shall provide regulations or other guidance for the purpose of carrying out this subsection . . . ."); *id.* § 10101(b)(1), 136 Stat. at 1823-24 (same language in section regulating corporations' adjusted financial statements); *id.* § 11003, 136 Stat. at 1864 (in section imposing excise tax on manufacturers of Selected Drugs who do not sign Manufacturer Agreements, stating "[t]he Secretary shall prescribe such regulations and other guidance as may be necessary to carry out this section"). Further, the statute suggests that Congress departed from the ordinary "regulations and other guidance" formulation only when it wanted the relevant agencies to expedite implementation of specific changes, including the Program, and then only as a temporary measure to jump start those changes. *See id.* § 11102(a), 136 Stat. at 1876 (providing for implementation of changes to manufacturer rebate provisions under Part D "for 2022, 2023, and 2024 by program instruction or other forms of program guidance"); *id.* § 11201, 136 Stat. at 1892 (providing for implementation of selected drug subsidy program "for 2024, 2025, and 2026 by program instruction or other forms of program guidance").

Section 11001(c) plainly contemplates a different procedure than the APA and Medicare Act, because it provides for the IRA to be implemented—for the first three years the Maximum

Fair Prices will be operative—only through guidance, rather than notice and comment rulemaking.[20] Any other interpretation of this provision would fail to account for Congress' deliberate choice to eschew regulations in the first three years of the Program.

During oral argument, BI offered an alternative theory: that Congress intentionally "clipped [CMS's] wings" for the first three years by requiring it to implement the Program without altering substantive rights. ECF No. 121 at 86-87. But this interpretation is squarely at odds with the text of the statute, which repeatedly directs CMS, from the outset of the program, to formulate standards of a kind that undoubtedly affect substantive rights. *See, e.g.*, 42 U.S.C. § 1320f-3(b)(1) ("The Secretary shall develop and use a consistent methodology and process . . . that aims to achieve the lowest maximum fair price for each selected drug."); *id.* § 1320f-2(a)(5) ("[T]he Secretary shall enter into agreements with manufacturers of selected drugs . . . under which . . . the manufacturer complies with requirements determined by the Secretary to be necessary for purposes of administering the program."); *id.* § 1320f-2(a)(4)(B) ("[T]he Secretary

_____

[20] BI points to *NRDC v. EPA*, 22 F.3d 1125, 1147 (D.C. Cir.) to support its claim that the language in 11001(c) does not waive the APA's notice and comment requirements. In that case, the statute directed the EPA to "review, revise, update, and republish in the Federal Register . . . guidance." *Id.* at 1146. One of the petitioners, the National Automobile Dealers Association ("NADA"), argued that CMS did not have the authority under the statute to issue such guidance "in the form of a final rule promulgated pursuant to the APA's notice and comment procedures." *Id.* The court ultimately held that NADA lacked standing to challenge the issuance of the guidance in the form of a final rule, because it was not prejudiced by the agency's decision to use notice and comment rulemaking procedures. *Id.* at 1147. But it commented about the meaning of the statute in dicta, observing that "Congress unambiguously intended [the aspects of the regulations the agency was directed to implement through guidance] . . . to be binding on the states." *Id.* at 1146. And since those rules "set[] forth the mandatory parameters of the states' obligations . . . [and were therefore] legislative in character," the court found "the EPA probably was *required* to promulgate such rules only through APA rulemaking procedures." *Id.* at 1147. Of course, the D.C. Circuit's opinion is not binding here, since it is dicta and from a different circuit. Nor do I find the court's brief analysis of this issue persuasive, since the court did not clearly explain the basis for concluding that the EPA could only promulgate binding rules through rulemakings.

BI has suggested that the promulgation of regulations that alter substantive rights without notice and comment might violate its right to procedural due process. ECF No. 121 at 83-84. Of course, to establish such a claim, it would first need to demonstrate that it has been deprived of a property right. But even if it could, "courts have generally held that the Due Process Clause does not require [the government] to engage in notice-and-comment rulemaking." *Wheeler v. Cohen*, No. 2:15-CV-00170, 2015 WL 6872338, at *5 (D. Vt. Nov. 9, 2015) (collecting cases) (citations and internal quotation marks omitted). Indeed, the APA itself includes numerous exceptions to its notice and comment requirements, including a broad exception for "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2).

shall enter into agreements with manufacturers of selected drugs . . . under which . . . the manufacturer submits to the Secretary, in a form or manner specified by the Secretary . . . information that the Secretary requires to carry out the negotiation (or renegotiation process).") BI fails to explain how CMS could have accomplished these tasks without using its authority to implement the Program through "program instructions and other forms of program guidance" to issue pronouncements that affected substantive rights.

BI also argues that Section 11001(c) exempts CMS guidance, but not the Manufacturer Agreement, from notice and comment. ECF No. 92 at 55. I disagree. The statute instructs CMS to implement "this Section, including the amendments made by this Section" through "program instruction and other forms of program guidance." IRA § 11001(c), 136 Stat. at 1854. The "Section" referred to is Section 11001, 136 Stat. at 1833-54, which contains most provisions related to the Program, including the provisions governing CMS's implementation of the Manufacturer Agreement, Section 1193, 136 Stat. at 1841-42 (included as a subsection of Section 11001 and later codified at 42 U.S.C. § 1320f-2). So Congress' instruction about implementation plainly applies to the Program as a whole, including the Manufacturer Agreement. And as with other elements of the Program, Congress directed CMS to establish substantive standards when implementing the Manufacturer Agreement. *See* 42 U.S.C. § 1320f-2(a)(5) (directing CMS to include in the Manufacturer Agreement "requirements . . . necessary for purposes of administering the program"); *id.* § 1320f-2(a)(4)(C) (directing CMS to include in the Manufacture Agreement a requirement that manufacturers submit "information that the Secretary requires to carry out the negotiation (or renegotiation) process").

Finally, if I adopted BI's view, the statute would leave arbitrary gaps in CMS's ability to implement the Program promptly. CMS's lengthy, detailed guidance would not be subject to

notice and comment procedures, but the Manufacturer Agreement, which largely tracks the statutory text and CMS guidance, would be. "It is a well-established canon of statutory construction that statutes should not be interpreted to reach an absurd result." *Guglietta v. Meredith Corp.*, 301 F. Supp. 2d 209, 213 (D. Conn. 2004).

Because CMS is expressly permitted to implement the Program through guidance for the first three negotiation cycles, its release of the Manufacturer Agreement does not violate the Medicare Act or the APA.

### E. Excessive Fines Claim

Finally, BI challenges the IRA's excise tax provisions under the Excessive Fines Clause of the Eighth Amendment. ECF No. 28-1 at 41. The defendants contend that the Court lacks jurisdiction over BI's Excessive Fines Clause claim, because (1) the claim is barred by the Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421, and (2) the claim "is not redressable because BI has not sued the Department of Treasury or the IRS—the only agencies empowered to enforce the tax that BI seeks to enjoin and have declared unconstitutional." ECF No. 48-1 at 24. Because I find that the Court lacks jurisdiction over this challenge under the AIA, I do not address the defendants' redressability argument.

The AIA provides that, subject to certain exceptions, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421. "The manifest purpose of [the AIA] is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to

the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962).

BI does not contest that the excise tax in this case is subject to the AIA, but it argues that the *Williams Packing* exception to the AIA applies. Under that exception, BI must show "[1] irreparable injury," and "[2] certainty of success on the merits." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 737 (1974) (citation omitted). BI cannot meet either of these requirements.

### (i)   <u>Irreparable Injury</u>

BI claims that it would be "irreversibly damaged by having to pay the tax for any meaningful period of time" because of "the extraordinary magnitude of the tax." ECF No. 92 at 52; *See* ECF No. 28-2 ¶ 16 (estimating that if BI refused to sign the Manufacturer Agreement and continued to sell Jardiance at its current volumes, "the statutory penalties [would] amount to more than $500 million per week initially, later increasing to more than $5.5 billion per week").[21]

But BI can bring a refund suit after incurring the tax on a single transaction. *Rocovich v. United States*, 933 F.2d 991, 995 (Fed. Cir. 1991). And it need not pay the entire tax upfront while it waits for courts to adjudicate its Eighth Amendment claim. Under an IRS Policy Statement, "[w]hen a refund suit is pending on a divisible [tax] assessment, the [IRS] will

---

[21] BI's estimates rely on the assumption that the excise tax will be imposed on all sales of Jardiance in the United States, rather than only those sales made through Medicare. ECF No. 28-1 at 43. As BI acknowledges, this assumption disregards an IRS Notice, which interprets the statute to apply only to sales made through Medicare. *Id.* at 44; ECF No. 28-14 at 4. The statute says that the excise tax is "imposed on the sale by the manufacturer, producer, or importer of any designated drug," 26 U.S.C. § 5000D(a), which is defined as "any negotiation-eligible drug . . . included on the list [of drugs selected under 42 U.S.C. § 1320f-1(a) for the Program] which is manufactured or produced in the United States or entered into the United States for consumption, use, or warehousing," *id.* § 5000D(e)(1). BI argues that the IRS Notice is non-binding and runs contrary to the text of the statute. ECF No. 28-1 at 43.

exercise forbearance with respect to collection provided that the interests of the government are adequately protected and the revenue is not in jeopardy . . . ." IRS Policy Statement 5-16, IRM § 1.2.1.6.4(6). "Divisible tax cases are those in which the tax assessment may be divided into separate portions or transactions." *Id.* § 1.2.1.6.4(7); *Rocovich*, 933 F.2d at 995 ("A divisible tax . . . is one that represents the aggregate of taxes due on multiple transactions (e.g., sales of items subject to excise taxes))." The IRA's excise tax is imposed on each "sale . . . of any designated drug," 26 U.S.C. § 5000D, and it is therefore divisible. So the IRS would likely exercise forbearance during the period when BI's refund suit was pending.

Of course, if BI continues to sell Jardiance—at least through Medicare, *see* discussion *supra*—it may accrue tax liability during the pendency of any refund suit. But when determining whether harm is irreparable, courts consider only the harm that arises "during the interim between the request for an injunction and final disposition of the case on the merits." *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995). Due to the IRS's forbearance policy, the harm during this interim period is minimal: BI would need to pay the excise tax on only one transaction in order to bring the refund suit. If BI ultimately prevailed, the IRS could not require it to pay the tax at all and would have to refund any amount BI had already paid. If it did not prevail, the IRS could constitutionally require it to pay the tax, which would mean the tax inflicted no actionable harm.

### (ii)    Certainty of Success

Even if BI could show an irreparable harm, it cannot show "certainty of success on the merits." *Bob Jones Univ.*, 416 U.S. at 737. "Certainty of success" means "it is clear" that "under no circumstances could the Government ultimately prevail." *Id.* (internal quotation marks omitted). BI cannot meet this demanding standard because its Eighth Amendment claim is novel and, so, far from certain. BI has identified no case in which a court has applied the Excessive

Fines Clause to a monetary amount that was not connected to criminal conduct or a criminal proceeding. Further, the defendants' position that the Excessive Fines Clause applies only to fines imposed on criminal conduct finds support in the text and structure of the Constitution. The Excessive Fines Clause appears in the Eighth Amendment, which addresses only punishment for criminal conduct. Specifically, the Excessive Fines Clause sits alongside the Excessive Bail Clause and the Cruel and Unusual Punishment Clause. *See Austin v. United* States, 509 U.S. 602 (1993) (finding that civil forfeiture action seeking forfeiture of convicted drug dealer's home and business was subject to Excessive Fines Clause and noting that the Clause "limits the government's power to extract payments … as *punishment* for some *offense*." (second emphasis added and internal quotation marks omitted)).

BI points out that two concurring justices in *Tyler v. Hennepin County* would have applied the Excessive Fines Clause in the context of a foreclosure proceeding. 598 U.S. 631, 658-660 (Gorsuch, J., concurring). But the view of a minority of justices, expressed in dicta in a concurrence, does not demonstrate a certainty of success. And each of the other Excessive Fines Clause cases BI cites involves a criminal violation of some type: either a criminal defendant's forfeiture of property,[22] or civil penalties imposed on criminal conduct.[23] None of the cases it cites involves a tax.

Because BI has not met either prong of the *Williams Packing* exception to the AIA, this Court lacks jurisdiction to consider a pre-enforcement challenge to the excise tax provisions of the IRA.

---

[22] *United States v. Bajakajian*, 524 U.S. 321, 328 (1998); *Austin v. United States*, 509 U.S. 602, 619-620 (1993).

[23] *Pimentel v. City of Los Angeles*, 974 F.3d 917, 923 (9th Cir. 2020) (civil penalty imposed for parking violations); *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 774 F. App'x 959, 961 (6th Cir. 2019) (civil penalty imposed on strip club for performer's illegal conduct).

**SPA47**

**V.      CONCLUSION**

For the reasons explained above, I grant the defendants' motion for summary judgment as to all claims and deny the plaintiff's motion for summary judgment. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

July 3, 2024

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

          v.                                      3:23-CV-01103-MPS

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
XAVIER BECERRA, CENTERS FOR
MEDICARE AND MEDICAID SERVICES,
CHIQUITA BROOKS-LASURE

### JUDGMENT

This matter came on for consideration on the cross motions for summary judgment before the Honorable Michael P. Shea, United States District Judge. The Court reviewed all papers filed in conjunction with the motions for summary judgment and on July 3, 2024, entered a ruling granting the defendant's motion, and denying the plaintiff's motion. It is therefore;

ORDERED, ADJUDGED, and DECREED that judgment is entered for the defendants, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, CENTERS FOR MEDICARE AND MEDICAID SERVICES, CHIQUITA BROOKS-LASURE, against the plaintiff, BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., and the case is closed.

Dated at Hartford, Connecticut, this 9th day of July 2024.

                                    DINAH MILTON KINNEY, Clerk

                            By:  _/s/ Christina Sichanh_____
                                     Deputy Clerk

EOD: 7/9/2024

## RELEVANT STATUTORY PROVISIONS (excerpted)

### 26 U.S.C. § 5000D: Designated drugs during noncompliance periods

**(a) In general**

There is hereby imposed on the sale by the manufacturer, producer, or importer of any designated drug during a day described in subsection (b) a tax in an amount such that the applicable percentage is equal to the ratio of—

(1) such tax, divided by

(2) the sum of such tax and the price for which so sold.

**(b) Noncompliance periods**

A day is described in this subsection with respect to a designated drug if it is a day during one of the following periods:

(1) The period beginning on the March 1st (or, in the case of initial price applicability year 2026, the October 2nd) immediately following the date on which such drug is included on the list published under section 1192(a) of the Social Security Act and ending on the earlier of—

(A) the first date on which the manufacturer of such designated drug has in place an agreement described in section 1193(a) of such Act with respect to such drug, or

(B) the date that the Secretary of Health and Human Services has made a determination described in section 1192(c)(1) of such Act with respect to such designated drug.

(2) The period beginning on the November 2nd immediately following the March 1st described in paragraph (1) (or, in the case of initial price applicability year 2026, the August 2nd immediately following the October 2nd described in such paragraph) and ending on the earlier of—

(A) the first date on which the manufacturer of such designated drug and the Secretary of Health and Human Services have agreed to a maximum fair price under an agreement described in section 1193(a) of the Social Security Act, or

(B) the date that the Secretary of Health and Human Services has made a determination described in section 1192(c)(1) of such Act with respect to such designated drug.

\*\*\*

**(c) Suspension of tax**

**(1) In general**

A day shall not be taken into account as a day during a period described in subsection (b) if such day is also a day during the period—

(A) beginning on the first date on which—

(i) the notice of terminations of all applicable agreements of the manufacturer have been received by the Secretary of Health and Human Services, and

(ii) none of the drugs of the manufacturer of the designated drug are covered by an agreement under section 1860D–14A or 1860D–14C of the Social Security Act, and

(B) ending on the last day of February following the earlier of—

(i) the first day after the date described in subparagraph (A) on which the manufacturer enters into any subsequent applicable agreement, or

(ii) the first date any drug of the manufacturer of the designated drug is covered by an agreement under section 1860D–14A or 1860D–14C of the Social Security Act.

**(2) Applicable agreement**

For purposes of this subsection, the term "applicable agreement" means the following:

(A) An agreement under—

(i) the Medicare coverage gap discount program under section 1860D–14A of the Social Security Act, or

(ii) the manufacturer discount program under section 1860D–14C of such Act.

(B) A rebate agreement described in section 1927(b) of such Act.

**(d) Applicable percentage**

For purposes of this section, the term "applicable percentage" means—

(1) in the case of sales of a designated drug during the first 90 days described in subsection (b) with respect to such drug, 65 percent,

(2) in the case of sales of such drug during the 91st day through the 180th day described in subsection (b) with respect to such drug, 75 percent,

(3) in the case of sales of such drug during the 181st day through the 270th day described in subsection (b) with respect to such drug, 85 percent, and

(4) in the case of sales of such drug during any subsequent day, 95 percent.

### (e) Definitions

For purposes of this section—

### (1) Designated drug

The term "designated drug" means any negotiation-eligible drug (as defined in section 1192(d) of the Social Security Act) included on the list published under section 1192(a) of such Act which is manufactured or produced in the United States or entered into the United States for consumption, use, or warehousing.

### (2) United States

The term "United States" has the meaning given such term by section 4612(a)(4).

### (3) Other terms

The terms "initial price applicability year", "price applicability period", and "maximum fair price" have the meaning given such terms in section 1191 of the Social Security Act.

\*\*\*

### (h) Regulations

The Secretary shall prescribe such regulations and other guidance as may be necessary to carry out this section.

---

### 42 U.S.C. § 1320f: Establishment of program

### (a) In general

The Secretary shall establish a Drug Price Negotiation Program (in this part referred to as the "program"). Under the program, with respect to each price applicability period, the Secretary shall—

(1) publish a list of selected drugs in accordance with section 1320f–1 of this title;

(2) enter into agreements with manufacturers of selected drugs with respect to such period, in accordance with section 1320f–2 of this title;

(3) negotiate and, if applicable, renegotiate maximum fair prices for such selected drugs, in accordance with section 1320f–3 of this title;

(4) carry out the publication and administrative duties and compliance monitoring in accordance with sections 1320f–4 and 1320f–5 of this title.

**(b) Definitions relating to timing**

For purposes of this part:

**(1) Initial price applicability year**

The term "initial price applicability year" means a year (beginning with 2026).

**(2) Price applicability period**

The term "price applicability period" means, with respect to a qualifying single source drug, the period beginning with the first initial price applicability year with respect to which such drug is a selected drug and ending with the last year during which the drug is a selected drug.

**(3) Selected drug publication date**

The term "selected drug publication date" means, with respect to each initial price applicability year, February 1 of the year that begins 2 years prior to such year.

**(4) Negotiation period**

The term "negotiation period" means, with respect to an initial price applicability year with respect to a selected drug, the period—

(A) beginning on the sooner of—

(i) the date on which the manufacturer of the drug and the Secretary enter into an agreement under section 1320f–2 of this title with respect to such drug; or

(ii) February 28 following the selected drug publication date with respect to such selected drug; and

(B) ending on November 1 of the year that begins 2 years prior to the initial price applicability year.

**(c) Other definitions**

For purposes of this part:

**(1) Manufacturer**

The term "manufacturer" has the meaning given that term in section 1395w–3a(c)(6)(A) of this title.

# SPA53

**(2) Maximum fair price eligible individual**

The term "maximum fair price eligible individual" means, with respect to a selected drug—

(A) in the case such drug is dispensed to the individual at a pharmacy, by a mail order service, or by another dispenser, an individual who is enrolled in a prescription drug plan under part D of subchapter XVIII or an MA–PD plan under part C of such subchapter if coverage is provided under such plan for such selected drug; and

(B) in the case such drug is furnished or administered to the individual by a hospital, physician, or other provider of services or supplier, an individual who is enrolled under part B of subchapter XVIII, including an individual who is enrolled in an MA plan under part C of such subchapter, if payment may be made under part B for such selected drug.

**(3) Maximum fair price**

The term "maximum fair price" means, with respect to a year during a price applicability period and with respect to a selected drug (as defined in section 1320f–1(c) of this title) with respect to such period, the price negotiated pursuant to section 1320f–3 of this title, and updated pursuant to section 1320f–4(b) of this title, as applicable, for such drug and year.

\*\*\*

**(5) Total expenditures**

The term "total expenditures" includes, in the case of expenditures with respect to part D of subchapter XVIII, the total gross covered prescription drug costs (as defined in section 1395w–115(b)(3) of this title). The term "total expenditures" excludes, in the case of expenditures with respect to part B of such subchapter, expenditures for a drug or biological product that are bundled or packaged into the payment for another service.

\*\*\*

**(d) Timing for initial price applicability year 2026**

Notwithstanding the provisions of this part, in the case of initial price applicability year 2026, the following rules shall apply for purposes of implementing the program:

(1) Subsection (b)(3) shall be applied by substituting "September 1, 2023" for ", with respect to each initial price applicability year, February 1 of the year that begins 2 years prior to such year".

# SPA54

(2) Subsection (b)(4) shall be applied—

(A) in subparagraph (A)(ii), by substituting "October 1, 2023" for "February 28 following the selected drug publication date with respect to such selected drug"; and

(B) in subparagraph (B), by substituting "August 1, 2024" for "November 1 of the year that begins 2 years prior to the initial price applicability year".

(3) Section 1320f–1 of this title shall be applied—

(A) in subsection (b)(1)(A), by substituting "during the period beginning on June 1, 2022, and ending on May 31, 2023" for "during the most recent period of 12 months prior to the selected drug publication date (but ending not later than October 31 of the year prior to the year of such drug publication date), with respect to such year, for which data are available"; and

(B) in subsection (d)(1)(A), by substituting "during the period beginning on June 1, 2022, and ending on May 31, 2023" for "during the most recent period for which data are available of at least 12 months prior to the selected drug publication date (but ending no later than October 31 of the year prior to the year of such drug publication date), with respect to such year".

(4) Section 1320f–2(a) of this title shall be applied by substituting "October 1, 2023" for "February 28 following the selected drug publication date with respect to such selected drug".

(5) Section 1320f–3(b)(2) of this title shall be applied—

(A) in subparagraph (A), by substituting "October 2, 2023" for "March 1 of the year of the selected drug publication date, with respect to the selected drug";

(B) in subparagraph (B), by substituting "February 1, 2024" for "the June 1 following the selected drug publication date"; and

(C) in subparagraph (E), by substituting "August 1, 2024" for "the first day of November following the selected drug publication date, with respect to the initial price applicability year".

(6) Section 1320f–4(a)(1) of this title shall be applied by substituting "September 1, 2024" for "November 30 of the year that is 2 years prior to such initial price applicability year".

---

**42 U.S.C. § 1320f–1: Selection of negotiation-eligible drugs as selected drugs**

**(a) In general**

Not later than the selected drug publication date with respect to an initial price applicability year, in accordance with subsection (b), the Secretary shall select and publish a list of—

(1) with respect to the initial price applicability year 2026, 10 negotiation-eligible drugs described in subparagraph (A) of subsection (d)(1), but not subparagraph (B) of such subsection, with respect to such year (or, all (if such number is less than 10) such negotiation-eligible drugs with respect to such year);

(2) with respect to the initial price applicability year 2027, 15 negotiation-eligible drugs described in subparagraph (A) of subsection (d)(1), but not subparagraph (B) of such subsection, with respect to such year (or, all (if such number is less than 15) such negotiation-eligible drugs with respect to such year);

(3) with respect to the initial price applicability year 2028, 15 negotiation-eligible drugs described in subparagraph (A) or (B) of subsection (d)(1) with respect to such year (or, all (if such number is less than 15) such negotiation-eligible drugs with respect to such year); and

(4) with respect to the initial price applicability year 2029 or a subsequent year, 20 negotiation-eligible drugs described in subparagraph (A) or (B) of subsection (d)(1), with respect to such year (or, all (if such number is less than 20) such negotiation-eligible drugs with respect to such year).

Subject to subsection (c)(2) and section 1320f–3(f)(5) of this title, each drug published on the list pursuant to the previous sentence and subsection (b)(3) shall be subject to the negotiation process under section 1320f–3 of this title for the negotiation period with respect to such initial price applicability year (and the renegotiation process under such section as applicable for any subsequent year during the applicable price applicability period).

**(b) Selection of drugs**

**(1) In general**

In carrying out subsection (a), subject to paragraph (2), the Secretary shall, with respect to an initial price applicability year, do the following:

(A) Rank negotiation-eligible drugs described in subsection (d)(1) according to the total expenditures for such drugs under parts B and D of

# SPA56

subchapter XVIII, as determined by the Secretary, during the most recent period of 12 months prior to the selected drug publication date (but ending not later than October 31 of the year prior to the year of such drug publication date), with respect to such year, for which data are available, with the negotiation-eligible drugs with the highest total expenditures being ranked the highest.

(B) Select from such ranked drugs with respect to such year the negotiation-eligible drugs with the highest such rankings.

\*\*\*

**(2) High spend part D drugs for 2026 and 2027**

With respect to the initial price applicability year 2026 and with respect to the initial price applicability year 2027, the Secretary shall apply paragraph (1) as if the reference to "negotiation-eligible drugs described in subsection (d)(1)" were a reference to "negotiation-eligible drugs described in subsection (d)(1)(A)" and as if the reference to "total expenditures for such drugs under parts B and D of subchapter XVIII" were a reference to "total expenditures for such drugs under part D of subchapter XVIII".

\*\*\*

## (c) Selected drug

### (1) In general

For purposes of this part, in accordance with subsection (e)(2) and subject to paragraph (2), each negotiation-eligible drug included on the list published under subsection (a) with respect to an initial price applicability year shall be referred to as a "selected drug" with respect to such year and each subsequent year beginning before the first year that begins at least 9 months after the date on which the Secretary determines at least one drug or biological product—

(A) is approved or licensed (as applicable)—

(i) under section 355(j) of title 21 using such drug as the listed drug; or

(ii) under section 262(k) of this title using such drug as the reference product; and

(B) is marketed pursuant to such approval or licensure.

\*\*\*

# SPA57

**(d) Negotiation-eligible drug**

**(1) In general**

For purposes of this part, subject to paragraph (2), the term "negotiation-eligible drug" means, with respect to the selected drug publication date with respect to an initial price applicability year, a qualifying single source drug, as defined in subsection (e), that is described in either of the following subparagraphs (or, with respect to the initial price applicability year 2026 or 2027, that is described in subparagraph (A)):

**(A) Part D high spend drugs**

The qualifying single source drug is, determined in accordance with subsection (e)(2), among the 50 qualifying single source drugs with the highest total expenditures under part D of subchapter XVIII, as determined by the Secretary in accordance with paragraph (3), during the most recent 12-month period for which data are available prior to such selected drug publication date (but ending no later than October 31 of the year prior to the year of such drug publication date).

\*\*\*

**(e) Qualifying single source drug**

**(1) In general**

For purposes of this part, the term "qualifying single source drug" means, with respect to an initial price applicability year, subject to paragraphs (2) and (3), a covered part D drug (as defined in section 1395w–102(e) of this title) that is described in any of the following or a drug or biological product for which payment may be made under part B of subchapter XVIII that is described in any of the following:

**(A) Drug products**

A drug—

(i) that is approved under section 355(c) of title 21 and is marketed pursuant to such approval;

(ii) for which, as of the selected drug publication date with respect to such initial price applicability year, at least 7 years will have elapsed since the date of such approval; and

(iii) that is not the listed drug for any drug that is approved and marketed under section 355(j) of such title.

\*\*\*

---

### 42 U.S.C. § 1320f–2: Manufacturer Agreements

#### (a) In general

For purposes of section 1320f(a)(2) of this title, the Secretary shall enter into agreements with manufacturers of selected drugs with respect to a price applicability period, by not later than February 28 following the selected drug publication date with respect to such selected drug, under which—

(1) during the negotiation period for the initial price applicability year for the selected drug, the Secretary and the manufacturer, in accordance with section 1320f–3 of this title, negotiate to determine (and, by not later than the last date of such period, agree to) a maximum fair price for such selected drug of the manufacturer in order for the manufacturer to provide access to such price—

(A) to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (A) of section 1320f(c)(2) of this title and are dispensed such drug (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed such drugs) during, subject to paragraph (2), the price applicability period; and

(B) to hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (B) of such section and are furnished or administered such drug during, subject to paragraph (2), the price applicability period;

\*\*\*

(3) subject to subsection (d), access to the maximum fair price (including as renegotiated pursuant to paragraph (2)), with respect to such a selected drug, shall be provided by the manufacturer to—

(A) maximum fair price eligible individuals, who with respect to such drug are described in subparagraph (A) of section 1320f(c)(2) of this title, at the pharmacy, mail order service, or other dispenser at the point-of-sale of such drug (and shall be provided by the manufacturer to the pharmacy, mail order service, or other dispenser, with respect to such maximum fair price eligible individuals who are dispensed such drugs), as described in paragraph (1)(A) or (2)(A), as applicable; and

(B) hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect

to such drug are described in subparagraph (B) of such section and are furnished or administered such drug, as described in paragraph (1)(B) or (2)(B), as applicable;

(4) the manufacturer submits to the Secretary, in a form and manner specified by the Secretary, for the negotiation period for the price applicability period (and, if applicable, before any period of renegotiation pursuant to section 1320f–3(f) of this title), and for section 1320f–1(f) of this title, with respect to such drug—

(A) information on the non-Federal average manufacturer price (as defined in section 8126(h)(5) of title 38) for the drug for the applicable year or period;

(B) information that the Secretary requires to carry out the negotiation (or renegotiation process) under this part; and

(C) information that the Secretary requires to carry out section 1320f–1(f) of this title, including rebates under paragraph (4) of such section; and

(5) the manufacturer complies with requirements determined by the Secretary to be necessary for purposes of administering the program and monitoring compliance with the program.

**(b) Agreement in effect until drug is no longer a selected drug**

An agreement entered into under this section shall be effective, with respect to a selected drug, until such drug is no longer considered a selected drug under section 1320f–1(c) of this title.

**(c) Confidentiality of information**

Information submitted to the Secretary under this part by a manufacturer of a selected drug that is proprietary information of such manufacturer (as determined by the Secretary) shall be used only by the Secretary or disclosed to and used by the Comptroller General of the United States for purposes of carrying out this part.

***

### 42 U.S.C. § 1320f–3: Negotiation and renegotiation process

**(a) In general**

For purposes of this part, under an agreement under section 1320f–2 of this title between the Secretary and a manufacturer of a selected drug (or selected drugs), with respect to the period for which such agreement is in effect and in accordance with subsections (b), (c), and (d), the Secretary and the manufacturer—

(1) shall during the negotiation period with respect to such drug, in accordance with this section, negotiate a maximum fair price for such drug for the purpose described in section 1320f–2(a)(1) of this title; and

(2) renegotiate, in accordance with the process specified pursuant to subsection (f), such maximum fair price for such drug for the purpose described in section 1320f–2(a)(2) of this title if such drug is a renegotiation-eligible drug under such subsection.

**(b) Negotiation process requirements**

**(1) Methodology and process**

The Secretary shall develop and use a consistent methodology and process, in accordance with paragraph (2), for negotiations under subsection (a) that aims to achieve the lowest maximum fair price for each selected drug.

**(2) Specific elements of negotiation process**

As part of the negotiation process under this section, with respect to a selected drug and the negotiation period with respect to the initial price applicability year with respect to such drug, the following shall apply:

**(A) Submission of information**

Not later than March 1 of the year of the selected drug publication date, with respect to the selected drug, the manufacturer of the drug shall submit to the Secretary, in accordance with section 1320f–2(a)(4) of this title, the information described in such section.

**(B) Initial offer by Secretary**

Not later than the June 1 following the selected drug publication date, the Secretary shall provide the manufacturer of the selected drug with a written initial offer that contains the Secretary's proposal for the maximum fair price of the drug and a concise justification based on the factors described in subsection (e) that were used in developing such offer.

# SPA61

**(C) Response to initial offer**

### (i) In general

Not later than 30 days after the date of receipt of an initial offer under subparagraph (B), the manufacturer shall either accept such offer or propose a counteroffer to such offer.

### (ii) Counteroffer requirements

If a manufacturer proposes a counteroffer, such counteroffer—

(I) shall be in writing; and

(II) shall be justified based on the factors described in subsection (e).

**(D) Response to counteroffer**

After receiving a counteroffer under subparagraph (C), the Secretary shall respond in writing to such counteroffer.

**(E) Deadline**

All negotiations between the Secretary and the manufacturer of the selected drug shall end prior to the first day of November following the selected drug publication date, with respect to the initial price applicability year.

**(F) Limitations on offer amount**

In negotiating the maximum fair price of a selected drug, with respect to the initial price applicability year for the selected drug, and, as applicable, in renegotiating the maximum fair price for such drug, with respect to a subsequent year during the price applicability period for such drug, the Secretary shall not offer (or agree to a counteroffer for) a maximum fair price for the selected drug that—

(i) exceeds the ceiling determined under subsection (c) for the selected drug and year; or

(ii) as applicable, is less than the floor determined under subsection (d) for the selected drug and year.

# SPA62

**(c) Ceiling for maximum fair price**

**(1) General ceiling**

**(A) In general**

The maximum fair price negotiated under this section for a selected drug, with respect to the first initial price applicability year of the price applicability period with respect to such drug, shall not exceed the lower of the amount under subparagraph (B) or the amount under subparagraph (C).

**(B) Subparagraph (B) amount**

An amount equal to the following:

**(i) Covered part D drug**

In the case of a covered part D drug (as defined in section 1395w–102(e) of this title), the sum of the plan specific enrollment weighted amounts for each prescription drug plan or MA–PD plan (as determined under paragraph (2)).

\*\*\*

**(C) Subparagraph (C) amount**

An amount equal to the applicable percent described in paragraph (3), with respect to such drug, of the following:

**(i) Initial price applicability year 2026**

In the case of a selected drug with respect to which such initial price applicability year is 2026, the average non-Federal average manufacturer price for such drug for 2021 (or, in the case that there is not an average non-Federal average manufacturer price available for such drug for 2021, for the first full year following the market entry for such drug), increased by the percentage increase in the consumer price index for all urban consumers (all items; United States city average) from September 2021 (or December of such first full year following the market entry), as applicable, to September of the year prior to the year of the selected drug publication date with respect to such initial price applicability year.

\*\*\*

**(2) Plan specific enrollment weighted amount**

For purposes of paragraph (1)(B)(i), the plan specific enrollment weighted amount for a prescription drug plan or an MA–PD plan with respect to a covered Part D drug is an amount equal to the product of—

(A) the negotiated price of the drug under such plan under part D of subchapter XVIII, net of all price concessions received by such plan or pharmacy benefit managers on behalf of such plan, for the most recent year for which data is available; and

(B) a fraction—

(i) the numerator of which is the total number of individuals enrolled in such plan in such year; and

(ii) the denominator of which is the total number of individuals enrolled in a prescription drug plan or an MA–PD plan in such year.

**(3) Applicable percent described**

For purposes of this subsection, the applicable percent described in this paragraph is the following:

**(A) Short-monopoly drugs and vaccines**

With respect to a selected drug (other than an extended-monopoly drug and a long-monopoly drug), 75 percent.

**(B) Extended-monopoly drugs**

With respect to an extended-monopoly drug, 65 percent.

**(C) Long-monopoly drugs**

With respect to a long-monopoly drug, 40 percent.

**(4) Extended-monopoly drug defined**

**(A) In general**

In this part, subject to subparagraph (B), the term "extended-monopoly drug" means, with respect to an initial price applicability year, a selected drug for which at least 12 years, but fewer than 16 years, have elapsed since the date of approval of such drug under section 355(c) of title 21 or since the date of licensure of such drug under section 262(a) of this title, as applicable.

**(B) Exclusions**

The term "extended-monopoly drug" shall not include any of the following:

(i) A vaccine that is licensed under section 262 of this title and marketed pursuant to such section.

(ii) A selected drug for which a manufacturer had an agreement under this part with the Secretary with respect to an initial price applicability year that is before 2030.

**(C) Clarification**

Nothing in subparagraph (B)(ii) shall limit the transition of a selected drug described in paragraph (3)(A) to a long-monopoly drug if the selected drug meets the definition of a long-monopoly drug.

**(5) Long-monopoly drug defined**

**(A) In general**

In this part, subject to subparagraph (B), the term "long-monopoly drug" means, with respect to an initial price applicability year, a selected drug for which at least 16 years have elapsed since the date of approval of such drug under section 355(c) of title 21 or since the date of licensure of such drug under section 262(a) of this title, as applicable.

**(B) Exclusion**

The term "long-monopoly drug" shall not include a vaccine that is licensed under section 262 of this title and marketed pursuant to such section.

**(6) Average non-Federal average manufacturer price**

In this part, the term "average non-Federal average manufacturer price" means the average of the non-Federal average manufacturer price (as defined in section 8126(h)(5) of title 38) for the 4 calendar quarters of the year involved.

**(d) Temporary floor for small biotech drugs**

In the case of a selected drug that is a qualifying single source drug described in section 1320f–1(d)(2) of this title and with respect to which the first initial price applicability year of the price applicability period with respect to such drug is 2029 or 2030, the maximum fair price negotiated under this section for such drug for such initial price applicability year may not be less than 66 percent of the average non-Federal average manufacturer price for such drug (as defined in subsection (c)(6)) for 2021 (or, in the case that there is not an average non-Federal average manufacturer price available for such drug for 2021, for the first full year

following the market entry for such drug), increased by the percentage increase in the consumer price index for all urban consumers (all items; United States city average) from September 2021 (or December of such first full year following the market entry), as applicable, to September of the year prior to the selected drug publication date with respect to the initial price applicability year.

**(e) Factors**

For purposes of negotiating the maximum fair price of a selected drug under this part with the manufacturer of the drug, the Secretary shall consider the following factors, as applicable to the drug, as the basis for determining the offers and counteroffers under subsection (b) for the drug:

**(1) Manufacturer-specific data**

The following data, with respect to such selected drug, as submitted by the manufacturer:

(A) Research and development costs of the manufacturer for the drug and the extent to which the manufacturer has recouped research and development costs.

(B) Current unit costs of production and distribution of the drug.

(C) Prior Federal financial support for novel therapeutic discovery and development with respect to the drug.

(D) Data on pending and approved patent applications, exclusivities recognized by the Food and Drug Administration, and applications and approvals under section 355(c) of title 21 or section 262(a) of this title for the drug.

(E) Market data and revenue and sales volume data for the drug in the United States.

**(2) Evidence about alternative treatments**

The following evidence, as available, with respect to such selected drug and therapeutic alternatives to such drug:

(A) The extent to which such drug represents a therapeutic advance as compared to existing therapeutic alternatives and the costs of such existing therapeutic alternatives.

(B) Prescribing information approved by the Food and Drug Administration for such drug and therapeutic alternatives to such drug.

(C) Comparative effectiveness of such drug and therapeutic alternatives to such drug, taking into consideration the effects of such drug and

therapeutic alternatives to such drug on specific populations, such as individuals with disabilities, the elderly, the terminally ill, children, and other patient populations.

(D) The extent to which such drug and therapeutic alternatives to such drug address unmet medical needs for a condition for which treatment or diagnosis is not addressed adequately by available therapy.

In using evidence described in subparagraph (C), the Secretary shall not use evidence from comparative clinical effectiveness research in a manner that treats extending the life of an elderly, disabled, or terminally ill individual as of lower value than extending the life of an individual who is younger, nondisabled, or not terminally ill.

\*\*\*

**(g) Clarification**

The maximum fair price for a selected drug described in subparagraph (A) or (B) of paragraph (1) 1 shall take effect no later than the first day of the first calendar quarter that begins after the date described in subparagraph 2 (A) or (B), as applicable.

---

### 42 U.S.C. § 1320f–4: Publication of maximum fair prices

**(a) In general**

With respect to an initial price applicability year and a selected drug with respect to such year—

(1) not later than November 30 of the year that is 2 years prior to such initial price applicability year, the Secretary shall publish the maximum fair price for such drug negotiated with the manufacturer of such drug under this part; and

(2) not later than March 1 of the year prior to such initial price applicability year, the Secretary shall publish, subject to section 1320f–2(c) of this title, the explanation for the maximum fair price with respect to the factors as applied under section 1320f–3(e) of this title for such drug described in paragraph (1).

**(b) Updates**

**(1) Subsequent year maximum fair prices**

For a selected drug, for each year subsequent to the first initial price applicability year of the price applicability period with respect to such drug,

with respect to which an agreement for such drug is in effect under section 1320f–2 of this title, not later than November 30 of the year that is 2 years prior to such subsequent year, the Secretary shall publish the maximum fair price applicable to such drug and year, which shall be—

(A) subject to subparagraph (B), the amount equal to the maximum fair price published for such drug for the previous year, increased by the annual percentage increase in the consumer price index for all urban consumers (all items; United States city average) for the 12-month period ending with the July immediately preceding such November 30; or

(B) in the case the maximum fair price for such drug was renegotiated, for the first year for which such price as so renegotiated applies, such renegotiated maximum fair price.

**(2) Prices negotiated after deadline**

In the case of a selected drug with respect to an initial price applicability year for which the maximum fair price is determined under this part after the date of publication under this section, the Secretary shall publish such maximum fair price by not later than 30 days after the date such maximum price is so determined.

---

## 42 U.S.C. § 1320f–6: Civil monetary penalties

### (a) Violations relating to offering of maximum fair price

Any manufacturer of a selected drug that has entered into an agreement under section 1320f–2 of this title, with respect to a year during the price applicability period with respect to such drug, that does not provide access to a price that is equal to or less than the maximum fair price for such drug for such year—

(1) to a maximum fair price eligible individual who with respect to such drug is described in subparagraph (A) of section 1320f(c)(2) of this title and who is dispensed such drug during such year (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed such drugs); or

(2) to a hospital, physician, or other provider of services or supplier with respect to maximum fair price eligible individuals who with respect to such drug is described in subparagraph (B) of such section and is furnished or administered such drug by such hospital, physician, or provider or supplier during such year;

shall be subject to a civil monetary penalty equal to ten times the amount equal to the product of the number of units of such drug so furnished, dispensed, or administered during such year and the difference between the price for such drug made available for such year by such manufacturer with respect to such individual or hospital, physician, provider of services, or supplier and the maximum fair price for such drug for such year.

\*\*\*

## (c) Violations of certain terms of agreement

Any manufacturer of a selected drug that has entered into an agreement under section 1320f–2 of this title, with respect to a year during the price applicability period with respect to such drug, that is in violation of a requirement imposed pursuant to section 1320f–2(a)(5) of this title, including the requirement to submit information pursuant to section 1320f–2(a)(4) of this title, shall be subject to a civil monetary penalty equal to $1,000,000 for each day of such violation.

## (d) False information

Any manufacturer that knowingly provides false information pursuant to section 1320f–5(a)(7) of this title shall be subject to a civil monetary penalty equal to $100,000,000 for each item of such false information.

## (e) Application

The provisions of section 1320a–7a of this title (other than subsections (a) and (b)) shall apply to a civil monetary penalty under this section in the same manner as such provisions apply to a penalty or proceeding under section 1320a–7a(a) of this title.

---

### 42 U.S.C. § 1320f–7: Limitation on administrative and judicial review

There shall be no administrative or judicial review of any of the following:

(1) The determination of a unit, with respect to a drug or biological product, pursuant to section 1320f(c)(6) of this title.

(2) The selection of drugs under section 1320f–1(b) of this title, the determination of negotiation-eligible drugs under section 1320f–1(d) of this title, and 1 the determination of qualifying single source drugs under section 1320f–1(e) of this title the 2 application of section 1320f–1(f) of this title,.

(3) The determination of a maximum fair price under subsection (b) or (f) of section 1320f–3 of this title.

# SPA69

(4) The determination of renegotiation-eligible drugs under section 1320f–3(f)(2) of this title and the selection of renegotiation-eligible drugs under section 1320f–3(f)(3) of this title.

# SPA70

**42 U.S.C. § 1395w–104: Beneficiary protections for qualified prescription drug coverage**

\* \* \*

**(b) Access to covered part D drugs**

\* \* \*

**(3) Requirements on development and application of formularies**

If a PDP sponsor of a prescription drug plan uses a formulary (including the use of tiered cost-sharing), the following requirements must be met:

\* \* \*

**(I) Required inclusion of selected drugs**

**(i) In general**

For 2026 and each subsequent year, the PDP sponsor offering a prescription drug plan shall include each covered part D drug that is a selected drug under section 1320f–1 of this title for which a maximum fair price (as defined in section 1320f(c)(3) of this title) is in effect with respect to the year.

**(ii) Clarification**

Nothing in clause (i) shall be construed as prohibiting a PDP sponsor from removing such a selected drug from a formulary if such removal would be permitted under section 423.120(b)(5)(iv) of title 42, Code of Federal Regulations (or any successor regulation).

\* \* \*

---

**42 U.S.C. § 1395w–111: PDP regions; submission of bids; plan approval**

\* \* \*

**2003 TEXT:**

**(i) Noninterference**

In order to promote competition under this part and in carrying out this part, the Secretary—

(1) may not interfere with the negotiations between drug manufacturers and pharmacies and PDP sponsors; and

(2) may not require a particular formulary or institute a price structure for the reimbursement of covered part D drugs.

**2023 TEXT:**

### (i) Noninterference

In order to promote competition under this part and in carrying out this part, the Secretary—

(1) may not interfere with the negotiations between drug manufacturers and pharmacies and PDP sponsors;

(2) may not require a particular formulary, except as provided under section 1395w–104(b)(3)(l) 4 of this title; and

(3) may not institute a price structure for the reimbursement of covered part D drugs, except as provided under part E of subchapter XI.

\*\*\*

---

### 42 U.S.C. § 1395w–114a: Medicare coverage gap discount program

\*\*\*

### (b) Terms of agreement

\*\*\*

### (4) Length of agreement

#### (A) In general

An agreement under this section shall be effective for an initial period of not less than 18 months and shall be automatically renewed for a period of not less than 1 year unless terminated under subparagraph (B).

#### (B) Termination

#### (i) By the Secretary

The Secretary may provide for termination of an agreement under this section for a knowing and willful violation of the requirements of the agreement or other good cause shown. Such termination shall not be effective earlier than 30 days after the date of notice to the manufacturer of such termination. The Secretary shall provide, upon request, a manufacturer with a hearing concerning such a termination, and such hearing shall take place prior to the effective date of the termination

with sufficient time for such effective date to be repealed if the Secretary determines appropriate.

**(ii) By a manufacturer**

A manufacturer may terminate an agreement under this section for any reason. Any such termination shall be effective, with respect to a plan year—

(I) if the termination occurs before January 30 of a plan year, as of the day after the end of the plan year; and

(II) if the termination occurs on or after January 30 of a plan year, as of the day after the end of the succeeding plan year.

**(iii) Effectiveness of termination**

Any termination under this subparagraph shall not affect discounts for applicable drugs of the manufacturer that are due under the agreement before the effective date of its termination.

**(iv) Notice to third party**

The Secretary shall provide notice of such termination to a third party with a contract under subsection (d)(3) within not less than 30 days before the effective date of such termination.

\*\*\*

---

**Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 11001, 136 Stat. at 1854**

**SEC. 11001. PROVIDING FOR LOWER PRICES FOR CERTAIN HIGH-PRICED SINGLE SOURCE DRUGS.**

\*\*\*

**(c) IMPLEMENTATION FOR 2026 THROUGH 2028.**—The Secretary of Health and Human Services shall implement this section, including the amendments made by this section, for 2026, 2027, and 2028 by program instruction or other forms of program guidance.